Case 1:11-cv-02472-JGK   Document 21   Filed 06/10/11   Page 1 of 77

Jeffrey M. Kurzon (#JM3388)
Jeff@KurzonStrauss.com
Jesse Strauss (#JS0212)
Jesse@KurzonStrauss.com
Attorneys for Plaintiffs and the Classes
Kurzon Strauss LLP
305 Broadway, 9 FL
New York, NY 10007
212-822-1496
www.KurzonStrauss.com



**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jonathan Tasini, Molly Secours, Tara Dublin, Richard Laermer and Billy Altman, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>AOL Inc., TheHuffintonPost.Com, Inc., Arianna Huffington and Kenneth Lerer<br><br>          Defendants. | **ECF CASE**<br><br>CIVIL ACTION: 11 CV 2472 (JGK)<br><br><br>FIRST AMENDED<br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiffs and putative Class Representatives Jonathan Tasini ("Tasini"), Molly Secours ("Secours"), Tara Dublin ("Dublin"), Richard Laermer ("Laermer") and Billy Altman ("Altman") (Tasini, Secours, Dublin, Laermer and Altman, together, the "Plaintiffs"), bring this action both individually and on behalf of damages and injunctive relief classes (collectively, "the Classes," as further defined herein), alleging as for their Class Action Complaint against Defendants AOL Inc. ("AOL"), TheHuffingtonPost.com, Inc. ("TheHuffingtonPost.com"), Arianna Huffington ("Huffington") and Kenneth Lerer ("Lerer") (AOL, TheHuffingtonPost.com,

Huffington and Lerer, together, and as the context so merits, the "Defendants"), upon personal knowledge as to themselves and as to all other matters upon information and belief, based on, *inter alia*, the investigation made by their attorneys signed below, as follows:

## PRELIMINARY STATEMENT

1.     This is an action claiming unjust enrichment and violations of New York's Deceptive Trade Practices Act due to Defendants' practice of obtaining valuable content and promotional services from Plaintiffs without providing compensation.

2.     This action seeks to vindicate the fundamental principle that the creators of value deserve to be compensated and, in particular, addresses the important issues of (a) whether in the digital age, digital media sites should be required to compensate the vetted creators of valuable content from which such sites derive substantial revenues and/or profits and (b) if so, how such vetted creators of content should be compensated.

3.     TheHuffingtonPost.com has been unjustly enriched by engaging in and continuing to engage in the practice of generating enormous profits by luring carefully-vetted contributors, with the prospect of "exposure" (which TheHuffingtonPost.com deceptively fails to verify or quantify), to provide valuable content at no cost to TheHuffingtonPost.com, while reaping the entirety of the financial gain derived from such content. As set forth below, this arrangement is atypical among digital media sites and a departure from customary practice and industry norms.

4.     Due to the valuable and uncompensated writings and promotional efforts of Plaintiffs and the Classes the cost of high quality content at the TheHuffingtonPost.com was, and continues to be, extremely low, making TheHuffingtonPost.com an extremely valuable internet property. As set forth below, when TheHuffingtonPost.com was recently acquired by AOL for approximately $315 million, the value added by the content and services provided by Plaintiffs

2

and the Classes to TheHuffingtonPost.com's price was at least $105 million, none of which was shared with Plaintiffs and the Classes.

5.     The injustice experienced by Plaintiffs and the Classes is compounded by the fact that Plaintiffs and the Classes were selected, and in many cases sought and/or solicited, by Defendants because of their ability to produce high quality, engaging content for the TheHuffingtonPost.com. The content provided by the Plaintiffs and the Classes drove, and continues to drive, internet traffic to TheHuffingtonPost.com, creating revenue for that enterprise, none of which is shared with Plaintiffs and the Classes. Plaintiffs and the Classes had access to internet tools that would have allowed them to use the content provided to TheHuffingtonPost.com to generate revenue for themselves but, because of Defendants' claim – which they refuse to verify – that more exposure is gained through the uncompensated contribution of content to TheHuffingtonPost.com, Plaintiffs and the Classes provided their content free of charge to Defendants and drove traffic to TheHuffingtonPost.com.

6.     By placing content on TheHuffingtonPost.com and publicizing that content as per Defendants' solicitation, rather than placing the content and directing traffic to their own websites, Plaintiffs were deprived of the revenue potentially generated by the content and were required to share exposure, if any, with TheHuffingtonPost.com.

7.     Moreover, Plaintiffs and the Classes were, and continue to be, asked to drive internet traffic to TheHuffingtonPost.com by using social networking media and advising other internet users of the valuable content they provided to TheHuffingtonPost.com, and by so doing increase internet traffic to TheHuffingtonPost.com.

8.     Finally, TheHuffingtonPost.com's continued assertion that it alone should be enriched by the valuable content and services provided by Plaintiffs and the Classes has the

broad detrimental effect of setting an artificially low price for the valuable digital content created by Plaintiffs and the Classes, depressing the market for such content and, over the long term, having a deleterious effect on the value of intellectual content being created by Plaintiffs and the Classes and on the ability of Plaintiffs and the Classes to support themselves as creators of high quality, engaging, digital content.

9.     Finally, TheHuffingtonPost.com's assertion that "writers write for free" serves to bring an ages-old falsity into the digital age, one this Court must adamantly reject.  Indeed, writers, like all creators and workers, deserve a share of the value they create and allowing such value to rest solely with Defendants is against equity and good conscience since it denies content providers even a drop of juice from the fruit of their labor.

10.     As set forth within, this action is instituted in accordance with and to remedy Defendants' inequitable, unfair, unlawful and unjust gain at the expense of the Plaintiffs and the Classes.  Plaintiffs and the Classes bring this action both individually and as a class action to recover damages and to enjoin Defendants' unlawful conduct as it affects the Classes.

11.     Defendants' mistreatment of Plaintiffs and the Classes was in fact indiscriminate, occurring in the regular course of Defendants' business throughout the United States and Canada, whereby Plaintiffs and the Classes were treated in the same general manner by Defendants.

12.     Plaintiffs and the Classes therefore seek to recover actual, statutory, treble, and other damages as well as declaratory, injunctive and equitable relief (as set forth below, declaratory and injunctive relief is only requested by the "Declaratory and Injunctive Relief Class"), together with reasonable attorneys' fees and costs.

**PARTIES**

**PLAINTIFFS AND THE CLASSES**

PLAINTIFF JONATHAN TASINI

13.     Plaintiff Tasini resides in New York County, New York.

14.     Tasini has worked as a union leader and organizer, a social activist, and a commentator and writer on topics including the changing nature of work, organized labor and broader economic and political issues.  From 1990 to April 2003, he served as president of the National Writers Union (United Auto Workers Local 1981).

15.     Tasini was the lead Plaintiff in *Tasini v. The New York Times*, the landmark electronic rights case that addressed the scope of copyrights belonging to thousands of freelance authors.  Mr. Tasini won that case on behalf of himself and a class of copyright holders at the United States Supreme Court.

16.     Tasini is a well-respected author and advocate with a readership and following independent of TheHuffingtonPost.com.   For the last 25 years, Tasini has written about labor and economics for a variety of newspapers and magazines including *The New York Times Magazine, The Atlantic, Business Week, The Washington Post, The Village Voice, The Los Angeles Times,* and *The Wall Street Journal*. Like most writers for these publications, Tasini was compensated for the content he provided.

17.     Tasini is the author of four books: *It's Not Raining, We're Getting Peed On: The Scam of the Deficit Crisis; The Audacity of Greed: Free Markets, Corporate Thieves and The Looting of America; The Edifice Complex: Rebuilding the American Labor Movement to Face the Global Economy, a critique and prescriptive analysis of the labor movement (1995);* and *They Get Cake, We Eat Crumbs: The Real Story Behind Today's Unfair Economy, An Average*

*Reader's Guide to the Economy (1997)*. Tasini is compensated for his writings through advances and royalties.

18.   Tasini also owns and operates a blog called "Working Life" (www.workinglife.org), which explores the economy and the labor movement. Tasini realized revenue from www.workinglife.org. Until 2010, Tasini did not select contributors to the Working Life blog but rather allowed members of the general public to provide content without regard for the ability to realize revenue.

19.   In 2006, Tasini ran for the Democratic nomination for United States Senator for New York. In 2010, Tasini ran for the Democratic nomination for New York's 15th Congressional District.

20.   In 2005, Tasini was selected to contribute to TheHuffingtonPost.com. Attesting to the value provided by Tasini to TheHuffingtonPost.com, Defendant Arianna Huffington personally invited Tasini to provide content to TheHuffingtonPost.com. Upon information and belief, Huffington knew of Tasini's ability (due, in part, to his political campaign) to garner internet traffic and thereby increase revenues for TheHuffingtonPost.com.

21.   From December 2005 forward, the TheHuffingtonPost.com realized revenue from the content Tasini provided. Each piece of content Tasini provided was accessible from the TheHuffingtonPost.com's home page by following a series of links. Tasini's content received numerous page views and generated revenues for TheHuffingtonPost.com. Nevertheless, despite the indeterminate number of page views received by Tasini's work, the majority of the benefit from the content that Tasini provided went to TheHuffingtonPost.com because many of the viewers would not have accessed TheHuffingtonPost.com but for Tasini's content.

22.    Moreover, despite its knowledge of the number of page views and revenue generated by each piece of content, TheHuffingtonPost.com has not disclosed the amount of page views Tasini received and the amount of revenue generated by the content Tasini provided.

23.    Tasini provided the following 216 pieces of content to TheHuffingtonPost.com:

- "Free Trade": The Capitulation Continues, Middle Class Weeps, posted on February 10, 2011 with 1,416 words and 1 Facebook share.
- The White House Hoists White Flag of Surrender, posted on February 9, 2011 with 947 words, 5 Facebook shares, 7 tweets, and 26 comments.
- Wall Street Pay 'Vaults to Record Altitude', posted on February 2, 2011 with 539 words, 30 Facebook "Likes," 15 Facebook shares, 1 tweet, and 3 comments.
- Our Demand: Increase Social Security Benefits, posted on January 25, 2011 with 732 words, 2 Facebook shares, 19 tweets, 14 e-mailed and 33 comments.
- Wal-Mart Whitewashing, posted on January 20, 2011 with 1,060 words, 2 Facebook shares, 13 tweets, 2 e-mailed and 4 comments.
- Richard Trumka v. Goldman Sachs: Different Visions of America, posted on January 19, 2011 with 664 words, 2 Facebook "Likes," 16 tweets, 2 e-mailed and 3 comments.
- Bernie Madoff To Replace Elizabeth Warren (Snark Alert), posted on January 14, 2011 with 1,193 words.
- Scalia et al Make Up Corporate Constitutional Rights, posted on January 14, 2011 with 863 words, 7 Facebook "Likes," 4 Facebook shares, 25 tweets, 1 e-mailed.
- *New York Times* Fuels War Against The Middle Class, posted on January 2, 2011 with 1180 words.
- Class Warfare and Korea "Free Trade": An Open Letter to UAW, My Union, posted on December 9, 2010 with 2,920 words, 7 Facebook shares, 29 tweets, 3 e-mailed and 2 comments.
- Catfood Commission Dead: Thank God, posted on December 3, 2010 with 1,080 words, 28 Facebook "Likes," 11 Facebook shares, 23 tweets, and 7 comments.
- It's Not Raining, We're Getting Peed On (4): The Scam of the Deficit Crisis, posted on December 2, 2010 with 1,526 words, 12 Facebook shares, 1 tweet, and 2 comments.
- It's Not Raining, We're Getting Peed On (3): The Scam of the Deficit Crisis, posted on December 1, 2010 with 1,450 words, 30 Facebook "Likes," 8 Facebook shares, 2 tweets, and 2 comments.
- It's Not Raining, We're Getting Peed On (2): The Scam of the Deficit Crisis, posted on November 30, 2010 with 1,226 words, 31 Facebook "Likes," 16 Facebook shares, 7 tweets, 1 e-mailed and 2 comments.
- It's Not Raining, We're Getting Peed On (1): The Scam of the Deficit Crisis, posted on November 29, 2010 with 1,441 words, 43 Facebook "Likes," 23 Facebook shares, 35 tweets, and 1 comment.

- Melissa Bean, Corporate Voice, Instead of Elizabeth Warren? No Way., posted on November 10, 2010 with 749 words, 8 Facebook "Likes," 3 Facebook shares, 7 tweets, and 3 comments.
- Kiss The Jobs and Wages Goodbye: Hello "Free Trade" Again posted on November 4, 2010 with 1,357 words, 2 Facebook shares and 5 tweets.
- The State of Labor -- Now Take to the Streets, posted on November 3, 2010 with 840 words, 9 Facebook "Likes," 5 Facebook shares and 4 tweets.
- A Lack of Seriousness, posted on November 2, 2010 with 1,029 words, 3 Facebook "Likes," 2 Facebook shares, 21 tweets, and 1 comment.
- "The rich guys don't want to pay the tax", posted on November 1, 2010 with 556 words, 8 Facebook "Likes," 4 Facebook shares, 24 tweets, and 5 comments.
- The Mozilo Method: Rob, Get Caught, Cut Deal, Die Rich, posted on October 28, 2010 with 1,548 words, 3 Facebook shares, 19 tweets, and 6 comments.
- The Republican Economic Propaganda Fraud Will Give Us A Lost Decade, posted on October 27, 2010 with 720 words, 8 Facebook "Likes," 5 Facebook shares, 22 tweets, and 4 comments.
- The Madness of U.S. Arms Sales: Good Business, Bad For Planet, posted on September 29, 2010 with 938 words, 4 Facebook shares, 4 tweets, and 1 comment.
- A Worldwide Revolt Against Poverty Wages, , posted on August 19, 2010 with 506 words, 8 Facebook "Likes," 6 Facebook shares, 9 tweets, and 14 comments.
- U.S.Wages as Cheap as India, , posted on August 18, 2010 with 518 words, 12 Facebook shares, 13 tweets, and 14 comments.
- Charles Rangel, Step Aside for the Good of the Party, posted on July 22, 2010 with 302 words, 3 Facebook shares, 3 tweets, and 23 comments.
- Not a Dime More for Afghanistan, posted on May 24, 2010 with 296 words, 2 Facebook shares, and 2 comments.
- Democrats Must Reject Goldman Sachs-Wall Street Money, posted on April 19, 2010 with 546 words, 2 Facebook shares, and 4 comments.
- CEO Greed: "Worse This Year Than It's Ever Been", posted on April 1, 2010 with 711 words, 5 Facebook shares and 1 comment.
- A Super Bowl Ad Peyton Manning Should Do, posted on February 5, 2010 with 335 words, 5 Facebook shares and 3 comments.
- Wall Street Democrats vs. the People, posted on February 3, 2010 with 1,332 words, 5 Facebook shares and 4 comments.
- They Still Don't Get It--Wall Street May Sue Obama, posted on January 18, 2010 with 370 words, 24 Facebook shares and 9 comments.
- The Health Insurance Industry: The Greatest Debt Threat, posted on December 14, 2009 with 764 words.
- I Try To Eat Less: The Story Of The Economy, posted on October 2, 2009 with 424 words and 4 comments.
- Priorities: Afghanistan Versus Worker Pay Hikes, posted on September 1, 2009 with 780 words.
- Senator Baucus: "Uniquely American" Is Not an Answer, posted on August 5, 2009 with 824 words and 5 comments.

- Victory at Smithfields: An Independence Day Symbol, posted on July 3, 2009 with 674 words and 4 comments.
- Why Is Rush Limbaugh Attacking Me?, posted on June 24, 2009 with 161 words and 2 comments.
- Screw The Center, posted on June 22, 2009 with 380 words and 2 comments.
- NY Sen Primary: Take the Pledge For Open Debate! (w/video), posted on June 15, 2009 with 391 words and 1 comment.
- I'm Running for the U.S. Senate in NY -- Here's Why, posted on June 11, 2009 with 695 words and 19 comments.
- The Dallas Principles: The Best Response To Prop 8, posted on May 26, 2009 with 293 words and 6 comments.
- Yes, Maria Bartiromo, There Is Class Warfare, posted on May 25, 2009 with 649 words and 97 comments.
- Labor Must Field a Primary Opponent to Blanche Lincoln, posted on April 8, 2009 with 402 words and 3 comments.
- Democratic Senators: Mess With EFCA, Face A Primary, posted on March 10, 2009 with 1,447 words and 8 comments.
- The Financial Times: Capitalism Has Failed, posted on April 9, 2009 with 1,210 words and 6 comments.
- Memo To Business: Only Unions Will Save Your Bottom Line, posted on March 2, 2009 with 905 words and 10 comments.
- Mr. President, Don't Cave: NAFTA Isn't About "Free Trade", posted on February 19, 2009 with 888 words.
- The Greed Continues: $121 Million For FOUR Merrill Execs, posted on February 11, 2009 with 697 words.
- The CEO Pay Caps Are A Mirage, posted on February 5, 2009 with 715 words and 6 comments.
- Banks Buying Both Parties To Get TARP Money--New Report, posted on February 4, 2009 with 462 words and 1 comment.
- A Demand: Banks Getting Our Money Can't Oppose Unions, posted on February 3, 2009 with 600 words and 8 comments.
- The Bigger Shame: The Rich Got Richer, posted on January 30, 2009 with 779 words and 2 comments.
- CEOs Boosting Their Pensions While Workers Pensions go Poof, posted on January 26, 2009 with 559 words and 26 comments.
- Gillibrand: Who Cares, Stop Whining, Organize!, posted on January 23, 2009 with 1,076 words and 1 comment.
- NY Senate 2010: A Primary Challenge Almost Certain, posted on January 16, 2009 with 1,423 words and 2 comments.
- Forget Social Security Taxes: Timothy Geithner, Robert Rubin and Citigroup, posted on January 15, 2009 with 919 words and 1 comment.
- Robert Rubin Gets His Pink Slip: Good Riddance, posted on January 10, 2009 with 693 words and 10 comments.
- A Choice: "Bi-Partisanship" Vs. Real Healthcare For Americans, posted on January 9, 2009 with 560 words and 11 comments.

- Cut Social Security, Don't Tax The Rich: Where Is The Outrage?, posted on January 8, 2009 with 560 words and 10 comments.
- President-Elect Obama, Tax The Rich To Keep Deficits Lower, posted on January 7, 2009 with 1,379 words and 16 comments.
- Conspiracy of Silence: Wage Collapse Caused Crisis, posted on January 6, 2009 with 666 words and 18 comments.
- Governor Paterson, Have You Lost Your Moral Compass?, posted on December 17, 2008 with 1,118 words and 1 comment.
- Blacking Out Single-Payer--And Killing The Auto Industry, posted on December 15, 2008 with 625 words and 4 comments.
- President-Elect Obama, Some "Unconventional" Economic Thinkers To Consider, posted on December 12, 2008 with 849 words and 4 comments.
- Boycott McDonald's: Every Big Mac Eaten Attacks Workers, posted on December 10, 2008 with 692 words and 21 comments.
- Robert Rubin: Coward or Liar -- or Both? , posted on November 29, 2008 with 1,457 words and 55 comments.
- AIG Pulls Fast One -- "Cash Awards" Going To Managers, posted on November 28, 2008 with 456 words and 246 comments.
- John Edwards for Labor Secretary, posted on November 24, 2008 with 2,249 words and 43 comments.
- You Got Screwed, CEOs Made a Fortune, posted on November 20, 2008 with 886 words and 15 comments.
- Big Media: Screw the Auto Workers, posted on November 19, 2008 with 922 words and 78 comments.
- It's Bozo The Clown's Fault, Not The "Free Market", posted on November 14, 2008 with 776 words and 50 comments.
- The Right Way To Bailout The Auto Industry, posted on November 12, 2008 with 1,172 words and 33 comments.
- We Have Plenty Of Money -- The Rich Are Killing Us, posted on November 11, 2008 with 802 words and 23 comments.
- How Your Tax Dollars Are Paying Bank Execs Billions, posted on October 31, 2008 with 925 words and 6 comments.
- We, The People, Should Run Freddie Mac and Fannie Mae, posted on September 11, 2008 with 499 words and 10 comments.
- Labor's Election Ground War -- And How The Media Is Missing It, posted on August 25, 2008 with 1,121 words and 1 comment.
- Is Joe Biden Good For Labor? Mostly, Yes, posted on August 23, 2008 with 1,640 words and 4 comments.
- Draft Copy of Democratic Party Platform, posted on August 7, 2008 with 1,719 words and 19 comments.
- Corporations Using WORKERS Money For CEO PENSIONS, posted on August 4, 2008 with 211 words and 3 comments.
- Why Are Democrats Taking Money From Wal-Mart?, posted on August 1, 2008 with 1,836 words and 4 comments.

- U.S. Businesses Hiding $58 Billion of *Your* Money, posted on July 29, 2008 with 321 words and 2 comments.
- The Minimum Wage: A Disgrace and a Scandal, posted on July 24, 2008 with 1,196 words and 17 comments.
- The Rich Get Richer: Time for a Change, posted on July 23, 2008 with 574 words and 19 comments.
- Into The Abyss: Millions Face Old-Age With No Savings, posted on July 10, 2008 with 1,216 words.
- Paying Off Clinton's Debt: Not A Dime For Mark Penn, posted on July 9, 2008 with 1,003 words and 19 comments.
- War, The Economy And The Death of A Man, posted on June 30, 2008 with 925 words and 1 comment.
- BREAKING: Corporations Admit Trade Is About Lower Wages (Duh) , posted on June 18, 2008 with 607 words and 7 comments.
- Hillary's Demise Was All About Iraq, posted on May 23, 2008 with 701 words and 69 comments.
- Super Delegates Might Tip Over Trade, posted on May 1, 2008 with 581 words.
- Pandering on Energy: Clinton/McCain--Yes, Obama--No, posted on April 30, 2008 with 1,132 words and 45 comments.
- Jimmy Carter: Talking Can Lead to Peace, posted on April 28, 2008 with 737 words and 4 comments.
- On Passover: Thank You, Jimmy Carter, posted on April 21, 2008 with 840 words and 11 comments.
- Let Them Eat Cake: Now Here Are Real Elitists, posted on April 16, 2008 with 387 words and 5 comments.
- Will So-Called "Free Trade" Cost Republicans A Maine Senate Seat?, posted on April 9, 2008 with 426 words and 3 comments.
- The Elites Rally For So-Called "Free Trade", posted on April 8, 2008 with 1,262 words and 4 comments.
- General Electric: Killing Chinese Workers For A Cleaner Environment, posted on April 1, 2008 with 751 words and 12 comments.
- Sen. Clinton, You Want *Who* To Fix Our Economic Mess?, posted on March 25, 2008 with 1,438 words and 62 comments.
- Some Super-delegates Are Using Their Noggins, posted on March 7, 2008 with 461 words and 1 comment.
- A Super Delegate Strategy--With Content, On Trade, posted on March 4, 2008 with 639 words and 3 comments.
- Partisans, Get Real: Neither Clinton or Bad Good on Trade, posted on February 28, 2008 with 745 words and 15 comments.
- What Will Labor Do with Edwards Out of the Race?, posted on January 31, 2008 with 1,029 words and 7 comments.
- Edwards – The Al Gore of Economic Struggle, posted on January 30, 2008 with 333 words and 21 comments.
- WAL-MART: Recession Ambulance Chasers, posted on January 29, 2008 with 426 words and 4 comments.

- Is CEO Greed Waning? Just a Little – And Not By Choice, posted on January 28, 2008 with 860 words and 3 comments.
- The WAL-MART Divide-And-Conquer Strategy, posted on January 25, 2008 with 804 words and 15 comments.
- Is Michael Cieply the Worst Reporter Ever?, posted on January 24, 2008 with 1,650 words and 5 comments.
- The Directors Guild Deal: Good or Bad? First Analysis, posted on January 18, 2008 with 1,790 words and 3 comments.
- How Can Labor People Hurt the Writers Strike?, posted on January 9, 2008 with 1,162 words and 6 comments.
- We Are Winning on Trade – Pick Your Candidate, posted on December 28, 2007 with 3,403 words and 4 comments.
- John Edwards's Closing Argument – And Why the Media Doesn't Get It, posted on December 19, 2007 with 686 words and 44 comments.
- Victoria's Secret, Slave Labor and So-Called "Free Trade," posted on November 27, 2007 with 1,028 words, 2 e-mailed and 19 comments.
- How Big Media Breaks the Law on "Survivor" Island, posted on November 26, 2007 with 1,072 words and 9 comments.
- Iowans Think John Edwards is Right on Trade, posted on November 21, 2007 with 683 words and 16 comments.
- Memo to Sen. Obama and Other Dems: There is No Social Security Crisis, posted on November 15, 2007 with 542 words and 8 comments.
- Are Democrats Blowing A Chance in a Generation on Trade, posted on November 9, 2007 with 1,518 words and 14 comments.
- Greed is Good: How Big Media Wants to Steal from its Workers, posted on November 1, 2007 with 1,021 words and 8 comments.
- The Great Retraining Lie, posted on October 31, 2007 with 1,117 words and 16 comments.
- Will Democrats Follow John Edwards on Trade and Win Elections?, posted on October 29, 2007 with 1,262 words and 49 comments.
- Remembering Paul Wellstone – Our Collective Loss Five Years Ago, posted on October 25, 2007 with 1,522 words, 1 e-mailed and 15 comments.
- George Bush and the Lies About the Economy, posted on October 12, 2007 with 1,268 words and 9 comments.
- Labor's Choice for President (Part IV): SEIU Netutral, posted on October 9, 2007 with 779 words and 2 comments.
- Democratic Golden Opportunity: Republican Voters Oppose "Free Trade," posted on October 5, 2007 with 953 words and 30 comments.
- Democrats Can't Capitulate on Economic Fairness, Either, posted on September 7, 2007 with 1,455 words and 13 comments.
- The Plan to Protect Homeowners, Not Hedge Funds, posted on August 2, 2007 with 521 words and 15 comments.
- Danger from China: Thanks Milton Friedman and the New York Times, posted on August 16, 2007 with 746 words and 19 comments.

- Guns Versus Butter – Our Real Economic Challenge, posted on August 13, 2007 with 1,393 words and 12 comments.
- Major Unions Set to Endorse – But Will They?, posted on August 7, 2007 with 1,083 words and 5 comments.
- John Edwards – On Trade, Leading the Way Again, posted on August 6, 2007 with 1,177 words and 5 comments.
- Edwards Driving Democratic Party Debate – WSJ Admits, posted on July 20, 2007 with 904 words and 8 comments.
- Why Some Democrats Can't be Trusted on Trade, posted on July 18, 2007 with 1,212 words and 2 comments.
- Does Tom Friedman Have a Clue About China? No, posted on July 17, 2007 with 593 words and 4 comments.
- Bar the Doors! The Protectionists Are Coming!, posted on July 8, 2007 with 474 words and 16 comments.
- CEOs Panic on Trade – But They Are Organizing the Counter-Attack, posted on July 6, 2007 with 2,035 words and 8 comments.
- Hillary Clinton Opposes South Korea "Free Trade," posted on June 11, 2007 with 539 words and 2 comments.
- Single-Payer Health = Reduced Global Warming, posted on June 8, 2007 with 562 words and 4 comments.
- Beating Up Nannies: The Unseen Abuse of Domestic Workers, posted on June 1, 2007 with 1,362 words and 3 comments.
- The World Bank: From Bad to Worse, posted on May 30, 2007 with 606 words and 5 comments.
- MSM Discovers: Globalization Creates Inequality –Duh, posted on May 24, 2007 with 1,057 words and 6 comments.
- Chrysler: Single-Payer Health Care, CEO Pay?, posted on May 15, 2007 with 799 words and 6 comments.
- Paul Krugman Gets it Wrong on Trade –Sadly, posted on May 14, 2007 with 1,356 and 5 comments.
- Wolfowitz's "Greed is Good" Defense, posted on May 1, 2007 with 449 words and 7 comments.
- The Coming Attack Against Auto Workers – And You, posted on April 25, 2007 with 1,158 words and 9 comments.
- Are There Four Anti-Union Democratic Senators?, posted on April 19, 2007 with 844 words and 8 comments.
- Wal-Mart Stock to be Dumped by the Norwegian Government, posted on April 6, 2007 with 1,215 words and 3 comments.
- How CEOs are Robbing America – And Enriching Themselves, posted on April 3, 2007 with 1,791 words and 17 comments.
- GDP Up, But Class Warfare Continues, posted on March 29, 2007 with 511 words and 16 comments.
- No More Blank Checks: Vote No on Iraq War Money, posted on March 20, 2007 with 463 words and 6 comments.

- "60 Minutes": Anti-Union or Just Dumb?, posted on March 12, 2007 with 1,405 words and 6 comments.
- The End of So-Called "Free Trade," posted on March 9, 2007 with 913 word and 5 comments.
- Charles Rangel, Don't Make Bad Deals on "Free Trade," posted on March 6, 2007 with 1,055 words and 1 comment.
- The Candidate Labor Should Support for President, posted on March 5, 2007 with 1,678 words and 18 comments.
- Republicans Admit: Labor Rights in the U.S. the Worst, posted on March 1, 2007 with 736 words and 9 comments.
- Baseball Disses Marvin Miller Again, posted on February 27, 2007 with 497 words and 2 comments.
- U.S. "Free Trade": Death, Drugs and Dispair in Colombia, posted on February 22, 2007 with 2,551 words and 6 comments.
- The New York Times; More Lies About the Economy, posted on February 16, 2007 with 1,022 words and 21 comments.
- Will a New Labor-Business Alliance Solve Health Care Crisis?, posted on February 7, 2007 with 799 words and 4 comments.
- The New York Times Shills for Corporate Trade, posted on February 2, 2007 with 1,280 words and 7 comments.
- Breaking: McGovern's End the Occupation Legislation, posted on January 31, 2007 with 1,160 words and 5 comments.
- Democrats Should Make Bush Pay Big for War-Funding, posted on January 30, 2007 with 421 words and 17 comments.
- Hillary Clinton Lied to Keith Olberman, posted on January 25, 2007 with 724 words and 41 comments.
- Why Were Democrats Applauding?, posted on January 24, 2007 with 837 words and 45 comments.
- Progressives Introduce End the War Legislation, posted on January 17, 2007 with 330 words and 6 comments.
- The New Republican Raid on the Treasury, posted on January 11, 2007 with 654 words and 8 comments.
- Why Does Charlie Rangel Want to Coddle the Rich?, posted on January 8, 2007 with 521 words and 5 comments.
- Do Democrats Have the Courage to Buck the "Free Market?", posted on January 2, 2007 with 1,848 words and 5 comments.
- Ford Prolonged Our Nightmare, Impeaching Bush Will Heal Our Nation, posted on December 29, 2006 with 979 words and 21 comments.
- Goldman Sachs, Can You Spare Some Workers a Couple of Billion, posted on December 19, 2006 with 671 words and 10 comments.
- The Education Lie Part II: The Fields of Dreams of Economic Theory, posted on December 15, 2005 with 912 words and 19 comments.
- Goldman Sachs Owes You Money, posted on December 14, 2006 with 749 words and 4 comments.

- The Great Lie: Education Will Save Us, posted on December 13, 2006 with 796 words and 50 comments.
- Fool's Gold: Raising the Minimum Wage, posted on December 7, 2006 with 663 word and 22 comments.
- Democrats: Get at Real Economic Agenda or Become the Minority Party Again, posted on December 5, 2006 with 1,600 words and 19 comments.
- The Dawn of the Next Corporate Crime Wave, posted on December 1, 2006 with 604 words and 5 comments.
- Greed is Good is Back, posted on November 10, 2006 with 401 words and 13 comments.
- The End of So-Called "Free Trade" Has Arrived, posted on November 8, 2006 with 673 words and 14 comments.
- "Why Aren't Democrats Embracing the Word 'Union'?", posted on November 7, 2006 with 748 words and 14 comments.
- Cut-Off War Funding: We Have the Power, posted on November 2, 2006 with 457 with 15 comments.
- Do Democrats Know the System is Broken?, posted on October 30, 2006 with 773 words and 26 comments.
- Remembering Paul Wellstone, posted on October 25, 2006 with 810 words and 25 comments.
- Nancy Pelosi, Stop Drinking at the K Street Trough, posted on October 23, 2006 with 493 words and 11 comments.
- Health Care Crisis? Your Fault, posted on October 18, 2006 with 384 words and 7 comments.
- Corporations Working Hard to Keep Chinese Slave Labor, posted on October 13, 2006 with 80 words and 15 comments.
- Lou Dobbs Versus Robert Reich: Who's the Corporate Shill?, posted on October 11, 2006 with 1,012 word and 36 comments.
- Lieberman is No Friend of Israel, posted on October 6, 2006 with 690 words and 29 comments.
- How Bush Just Screwed 8 Million Workers, posted on October 3, 2006 with 680 words and 3 comments.
- A November 8th Coalition: Take Back Our Country, posted on September 29, 2006 with 484 words and 21 comments.
- Dems and Lobbyists, posted on September 27, 2006 with 597 words and 2 comments.
- Hillary is Finished If. . ., posted on September 18, 2006 with 805 words and 15 comments.
- Hillary: Cluster Bombs Are Not Village- Friendly, posted on September 8, 2006 with 297 words and 7 comments.
- MoveOn Rank-And-File Votes in Large Numbers to Dump Hillary, posted on April 5, 2006 with 448 words and 22 comments.
- MoveOn Polling in Hillary Race, posted on August 31, 2006 with 197 words and 38 comments.
- Hillary is Making Us All Sicker, posted on August 24, 2006 with 534 words and 10 comments.

- Hillary, Thanks for Raising Our Taxes, posted on August 23, 2006 with 458 words and 11 comments.
- The Times and NY Post Agree: Hillary, Stop Hiding, posted on August 21, 2006 with 3187 words with 27 comments.
- How Big Media Censors Political Debate, posted on August 3, 2006 with 1,078 words and 14 comments.
- The Children of Qana and Our Politicians Culpability, posted on August 1, 2006 with 804 words and 9 comments.
- The DLC Won't Talk About Corporate Power, posted on July 25, 2006 with 1,078 words and 31 comments.
- First Joe, Now Voters Ready to Reject Hillary Over War, posted on July 21, 2006 with 735 words and 18 comments.
- Exposing the Clinton Charade (Part 1), posted on July 26, 2006 with 1,580 words and 31 comments.
- When It Comes to Sucking Up to Power, Progressives Are Censors, Too, posted on June 14, 2006 with 849 words and 10 comments.
- Zogby Says: Hillary Clinton Can Lose Re-Election, posted on June 2, 2006 with 564 word and 70 comments.
- Immigration, posted on April 13, 2006 with 567 words and 17 comments.
- Where is the Soul of the Democratic Party, posted on April 1, 2006 with 258 words and 22 comments.
- Why Jews Must Speak Up on Palestine, posted on March 24, 2006 with 1,102 words and 52 comments.
- Welfare "Reform": The NY Times Perpetuates a Myth, posted on March 20, 2006 with 658 words and 5 comments.
- Democrats Shilling for Wal-Mart, posted on March 3, 2006 with 515 words and 14 comments.
- Will the Troops Give Democrats Some Spine?, posted on February 28, 2006 with 588 words and 27 comments.
- Sen. Coburn, Ask the Rich to Sacrifice First, posted on February 13, 2006 with 522 words and 6 comments.
- Raising the Peoples' Expectations, posted on February 10, 2006 with 627 words and 14 comments.
- Hillary and Wal-Mart: A Love Story, posted on February 7, 2006 with 507 words and 31 comments.
- Democrats Blowing It Again, posted on February 1, 2006 with 540 words and 8 comments.
- Real Corruption, posted on January 27, 2006 with 537 words and 6 comments.
- Fire Rumsfeld, posted on January 11, 2006 with 181 words and 42 comments.
- Hillary Panders Again, posted on December 7, 2005 with 365 words and 32 comments.
- Why I'm Running Against Hillary, posted on December 5, 2005 with 769 words and 62 comments.

24.     Tasini worked, on average, between one and ten hours on each of the above pieces of content provided to TheHuffingtonPost.com.

25.     Despite the fact that the 216 pieces of content listed above generated revenue for TheHuffingtonPost.com, Tasini has never been compensated by TheHuffingtonPost.com.

26.     TheHuffingtonPost.com encouraged Tasini to circulate links to the content he provided to TheHuffingtonPost.com through his social networking media to his over 4,000 Facebook "friends," hundreds of Twitter "followers" and his email list containing in excess of 10,000 addresses, which he did.  Tasini's efforts to publicize his work drew substantial internet traffic to TheHuffingtonPost.com.

27.     Tasini was unaware of the of TheHuffingtonPost.com's Browse-wrap Terms when he provided content to TheHuffingtonPost.com.

28.     Tasini provided content to TheHuffingtonPost.com through its "backstage" website located at http://blogger.huffingtonpost.com. The Browse-wrap Terms were not visible on that website.

<u>PLAINTIFF MOLLY SECOURS</u>

29.     Plaintiff Molly Secours resides in Nashville, Tennessee.

30.     Secours is a writer, filmmaker and speaker who focuses her artistic efforts to effect social change and public policy regarding inequities in health care, education and criminal justice.

31.     Secours is a well-respected author, filmmaker and advocate with a readership and following independent of TheHuffingtonPost.com.  Secours' film company, "One Woman Show Productions" has brought national recognition to her work in the world of social justice. Her most recent documentary "Faces of TennCare: Putting a Human Face on Tennessee's Health

Care Failure" has aired on the Documentary Channel and received praise from Congressman John Conyers and the late Senator Edward Kennedy. Secours' writings have appeared in over 50 mainstream and internet magazines and newspapers and she has appeared on local and national television and radio talk shows.

32.     Secours provides content to www.Redroom.com ("Redroom"), a donor funded site for writers, authors and essayists. Secours has an established presence on that site. Secours also has a personal website at www.MollySecours.com.

33.     Secours currently receives per article compensation from various local publications, for example, Nashville City Paper and the Tennessee Tribune where she earns $100 to $200 per column, as well as being a paid contributor for internet publications such as Znet where she earns a fee of $100 per article.

34.     In late 2009, Secours was recommended to write for the TheHuffingtonPost.com by one of TheHuffingtonPost.com existing contributors. Secours contacted TheHuffingtonPost.com's editors and after reviewing her on-line writings, Secours was offered the opportunity to contribute to TheHuffingtonPost.com within several days.

35.     Based on her affiliation with Redroom, which notifies content providers of the amount of page views generated by each piece of content, Secours estimates that each piece of content provided to TheHuffingingPost.com generated between 500 and 700 page views. Secours was never informed of the number of page views her content generated for TheHuffingtonPost.com despite the fact that TheHuffingtonPost.com was aware of that information.

36.     From late 2009 forward, the TheHuffingtonPost.com realized revenue from the content provided by Secours. Each piece of content Secours provided was accessible from the

TheHuffingtonPost.com's home page by following a series of links. Secours' content received numerous page views and generated revenues for TheHuffingtonPost.com. Nevertheless, despite the indeterminate number of page views received by Secours' work, the majority of the benefit from the content that Secours provided went to TheHuffingtonPost.com because many of the viewers would not have accessed TheHuffingtonPost.com but for Secours' content.

37.    Moreover, despite its knowledge of the number of page views and revenue generated by each piece of content, TheHuffingtonPost.com has not disclosed the amount of page views Secours received and the amount of revenue generated by the content Secours provided.

38.    Secours provided the following 23 pieces of content to TheHuffingtonPost.com:

- Nashville Youth Take to the Streets for Historic MLK March, posted on January 17, 2011, with 88 words, 3 Facebook "Likes," and 6 tweets.
- Horsing Around With Gangs: Horse Whisperer Meets Gang Advocate, posted December 20, 2010 with 913 words, 18 Facebook "Likes," 12 Facebook shares, 13 Tweets and 3 comments.
- When a 'Bad White People Day' is Just Another Tuesday, posted on November 29, 2010 with 274 Facebook "Likes," 56 Facebook shares, 13 tweets and 25 comments.
- Think Public Transportation isn't a Social Justice Issue? posted on November 11, 2010 with 1,105 words, 193 Facebook "Likes," 72 Facebook shares, 29 Tweets, 1 e-mail and 15 comments.
- Raceaholics Anonymous: A 12 Step Program for the Team Party, posted on September 23, 2010 with 1,214 words, 75 Facebook "Likes," 18 Facebook shares, 7 Tweets and 14 comments.
- God Interview II: Sarah Palin Gets Equal Time with God and Explains Tea Party, posted on September 8, 2010 with 304 Facebook "Likes," 124 Facebook shares, 11 Tweets and 39 comments.
- Katie Couric Interviews God About Ground Zero Mosque, posted on August 31, 2010 with 1,824 words, 330 "Likes," 127 Facebook shares, 14 Tweets and 66 comments.
- Cancer, Basil Marceaux & Tennessee's 'Goober' natorial Spectacle, posted on August 23, 2010 with 812 words, 19 Facebook "Likes," 8 Facebook shares, 21 Tweets and 9 comments.
- The Trouble with "Black Folks," posted on August 13, 2010 with 1,104 words, 47 Facebook "Likes," 20 Facebook shares, 9 Tweets and 84 comments.
- When Art and Activism Spill Over, posted on July 13, 2010 with 921 words, 27 Facebook shares, 12 tweets and 4 comments.

- Blabbers Remorse, White Entitlement and General Stanley McChrystal's Ego, posted on June 23, 2010 with 758 words, 42 Facebook "Likes," 14 Facebook shares, 14 Tweets and 43 comments.
- Rural Youth Need to be Seen and Heard, posted on June 16, 2010 with 906 words, 35 Facebook "Likes," 14 Facebook shares and 10 comments.
- Fear and Loathing in Tennessee, Arizona and All Points North and South, posted on June 8, 2010 with 949 words, 23 Facebook "Likes," 7 Facebook shares and 23 comments.
- Disposable Children: Nashville Teen Faces Life in Prison, posted on May 24, 2010 with 873 words, 50 Facebook "Likes," 11 Facebook shares and 25 comments.
- Nashville Floods: The Inequities of a Natural·Disaster Are Usually Man-Made, posted on May 11, 2010 with 931 words, 20 Facebook shares and 2 comments.
- Nashville: Not Just Flooded with Water; But Civil Rights Memories, posted on May 2, 2010 with 913 words, 16 Facebook "Likes" and 9 Facebook shares.
- White Washing and Dressing Up History: Grooming Southern Belles For the Tea-Party Movement, posted on April 19, 2010 with 1,128 words, 29 Facebook "Likes," 14 Facebook shares and 14 comments.
- Colicky Babies, Tea Party Tantrums & Comparison, posted on March 28, 2010 with 774 words, with 29 Facebook shares and 29 comments.
- Cancer, John Mayer and "Please Don't Call me a Racist": Diffusing the R-Bomb, posted on February 15, 2010 with 2,152 words, 29 Facebook shares, 1 e-mail and 27 comments.
- White People "Passing": John Mayer, Racism and the Arrogance of Whiteness, posted on February 11, 2010 with 146 Facebook shares and 462 comments.
- Hey Stranger, Gotta Match? New York Attorney/Activist/Mother Needs Bone Marrow Transplant, posted on February 8, 2010 with 480 words, 49 Facebook shares and 6 comments.
- Illness Speaks: Healing from Cancer, Addition and Racism in the Age of Rush Limbaugh, posted on January 7, 2010 with 1,251 words and 18 comments.
- Okeedoked in Tennessee: How to Avoid Serious Discussion About Health Care Reform: Southern Style, posted on November 11, 2009 with 646 words and 7 comments.

39.    Secours worked and spent considerable time on each of the above pieces of content provided to TheHuffingtonPost.com.

40.    Despite the fact that the 23 pieces of content listed above generated revenue and/or profit for TheHuffingtonPost.com, Secours has never been compensated by TheHuffingtonPost.com.

41.    At the request of TheHuffingtonPost.com, Secours promoted the content she provided by (a) sending links to her personal e-mail lists (consisting of over 1,000 contacts), (b)

posting links to the content provided on Facebook and Twitter, (c) publicizing the content provided on her weekly radio show "Freestyle," a Nashville public radio talk show, and (4) referencing the content provided at her speaking engagements around the country.

42.     Secours was unaware of the of TheHuffingtonPost.com's Browse-wrap Terms when she provided content to TheHuffingtonPost.com.

43.     Secours provided content to TheHuffingtonPost.com through its "backstage" website located at http://blogger.huffingtonpost.com. The Browse-wrap Terms were not visible on that website.

PLAINTIFF TARA DUBLIN

44.     Plaintiff Tara Dublin resides in the State of Washington.

45.     Dublin is a single mother, freelancer writer and a voiceover artist. From 2004-2009 Dublin was a DJ on KNRK in Portland, Oregon.

46.     Dublin's writings address music and entertainment, often with a humorous approach.

47.     Dublin is a well respected author with a readership and following independent of TheHuffingtonPost.com.  She has been published in the Oregonian and maintains her own blog at www.taradublinonline.com.

48.     In July of 2010, Dublin entered a contest she found on TheHuffingtonPost.com's website to win a chance to cover the AIDS Life Ball in Vienna. Dublin did not win, but TheHuffingtonPost.com's judging committee liked her work and she was asked to contribute content to TheHuffingtonPost.com.

49.     TheHuffingtonPost.com declined to publish two of Dublin's pieces that addressed gay rights.

50.     From July 2010 forward, the TheHuffingtonPost.com realized revenue from the content Dublin provided. Each piece of content Dublin provided was accessible from the TheHuffingtonPost.com's home page by following a series of links.  Dublin's content received numerous page views and generated revenues for TheHuffingtonPost.com. Nevertheless, despite the indeterminate number of page views received by Dublin's work, the majority of the benefit from the content that Dublin provided went to TheHuffingtonPost.com because many of the viewers would not have accessed TheHuffingtonPost.com but for Dublin's content.

51.     Moreover, despite its knowledge of the number of page views and revenue generated by each piece of content, TheHuffingtonPost.com has not disclosed the amount of page views Dublin received and the amount of revenue generated by the content Dublin provided.

52.     Dublin provided the following 16 pieces of content to TheHuffingtonPost.com:

- How Twitter Has Made the Tape-Delay Obsolete, posted on February 14, 2011 with 690 words, 20 Facebook "Likes," 9 Facebook shares, 50 tweets, 1 e-mailed and 8 comments.
- A Day in the Life of an Unemployed Writer Person, posted on February 6, 2011 with 1,020 words, 358 Facebook "Likes," 138 Facebook shares, 427 tweets,   34 e-mailed and 49 comments.
- It's All in the Trailer: A Guide to Saving Your Money on Movies, posted on December 14, 2010 with 353 words, 142 Facebook "Likes," 72 Facebook shares, 83 tweets, 6 e-mailed and 139 comments.
- I Tweet, Therefore I am, posted on November 30, 2010 with 1,061 words, 17 Facebook "Likes," 5 Facebook shares, 47 tweets, and 2 comments.
- How to Succeed in America Without Really Trying, posted on November 29, 2010 with 833 words, 2 Facebook "Likes," 1 Facebook share, 22 tweets, and 2 comments.
- Things We Think But Should Not Say, posted on November 9, 2010 with 939 words, 9 Facebook "Likes," 4 Facebook shares, 25 tweets, and 11 comments.
- An Open Letter to Hollywood, posted on October 17, 2010 with 601 words, with 9 Facebook "Likes," 4 Facebook shares, 16 tweets, and 1 comment.
- A Survivor of Bullying Speaks Out, posted on October 8, 2010 with 821 words, 230 Facebook "Likes," 85 Facebook shares, 145 tweets, and 24 comments.
- The Matter of Manners, posted on September 20, 2010 with 1,231 words, 25 Facebook "Likes," 9 Facebook shares, 31 Tweets, 8 comments and 1-email.

- In Defense of My Crushes, posted on September 9, 2001 with 1,107 words, 9 Facebook "Likes," 5 Facebook shares, 23 tweets, and 1 comment.
- I am the Anti-Snooki, posted August 30, 2010 with 1,607 words, 26 Facebook "Likes," 8 Facebook shares and 21 tweets.
- I Got Tattooed Today (Oh Boy!), posted on August 23, 2010 with 1,553 words, 7 Facebook "Likes," 1 Facebook share, 11 tweets, 2 e-mailed and 5 comments.
- Radio, Someone (That Would be Me) Still Loves You, posted on August 9, 2010 with 1,553 words, 63 Facebook "Likes," 20 Facebook shares, 32 tweets, and 27 comments.
- Ten Songs Radio Should Never Play Again, posted on August 3, 2010 with 1,181 words, with 19 Facebook shares, 31 tweets, 1 e-mailed and 69 comments.
- Of Unemployment and Cats, posted on July 20, 2010 with 1,371 words, 41 Facebook "Likes," 14 Facebook shares, 47 tweets, and 2 comments.
- The Short and Short of It, posted on July 12, 2010, with 851 words, with 14 Facebook shares, 17 tweets, and 13 comments.

53.    Dublin worked, on average, between two and three hours on each of the above pieces of content provided to TheHuffingtonPost.com.

54.    Despite the fact that the 16 pieces of content listed above generated revenue and/or profit for TheHuffingtonPost.com, Dublin has never been compensated by TheHuffingtonPost.com.

55.    TheHuffingtonPost.com encouraged Dublin to circulate through social networking media links to the content she provided to TheHuffingtonPost.com and to her personal e-mail lists, which Dublin did.

56.    Dublin was unaware of the of TheHuffingtonPost.com's Browse-wrap Terms when she provided content to TheHuffingtonPost.com.

57.    Dublin provided content to TheHuffingtonPost.com through its "backstage" website located at http://blogger.huffingtonpost.com. The Browse-wrap Terms were not visible on that website.

## PLAINTIFF RICHARD LAERMER

58.    Plaintiff Richard Laermer resides in New York County, New York.

59.     Laermer is the founder and Chief Executive Officer of RLM PR, a New York based public relations firm.

60.     Laermer is a well respected author, public relations specialist and is an authority on media culture with a readership and following independent of TheHuffingtonPost.com. Laermer maintains several of his own blogs, including Bad Pitch Blog (www.badrelease.com), www.PunkMarketing.com and www.Laermer.com. Laermer is a frequent guest on CNN, FOX News, CNBC, National Public Radio's *Marketplace, Hints with Heloise,* FOX's *Good Day New York* and CNNMoney.com. His "Unspun" media commentary regularly runs on radio and his columns on the public relations business appear in *Advertising Age, Ad Week, Meetings* magazine, and *PR News.*

61.     Laermer wrote five bestselling books including *2011: Trendspotting for the Next Decade, Punk Marketing* and *Full Frontal PR.* Laermer is compensated for his book writings through advances and royalties.  Prior to writing books about the topic of public relations, Laermer wrote travel books, including the best selling *Native's Guide to New York.*

62.     Also, prior to becoming a public relations specialist, Laermer was a reporter.  His columns, reporting and reviews have been published in *The New York Times, New York Daily News,* Reuters, *USA Today, New York Observer, People, US Weekly, Chief Executive, Washington Post, Rolling Stone, Editor & Publisher.* Laermer was compensated for his writings in these publications.

63.     Laermer also serves as a media trainer and has taught hundreds of CEOs, celebrities and spokespeople to deliver messages skillfully.  Laermer has spoken to audiences on five continents.  Laermer is compensated for speaking engagements and media training sessions.

64.     In November 2008, editors from TheHuffingtonPost.com contacted Laermer after receiving an advance copy of his book *2011: Trendspotting For the Next Decade*. The editors asked Laermer to provide content related to portions of Laermer's books, especially cultural criticism and content related to Laermer's critique of various branding techniques.

65.     Laermer's content was an immediate success on TheHuffingtonPost.com and garnered hundreds of comments and links. Some of Laermer's most popular content provided to TheHuffingtonPost.com included content that critiqued the branding of the Sy Fy Network and a recent piece regarding the late Gerry Rafferty. Other times, TheHuffingtonPost.com would post video of Laermer's appearances on cable news channels, which would remain on TheHuffingtonPost.com's front page for prolonged periods, attracting additional page views and creating revenue for TheHuffingtonPost.com.

66.     After November 2009, Laermer was provided full blogging privileges, meaning that the content he provided did not need to be reviewed prior to being published on TheHuffingtonPost.com. These privileges have been recently revoked for reasons that Laermer was never informed of although appear to be related to a piece Laermer provided that was critical of the actor Ashton Kutcher.

67.     Laermer was identified as a TheHuffingtonPost.com writer in a well respected marketing magazine, *Orange*. The magazine has 500,000 subscribers and Laermer's association with TheHuffingtonPost.com garnered significant attention for TheHuffingtonPost.com.

68.     From 2008 forward TheHuffingtonPost.com realized revenue from the content Laermer provided. Each piece of content Laermer provided was accessible from the TheHuffingtonPost.com's home page by following a series of links. Laermer's content received numerous page views and generated revenue for TheHuffingtonPost.com. Nevertheless, despite

the indeterminate number of page views received by Laermer, the majority of the benefit from the content that Laermer provided went to TheHuffingtonPost.com because many of the viewers would not have accessed TheHuffingtonPost.com but for Laermer's content.

69.     Moreover, despite its knowledge of the number of page views and revenue generated by each piece of content, TheHuffingtonPost.com has not disclosed the amount of page views Laermer received and the amount of revenue generated by the content Laermer provided.

70.     Laermer     provided     the     following     115     pieces     of     content     to TheHuffingtonPost.com:

- Donald Trump Goes Down, posted on April 22, 2011 with 1,437 words 1 Facebook "Like," 1 Facebook share and 4 tweets.
- These Award Shows Mean Nothing – And We Can't Get Enough, posted on February 26, 2011 with 697 words, 4 Facebook "Likes," 2 Facebook shares, 31 tweets and 4 comments.
- Gerry Raferty and the Inanity of Fame, posted on January 5, 2011 with 840 words, 122 Facebook "Likes," 57 Facebook shares, 9 tweets, 13 e-mailed and 25 comments.
- I'm not Shopping (How to Stop Spending in this Dangerous Holiday Month), posted on November 20, 2010 with 821 words, 3 Facebook shares, 3 tweets and 2 comments.
- The Last Decade & Mediocrity: A Look Ahead, posted on November 7, 2010 with 831 words, 15 Facebook "Likes," 3 Facebook shares, 20 tweets and 5 comments.
- Your Life Hasn't Changed by the Man Who's Elected, posted on November 1, 2010 with 1,358 words, 30 tweets and 1 comment.
- You don't want to help, you just want help: a rant, posted on October 17, 2010 with 930 words, 9 tweets and 3 comments.
- It's October, Let's Work, posted on October 7, 2010 with 792 words and 22 tweets.
- Michael Douglas' 'Blatant Honesty' Could Stone Wall Street 2m posted on September 22, 2010 with 914 words, 7 Facebook "Likes," 4 Facebook shares, 9 tweets and 1 comment.
- How to Know if Your Client's an Incurable Ass, posted on November 9, 2010 with 1,514 words, 7 Facebook "Likes," 4 Facebook shares, 9 tweets and 1 comment.
- Seven Signs the Recession's still Ramming Us, posted on September 1, 2010 with 907 words, 3 Facebook shares, 9 tweets and 2 comments.
- I learned Everything on My Summer Vacation, posted on August 8, 2010 with 2,133 words and 2 tweets.
- 10 Mistakes Businesses Make Daily. . .and 10 quick-fix solutions, posted on June 6, 2010 with 605 words, 4 Facebook "Likes," and 1 Facebook share.

- Sorry, Big Doesn't Get the Job Done, posted on April 6, 2010 with 893 words, 3 Facebook shares and 2 comments.
- I So Hate Winter – And Now You Will Too, posted on February 29, 2010 with 524 words, 1 Facebook share and 1 comment.
- Sleep: Memory, Technology and the Future, posted February 19, 2010 with 1,338 words, 7 Facebook shares and 3 comments.
- Apple, Clooney, *Game Change* & Hype Du Jour: Five Random Stories About the Media, posted on January 29, 2010 with 1,332 words.
- The PR Disaster Called NBC: Death of Corporate Speak, posted on January 17, 2010 with 1,401 words 21 Facebook shares and 4 comments.
- The Decade is Starting Anew – Maybe He Will Too, posted on December 29, 2009 with 565 words and 1 comment.
- This Title Could Never Do Justice to How Much Christmas is Pissing Me off this Year, posted on December 23, 2010 with 917 words.
- It's Not All About You: Cult-of-Personality Dies, posted on December 19, 2009 with 501 words and 2 comments.
- Tiger – And All the Other Untrustworthy Spokesboys, posted on December 9, 2009 with 1,283 words with 4 comments.
- My List of Next Year's "Predictions" (if Things Get Really Bad), posted on December 3, 2009 with 852 words and 3 comments.
- Science Says We're Unhappy – So Let's Change, posted on November 22, 2009 with 370 words and 2 comments.
- Megan Fox Fools the New York Times, posted on November 15, 2009 with 1,340 words.
- That "Thing" You Don't, posted on November 10, 2009 with 360 words and 1 comment.
- The Myth of "Personal Branding," posted on November 1, 2009 with 1,167 words and 4 comments.
- Travel Addiction: The Newest Affliction of a Troubled Nation, posted on October 25, 2011 with 988 words.
- Introducing "The Axed Hack's Guide to Flacking," posted on October 17, 2009 with 1,382 words.
- "Get You're Creative On" (A Friendly Suggestion), posted on September 18, 2009 with 675 words.
- Have Balls; Mortgage Will Follow, posted on September 22, 2009 with 1,383 words and 1 comment.
- Senator Ted Kennedy: The Lion in Water, posted on August 27, 2009 with 549 words and 1 comment.
- Lenny Bernstein is Buzzing Up There, posted on August 26, 2009 with 592 words and 5 comments.
- Nobody Out-Novaked Novak, posted August 18, 2009 with 419 words and 7 comments.
- It's August 18th…and the Living Isn't That Easy, posted on August 17, 2009 with 687 words.

27

- Hey Wait, Socialism is Here Already?, posted on August 14, 2009 with 724 words and 1 comment.
- "Kidlessness" or It's Not About the Children, posted in August 3, 2009 with 1,318 words and 44 comments.
- Earth to Lou Dobbs: Hawaii is a "United State," posted on July 30, 2009 with 458 words and 55 comments.
- Gay, Gay More Gay: Can't We All Just Get It Straight, posted on July 24, 2009 with 481 words and 66 comments.
- Tell the Truth: You're a Real Storyteller, posted on July 21, 2009 with 393 words.
- Much Ado About So Little It Hurts, posted on July 16, 2009 with 337 words and 3 comments.
- Sy Fy: The Latest Mess From Another Stupid Branding Company, posted on July 8, 2009 with 859 words and 200 comment.
- Rules of the Blogging Road, posted on June 15, 2009 with 225 words.
- Story of Reusing the City: Welcome High Line, posted on June 10, 2009 with 359 words.
- Paper of Record Is No Longer Interesting, posted on June 4, 2009 with 412 words and 1 comment.
- Attention Marketers: What Just Happened to the Long Tail?, posted on May 28, 2009 with 938 words.
- Attention Economy: Or, Who's Paying Attention Now?, posted on May 25, 2009 with 575 words.
- Let's Talk About Real Fame: "Pragmatic Notoriety," posted on May 24, 2009 with 88 words.
- Dramamine & "American Idol": Whose Country's Making Me Sick Now?,, posted on May 21, 2009 with 558 words.
- Celebrity Athletes: Could the Marketing Game Be Played Out?, posted on May 12, 2009 with 1,111 words.
- The Coming Newspaper Renaissance: Instructions for Survival, posted on May 12, 2009 with 1,010 words and 1 comment.
- Why We're Gadget Freaks (It's Not as Simple As You Think), posted on May 12, 2009 with 860 words and 1 comment.
- Barrage of Convenience: A "Punk Marketing" Allegory, posted May 3, 2009 with 897 words.
- Amazon Failure, the Future of the Corporation and "Crisis Communications 101," posted on April 28, 2009 with 726 words.
- Reliable Sources (and the People Who Love Them), posted on April 27, 2009 with 387 words and 1 comment.
- Spitzer, Spitzer, Spitzer: A Cautionary Tale Of No, April 22, 2009 with 631 words.
- "Punk Marketing" In a Recession, posted on April 20, 2009 with 1,202 words with 1 comment.
- Gumby Is My Mascot, posted on April 20, 2009 with 680 words.
- Wouldn't It Be Great If We Were All Creative?, posted on April 18, 2009 with 944 words and 6 comments.

- The Problem with Captive Consumerism, posted on April 15, 2009 with 568 words, 1 e-mailed and 5 comments.
- Beauty Sells: How Design Has Made "Okay" Products Stellar, posted on April 12, 2009 with 1,583 words and 1 comment.
- My Twitter Love Affair with Jane Fonda, posted on April 10, 2009 with 778 words.
- Recession! Most Fun I've Had With My Clothes On, posted on April 3, 2009 with 273 words and 1 comment.
- Publishing is Dead [Part 2]: Can We Make it About Writers For a Change?, posted on March 31, 2009 with 764 words and 2 comments.
- Well Hello There, Generation WTF, posted on March 25, 2009 with 361 words and 5 comments.
- Introducing a New Holiday: "Totally Honest Work Week," posted on March 11, 2009 with 361 comments and 5 comments.
- No Such Thing as a Free Launch! posted on March 9, 2011 with 898 words and 1 comment.
- Why No One Runs for Office Today: An Allegory, posted on March 8, 2009 with 1,939 words and 1 comment.
- Warm Your Ass, posted on February 22, 2009 with 533 words.
- Advice for Businesses and Michael Phelps, posted on February 16, 2009 with 1,591 words.
- The Week That Was, posted on February 9, 2009 with 1,234 words and 1 comment.
- The Real American Idols Are Going to Mess it Up for the Fake Ones, posted on January 22, 2009 with 334 words and 3 comments.
- Will the New President Cut My Lawn?, posted on January 16, 2009 with 416 words and 1 comment.
- It's Bad, It's Bad – And That's Good! posted on January 13, 2009 with 493 words and 6 comments.
- Caroline Kennedy, We Hardly Know Y – Wait, We Don't Know You At All! posted on January 2, 2009 with 571 words and 10 comments.
- Resolve to Be Pessimistic: An Eager Lesson for 2009, posted on December 27, 2009 with 634 words.
- Man Bites Dog: Newspapers Outlive Themselves; Blissfully Unaware Become an Artform, posted on December 23, 2009 with 455 words and 1 comment.
- Good News is Out: Bad's the Rage, posted on December 17, 2008 with 582 words.
- Bandwagoning: The Lazy Man's Guide to Success, posted on November 24, 2008 with 399 comments.
- Obama Wins: America Has Nothing to Whine About Anymore, posted on November 3, 2008 with 719 words.
- It's the Bad News Bores: Celebratory Nature of News, posted on October 20, 2009 with 1,279 words.
- Get Ready Kids; Time for Musical Chairs, posted on October 5, 2008 with 501 words.
- It's An Election and I Want What I Want, posted on October 1, 2008 with 772 words.
- You're Gay. Yeah, Whatever, posted on September 26, 2008 with 819 words and 3 comments.

- Getting or Finding?, Sad Truth About Shopping (Replete with Gerunds Galore), posted on September 16, 2008 with 584 words.
- Information Gone Wild: Good News About Alerts, posted on September 4, 2008 with 515 words and 1 comment.
- The Brand New Grandmama Drama, posted on September 3, 2008 with 540 words.
- Barack: The Non-White Candidate, posted on August 25, 2008 with 587 words and 1 comment.
- Why Book Publishing is Dead (Part One), posted on August 24, 2008 with 1,801 words and 8 comments.
- Old Journalism's Demise is Good for Communicators, posted on August 18, 2008 with 1,064 words and 4 comments.
- Will the Real John Edward's Sit Down?, posted on August 15, 2008 with 582 word and 10 comments.
- "We Are Not Alone," posted on August 3, 2008 with 634 words.
- Gumby is the Meaning of Life (Amen!), posted on July 30, 2008 with 567 words and 14 comments.
- And I Quote (Random Quotations for a Mediocre Time), posted on July 24, 2008 with 382 words.
- The End of the Heath Ledger Story, posted on July 13, 2008 with 923 words.
- All Press is (no Longer) Good Press, posted on July 11, 2008 with 497 words and 1 comment.
- Barack: The Truth Blog, posted on July 11, 2008 with 493 words.
- When You Speak, Sometime Audiences Teach You More than You Know, posted on July 6, 2008 with 1,606.
- The Yooks Have It: Why We Are Gadget Freaks, posted on June 27, 2008 with 831 words and 2 comments.
- Trendspotting: The Vonnegut Files, posted on June 26, 2008 with 354 words and 2 comments.
- Do We Bitch?, Oh Yeah, posted on June 20, 2008 with 368 words.
- Why Reality TV Will Soon Die a Healthy Death, posted on June 20, 2008 with 890 words and 14 comments.
- Oh my Blog: What's the Big Deal About "New Media" Influence?, posted on June 14, 2008 with 802 words and 4 comments.
- Time to Listen to People Who Fly for a Living – And I am not Talking About the Pilots, posted on June 11, 2008 with 1,177 words and 3 comments.
- Is it Over?, posted on June 9, 2008 with 773 words.
- Just Think, posted on June 6, 2008 with 518 words.
- 7 Ways to Act More Social, posted on June 4, 2008 with 797 words.
- Oh Emily…What Hath Your Not Wrought?, posted on May 29, 2008 with 712 words and 1 comment.
- The Last Thing You'll Ever Have to Read about Sex and the City, posted on May 27, 2008 with 813 words and 1 comment.
- The Five Year – Oh Forget it Already, posted on May 19, 2008, with 640 words.
- Your Own Personal Slap of Fame: Much Cooler Than Any Brush with Greatness, posted on May 2, 2008 with 1,250 words.

- Can't We Get This Over With Already! A Hopeful Plea to the Electorate, posted on April 29, 2008 with 638.
- Gap Short(s): What Businesses Learn from America's Flailing Retailer, posted on April 28, 2008 with 974 words.
- Am I Off?, What Vacation Has Become, posted on April 23, 2008 with 623 words and 1 comment.
- Moby Died for Your Sins: How Selling Out is Pretty Fabulous, posted on April 21, 2008 with 1,114 words and 2 comments.

71.     Laermer worked and spent considerable time on each of the above pieces of content provided to TheHuffingtonPost.com.

72.     Many of the pieces of content provided by Laermer to TheHuffingtonPost.com were also posted on Laermer's own websites.

73.     Despite the fact that the 115 pieces of content listed above generated revenue for TheHuffingtonPost.com, Laermer has never been compensated by TheHuffingtonPost.com.

74.     TheHuffingtonPost.com encouraged Laermer to circulate hyperlinks to the content he provided to TheHuffingtonPost.com through his social networking media to his over 13,000 Twitter "followers" as well as place in his widely read email list, which he did. Laermer's efforts to publicize his work drew substantial internet traffic to TheHuffingtonPost.com.

75.     Laermer was unaware of TheHuffingtonPost.com's Browse-wrap Terms when he provided content to TheHuffingtonPost.com.

76.     Laermer provided content to TheHuffingtonPost.com through its "backstage" website located at http://blogger.huffingtonpost.com. The Browse-wrap Terms were not visible on that website.

## PLAINTIFF BILLY ALTMAN

77.     Plaintiff Billy Altman resides in Westchester, New York.

78.    Altman is a well respected writer and commentator with a readership and following independent of TheHuffingtonPost.com.  His work has appeared in such premier publications as *The New York Times, The New Yorker, Rolling Stone, Esquire, GQ, Harper's Bazaar, Sport, Inside Sports, TV Guide, People, Entertainment Weekly*, msn.com and foxsports.com.

79.    As a sports writer, Altman covered New York baseball and other sports for many years at the *Village Voice*, and was head scriptwriter at Olympia Sports Networks for numerous syndicated radio programs.

80.    Altman is also a respected music journalist and a longtime senior editor of Detroit's legendary *CREEM Magazine*, former assistant curator for the Rock and Roll Hall of Fame and a recipient of the ASCAP-Deems Taylor Award for Excellence in Music Journalism. Most recently, Altman served as the "Stop The Presses!" music and entertainment columnist for Yahoo's front page division.

81.    Altman is the author of *Laughter's Gentle Soul: The Life of Robert Benchley* (W.W. Norton, 1997). Altman teaches in the Humanities Department of the School of Visual Arts in New York City.

82.    Altman is compensated for his writings and teaching through advances, royalties and salary.  As a freelance journalist, Altman has been paid and continues to be paid for his work. The range of payments varies, depending on the circulation and prestige of the publication.

83.    Altman first began blogging for TheHuffingtonPost.com in the Fall of 2009. A colleague of his put him in touch with an editor for the sports page that TheHuffingtonPost.com was about to launch and Altman was asked by TheHuffingtonPost.com to begin contributing content.

84.     At the request of TheHuffingtonPost.com, and sometimes without Altman's knowledge, the content Altman provided to TheHuffigntonPost.com was publicized via Facebook and appeared on many other websites. Altman did not give permission for the content he contributed to TheHuffingtonPost.com to be posted elsewhere and was unaware of TheHuffingtonPost.com's plans to do so.

85.     From the Fall of 2009 forward, TheHuffingtonPost.com realized revenue from the content provided by Altman. Each piece of content Altman provided was accessible from the TheHuffingtonPost.com's home page by following a series of links.  Altman's content received numerous page views and generated revenues for TheHuffingtonPost.com. Nevertheless, despite the indeterminate number of page views received by Altman, the majority of the benefit from the content that Altman provided went to TheHuffingtonPost.com because many of the viewers would not have accessed TheHuffingtonPost.com but for Altman's content.

86.     Moreover, despite its knowledge of the number of page views and revenue generated by each piece of content, TheHuffingtonPost.com has not disclosed the amount of page views Altman received and the amount of revenue generated by the content Altman provided.

87.     Altman provided the following 22 pieces of content to TheHuffingtonPost.com:

- Will No CC's for CC Sabathia Mean Trouble for Yanks?, posted on February 15, 2011 with 452 words, 2 Facebook shares, 11 Tweets, 5 e-mailed and 1 comment.
- Remembering Bill Shannon, Baseball Scorer for All Seasons, posted on October 28, 2010 with 1,085 words, 24 Facebook "Likes," 11 Facebook shares, 16 Tweets, and 1 comment.
- Mets Say a Change is Coming Come - - We'll See, posted on October 5, 2010 with 924 words, 11 Tweets and 4 comments.
- Weird Baseball Headlines for a Weird Week, posted on September 1, 2010 with 720 words, 4 Facebook shares, 10 Tweets and 3 comments.
- Stephen Strasburg: From Best in Show to Best in Rehab?, posted on August 28, 2010 with 583 words, 2 Facebook shares and 14 Tweets.

33

- Alex Rodriguez's Trivial Pursuit, posted on August 6, 2010 with 330 words, 3 Facebook shares and 12 Tweets.
- On George Steinbrenner's Passing: Recalling a Picture, with a Thousand Words or More (Give or Take), posted on July 14, 2010 with 1,123 words, 3 Facebook shares and 3 Tweets.
- Arthur Rhodes Makes All-Star Team?, Gimme a Bling, posted on July 5, 2010 with 451 words, 1 Facebook share and 7 Tweets.
- Jim Joyce Gets Call Wrong, Life Right: I'll take it, posted on June 4, 2010 with 727 words, 2 Facebook shares and 5 comments.
- Tell the Trust, Nominee Kagan: Red Sox Supporter, or Yankee Hater?, posted on May 21, 2010 with 469 words, 2 Facebook shares and 20 comments.
- Man Goes to All-You-Can-Eat Buffet. Yankee Game Breaks Out. Film at 11, posted on April 20, 2010 with 1,107 words.
- Broken Bats: A Communist Plot?, posted on March 15, 2010 with 521 words, 4 Facebook shares and 2 comments.
- Kill the Umpire, Ok, but Please - - Bare Hands Only! posted on February 22, 2010 with 507 words, 1 Facebook share and 2 comments.
- The 87th Annual Baseball Writers' Dinner: Give us this Day Our Daily Sandwich, posted on January 26, 2010 with 572 words and 1 comment.
- Will Delusions Set Mark McGuire Free?, posted on January 16, 2010 with 754 words and 1 comment.
- In Spitting Distance of Baseball's Hall of Fame, posted on January 11, 2010 with 721 words.
- Hey, Harry Reid: Who's on First, posted on December 25, 2009 with 922 words and 1 comment.
- The Good Sheppard of Yankee Stadium, posted on December 8, 2009 with 645 words.
- Mets' Mo(u)rning Jacket, posted on November 24, 2009 with 587 words.
- Canyon of Haircuts, posted on November 11, 2009 with 566 words.
- Joe Buck's Broken Record and Other Post-Season Delights, posted on November 4, 2009 with 677 words.
- The 2009 World Series: Daddy Dearest, posted on October 30, 2009 with 573 words and 2 comments.

88.  Altman worked, on average, between one and four hours on each of the above pieces of content provided to TheHuffingtonPost.com.

89.  Despite the fact that the 22 pieces of content listed above generated revenue and/or profit for TheHuffingtonPost.com, Altman has never been compensated by TheHuffingtonPost.com.

90.     TheHuffingtonPost.com encouraged Altman to circulate through social networking media links to the content provided to TheHuffingtonPost.com and to his personal e-mail lists.

91.     Altman was unaware of TheHuffingtonPost.com's Browse-wrap Terms when he provided content to TheHuffingtonPost.com.

92.     Altman provided content to TheHuffingtonPost.com through its "backstage" website located at http://blogger.huffingtonpost.com. The Browse-wrap Terms were not visible on that website.

**DEFENDANTS**

93.     Defendant AOL is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in the County of New York in the State of New York at 770 Broadway, 4th floor, New York, NY 10003.

94.     Defendant TheHuffingtonPost.com is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the County of New York in the State of New York at 770 Broadway, 4th floor, New York, NY 10003.

95.     Upon information and belief, Defendant Huffington is an individual with a residence in the County of New York in the State of New York and in the State of California.

96.     Upon information and belief, Defendant Lerer, a former AOL executive, is an individual with a residence in the County of New York in the State of New York.

97.     Whenever in this Complaint reference is made to any act, deed, or transaction of the Defendants, the allegation means that the Defendants engaged in the act, deed, or transaction, either individually, or by or through their partners, officers, directors, agents, employees, or

representatives, as the case may be, while they were actively engaged in the management, direction, control or transaction of TheHuffingtonPost.com's business or affairs.

## JURISDICTION AND VENUE

98.    Subject matter jurisdiction of this Court is appropriate under the Class Action Fairness Act of 2005 and 28 U.S.C. 1332(d)(2)(A) because:

a.    The amount in controversy exceeds $5,000,000, exclusive of interests and costs;

b.    At least one of the Plaintiffs is a citizen of a state different than any one Defendant;

c.    Greater than one-third (1/3) of the members of the Class reside outside the State of New York.

99.    The estimate that aggregate damages in this matter exceed $5 million is based on current information regarding the value created by the content and services provided by Plaintiffs and the Classes to Defendants.    Plaintiffs and the Classes have created content and provided services worth at least $105 million to Defendants that should be returned to Plaintiffs and the Classes as content creators.

100.    Venue is properly laid in the Southern District of New York because Defendants reside, are found, have agents and transact business in this District pursuant to 28 U.S.C. §1391. Defendants have all transacted business in New York County, State of New York; many of the services provided by Plaintiffs and the Classes were in New York County, State of New York; and Defendants either reside or have principal places of business in New York County, State of New York. In addition, the transactions or occurrences which comprise this action occurred in the County of New York, State of New York.

101.    This Court has personal jurisdiction over the Defendants because, *inter* alia, Rule 4 of the Federal Rules of Civil Procedure (the "F.R.C.P.") where under New York law, Defendants have all transacted business in New York County, State of New York, many of the services provided by Plaintiffs and the Classes were in New York County, State of New York, and Defendants either reside or have places of business in New York County, State of New York.

102.    Finally, Defendants have selected New York law as the applicable law in this matter and Plaintiffs and the Classes agree that New York law applies.

103.    This First Amended Complaint is made pursuant to Rules 15 and 22 of the F.R.C.P.

## CLASS ACTION ALLEGATIONS

104.    Plaintiffs bring this action as a class action under Rules 23(b)(2) and (b)(3) of the F.R.C.P. on their own behalf and on behalf of the following two described classes (the "Classes"):

The "Declaratory and Injunctive Relief Class":

All current and former unpaid content providers to TheHuffingtonPost.com selected by TheHuffingtonPost.com to contribute content who reside in the United States and Canada and who did not and continue not to receive any compensation related thereto. This class does not include employees of TheHuffingtonPost.com or partners, of counsel or employees of Kurzon Strauss LLP.

The "Damages Class":

All current and former unpaid content providers to TheHuffingtonPost.com selected by TheHuffingtonPost.com to contribute content who reside in the United States and Canada and who did not receive and continue not to receive any compensation or restitution related thereto during the period of three years preceding this Complaint for the claim of Count 1: Deceptive Business Practice, and the same for six years for Count 2: Unjust Enrichment or for such other period as this Court finds to be equitable and just given the circumstances. This

class does not include employees of TheHuffingtonPost.com or partners, of counsel or employees of Kurzon Strauss LLP.

105.   Members of the Damages and Declaratory and Injunctive Relief Classes are collectively referred to herein as the "Classes" unless otherwise individually specified.

106.   Based on numerous public reports, Plaintiffs believe that the Classes' members number approximately 9,000 and are geographically diverse so that joinder of all the Classes' members is impracticable. The Classes' members are residents of most, if not all, of the fifty States of the United States, the District of Columbia, and Canada.

107.   Plaintiffs and the Classes do not know the exact number of the Classes' members, but such information is easily ascertainable as the Defendants maintain an alphabetical index of its content providers at http://huffingtonpost.com/theblog/index. The information includes the Classes members' e-mail addresses.

108.   There are questions of law and/or fact common to members of the Damages Class, including but not limited to the following:

a.   Whether Defendants recognized revenue and profit from the services provided by Plaintiffs and the Damages Class;

b.   Whether Defendants have been unjustly enriched by the services provided by Plaintiffs and the Damages Class;

c.   Whether Defendants are responsible for compensating Plaintiffs and the Damages Class at common law under a claim of unjust enrichment;

d.   Whether Plaintiffs and the Damages Class are entitled to restitution at common law under a claim of unjust enrichment;

e.   Whether Defendants engaged in deceptive business practices under New York law in procuring services from the Plaintiffs and the Damages Class;

38

109.    With respect to the Declaratory Relief and Injunctive Relief Class, common questions of law and/or fact include the following:

    a.    Whether Defendants should be permitted to continue to recognize revenue and profit from the services provided by Plaintiffs and the Declaratory and Injunctive Relief Class;

    b.    Whether Defendants continue to be unjustly enriched;

    c.    Whether Defendants are responsible for compensating Plaintiffs and the Declaratory and Injunctive Relief Class at common law under a claim of unjust enrichment;

    d.    Whether Plaintiffs and the Declaratory and Injunctive Relief Class are entitled to restitution at common law under a claim of unjust enrichment;

    e.    Whether injunctive relief is appropriate;

    f.    If injunctive relief is appropriate, what types of such relief are suitable in this matter and;

    g.    Whether a constructive trust or other remedy for the benefit of the Declaratory and Injunctive Relief Class should be established.

110.    With respect to the members of the Declaratory and Injunctive Relief Class, as further set forth below, Defendants have continued to derive revenue and profit from the services provided by the Declaratory and Injunctive Relief Class without providing any compensation to Plaintiffs and the Declaratory and Injunctive Relief Class.

111.    Plaintiffs' claims are typical of, and not antagonistic to the claims of the Classes' members. By advancing their claims, Plaintiffs will also advance the claims of all the Classes'

members, because Defendants participated in activity that caused all the Classes' members to suffer similar injuries.

112.    Plaintiffs and their counsel will fairly and adequately protect the interests of the Classes' members who are absent. There are no material conflicts between Plaintiffs' claims and those of the Classes' members who are absent that would make class certification inappropriate. Counsel for Plaintiffs and the Classes are experienced in complex class action litigation, including matters with respect to common law and trade, and will vigorously assert Plaintiffs' claims and those of the Classes' members who are absent.

113.    A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action method of dispute resolution presents fewer case management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiffs and each of the members of the Damages Class are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiffs and the members of the Damages Classes to redress the wrongs done to them.

114.    It would also be grossly inefficient for the judicial system to preside over such large numbers of individual cases. Furthermore, litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, this dispute is most appropriately resolved through the class action procedure.

## FURTHER INFORMATION ABOUT THE CLASS

115.    At the time of the Merger (as defined below), upon information and belief, approximately 9,000 unpaid content providers, like Plaintiffs, had been (and continue to be) selected to provide content to TheHuffingtonPost.com. The approximately 9,000 other unpaid content providers, like Plaintiffs, regularly advised their contacts through social networking media of the valuable content they provided to TheHuffingtonPost.com, driving substantial internet traffic to TheHuffingtonPost.com.

116.    On or about May 10, 2011, the Media Industries Project of the Carsey-Wolf Center at the University California, Santa Barbara published an academic study entitled "HuffPo Bloggers Raise Status and Pay Concerns: Responses to the AOL-Huffington Post Merger."

117.    The study was based on a 26-question survey designed to explore how the $315 million Merger Consideration affected TheHuffingtonPost.com's unpaid content creators.

118.    The survey sample participants were chosen as follows:

Our survey sample was comprised of frequent HuffPo bloggers. At the time we assesses which participants should be included, HuffPo listed its most popular bloggers (top 10) based on most e-mailed posts among readers and most reader comments for a particular week as well as for all time. Significantly, the site does not rank bloggers on frequency of posts, but does have an alphabetical index of its bloggers (www.huffingtonpost.com/theblog/index). We used Xenu (http://home.snafu.de/tilman/xenulink.html), a free link-checking software program, to index the site.

Based on our indexing of the site, we identified 61 [sic] bloggers who had the most post/links. Once these bloggers were identified, we searched for the their public e-mail addresses, and sent a message inviting them to take the survey. Only one of the bloggers we identified was previously known to the research team. Of the 61 who were invited, 26 completed the survey, and 1 partially completed the survey, for a 44% response rate. The survey opened up on March 21, 2011 and closed on April 15, 2011.

85.    According the survey: (a) Sixty-nine percent believe bloggers should share in the $315 million received by TheHuffingtonPost.com, Lerer and Huffington from AOL; (b) a majority 54% say TheHuffingtonPost.com should develop a flat-rate payment schedule for

contributors (based on words per post, for example); (c) 54% say TheHuffingtonPost.com's unpaid content providers should press their case through some form of concerted action, such as online organizing and unionization.

## FACTUAL ALLEGATIONS

### ABOUT THEHUFFINGTONPOST.COM

119.    TheHuffingtonPost.com launched on May 9, 2005 as a for-profit enterprise.

120.    Upon information and belief, TheHuffingtonPost.com was a company created by Huffington and Lerer, but the creation of TheHuffingtonPost.com is subject to ongoing litigation.

121.    An action commenced in November 2010 and currently pending in New York State Supreme Court, New York County (Index No. 651997/2010), alleges that Peter Daou ("Daou") and James Boyce ("Boyce") entered into a joint venture with Huffington and Lerer to develop a liberal political website that Daou and Boyce had conceived, a website that Huffington and Lerer branded "The Huffington Post" without properly crediting or compensating Daou or Boyce. In May 2011, Supreme Court Justice Charles Ramos ruled that the parties may proceed with discovery on the counts of idea misappropriation and breach of contract.  Daou and Boyce are not defendants in this Complaint; however Plaintiffs and the Classes reserve their right to amend this Complaint to include them as individual defendants.

122.    Upon information and belief, when TheHuffingtonPost.com began, it employed only editorial staff. All content was provided by unpaid content providers, such as Plaintiffs and the Classes.

123.    TheHuffingtonPost.com is in the business of selling advertising targeted toward visitors to the website www.huffingtonpost.com and its sub-sites.   TheHuffingtonPost.com attracts visitors though its presentation of content, much of it created by Plaintiffs and the

Classes.  As set forth below, although TheHuffingtonPost.com realizes significant revenues from advertising sales to viewers of content provided by Plaintiffs and the Classes, TheHuffingtonPost.com does not provide any compensation to Plaintiffs and the Classes.

124.    As of January, 2011, TheHuffingtonPost.com received more than 26 million unique visitors per month. Many of those page views were of content created by Plaintiffs and the Classes.

125.    In late 2007 Huffington considered compensating content providers by, among other ideas, allowing content providers to select charities to which a portion of the revenue generated by advertising associated with the content provided would be donated.  Despite publicly enticing content providers by proposing such a revenue sharing system, TheHuffingtonPost.com never implemented a revenue sharing system with content providers.

126.    Huffington has been publicly quoted as believing that TheHuffingtonPost.com's "greatest asset" is its unpaid content providers.  However, despite being aware for some time that the content provided by Plaintiffs and the Classes was producing substantial revenue for TheHuffingtonPost.com, Defendants have refused to provide any compensation.  In September 2007, Lerer stated that TheHuffingtonPost.com has no plans to pay its content providers and stated, "That's not our financial model…we offer them visibility, promotion and distribution."

127.    Upon information and belief, TheHuffingtonPost.com, despite promoting itself as a forum for ideas and news, always intended to derive revenues from the content provided by the expense of, Plaintiffs and the Classes.

128.    TheHuffingtonPost.com was originally regarded as a "progressive" or left wing media source and Defendant Arianna Huffington's own recent statements indicate her own belief that the creators of content should be fairly compensated for the value provided.

129.    For example, in her book "Third World America" (Crown, 2010), Huffington notes that whereas forty-years ago CEOs made, on average, thirty times what their workers did, CEO's now they make 300 times what their workers make. Huffington then states:

> This two-tier economy comes with two sets of rules – one for the corporate class and another for the middle class.
>
> The middle class, by and large, plays by the rules, then watches as its jobs disappear. The corporate class games the system – making sure its license to break the rules is built into the rules themselves.

(pages 55 and 56)

130.    Towards the conclusion of "Third World America," Huffington writes that to avoid a "Third World America," she believes the nation needs to make certain it is "a place where economic opportunity is once again real for everyone, not just the economic elite" and "a place where greed and selfishness are no longer rewarded and the 'least among us' are given a helping hand, rather than the back of it." (page 237).

131.    Despite these proclamations, by failing to compensate Plaintiffs and the Classes for the valuable content provided to the TheHuffingtonPost.com, content from which TheHuffingtonPost.com recognized, and continues to recognize, revenue, Huffington is exacerbating the very inequalities she seeks to redress.

## THE HUFFINGTONPOST.COM'S UNPAID CONTENT PROVIDERS

### Content Providers Are Recruited and Selected Based on Their Ability to Drive Traffic to TheHuffingtonPost.com

132.    Unlike social networking internet platforms, micro-blogging internet sites, and other digital media sites, such as TheDailyKos.com, TheHuffingtonPost.com recruits and selects its content providers and does not allow content from non-vetted providers.

133.    Although the TheHuffingtonPost.com's selection criteria is not generally known or publicly available, upon information and belief, the criteria is based on, among other things, the ability of the content provider to drive internet traffic to TheHuffingtonPost.com and optimize the TheHuffingtonPost.com's ranking on popular search engines, such as Google.com, thereby creating revenue for the TheHuffingtonPost.com.

134.    Original content, such as that created by Plaintiffs and the Classes, optimizes a web site's search engines ranking.

135.    Plaintiffs and the Classes were not officious contributors to the TheHuffingtonPost.com and, rather, were carefully selected, and in many cases recruited through contests and other means by TheHuffingtonPost.com and Huffington to perform services for TheHuffingtonPost.com.

136.    For example, media reports indicate that Huffington started TheHuffingtonPost.com by soliciting "hundreds of people in her electronic Rolodex" to provide valuable content.

137.    In July of 2007 Roy Sekoff, the editor of TheHuffingtonPost.com was quoted as stating that TheHuffingtonPost.com is "very active in pursuing people we think are interesting" and that certain content providers need to be "seduced."

138.    Also in July of 2007 Huffington was quoted as stating that she is constantly inviting people she meets in her travels to contribute content to TheHuffingtonPost.com.

139.    Huffington actively dissuaded Plaintiffs and the Classes from establishing their own websites, where they would receive all revenue and exposure, by publicly stating that "maintaining a blog is an enormous amount of work. And if they have 'another life' and another line of work, it's very hard to maintain a blog that gets traffic."

140.   In *The Huffington Post Complete Guide to Blogging* (Simon & Schuster, 2008), a general solicitation to members of the public, including Plaintiffs and the Classes, Defendants encourage the public to contribute valuable content.   For example, in the foreword Lerer writes: "if you've got something to say, you'll want to say it on The Huffington Post."

141.   Huffington also solicited contributions from the general public, including Plaintiffs and the Classes, by touting the potential for book deals.   Huffington did so on several occasions, for example, in the Spring of 2010 at, among other places, the Columbia University Graduate School of Journalism.   Upon being pressed after her solicitation to provide the number of book deals offered to unpaid content providers, Huffington was unable and/or unwilling to.

142.   Defendants' efforts to solicit high quality creators to provide content to TheHuffingtonPost.com was successful. Upon information and belief, the vast majority of the Classes' members, like Plaintiffs, are professional or quasi-professional writers, the latter meaning that they occasionally earn fees for their writing, but it was not their principle occupation.   Approximately half of the Classes' members are professional journalists and, moreover, approximately half of the Classes' members are published authors.   In sum, the content provided by Plaintiffs and the Classes to TheHuffingtonPost.com is of the highest quality, and selected or solicited by TheHuffingtonPost.com for that very reason.

143.   Plaintiffs   Tasini,   Altman   and   Laermer   were   all   contacted   by TheHuffingtonPost.com, or Huffington herself, and asked to provide valuable content.   Plaintiff Dublin was solicited to provide valuable content after she entered a contest that was opened to the general public.

144.   Upon information and belief, TheHuffingtonPost.com rejected a great number of content providers who wanted to blog for TheHuffingtonPost.com, only accepting high quality

content from the Plaintiffs and the Classes based on the ability of Plaintiffs and the Classes to drive internet traffic to TheHuffingtonPost.com.

145.   Moreover, upon information and belief, the valuable content provided by Plaintiffs and the Classes are accessible from the TheHuffingtonPost.com in perpetuity, thereby continuing to optimize TheHuffingtonPost.com's ranking on popular search engines.

## Unpaid Content Providers, Such as Plaintiffs and the Classes, Lower the Cost of Production for TheHuffingtonPost.com

146.   By selecting and soliciting top quality content from Plaintiffs and the Classes without providing any compensation to Plaintiffs and the Classes, TheHuffingtonPost.com was able to produce content at an extremely low cost, therefore was further enriched by the content provided by Plaintiffs and the Classes.

147.   Upon information and belief, a large part of the success of TheHuffingtonPost.com is due to the high quality of the content provided by Plaintiffs and the Classes at no cost, which created, and continues to create, real and substantial value to Defendants by, *inter alia* reducing the cost of content production and driving internet traffic to TheHuffingtonPost.com.

148.   Executives of AOL noted that $20 million in "cost savings" would be recognized by AOL due to TheHuffingtonPost.com's history of not compensating Plaintiffs and the Classes for high quality content.  For example, in a February 7, 2011 conference call announcing AOL's merger with TheHuffingtonPost.com, AOL's Chief Financial Officer Artie Minson stated:

> Even in a stand-alone basis, we think this is a very good deal for us financially. Second, the added benefit of this deal is the cost savings opportunities. As you know, one of the stated goals we've had at AOL is to produce high-quality content profitably. Certain areas, we've been losing money and we've told you of our intent to reverse that through cost cuts, M&A or partnerships with third parties. [. . .] There are a number of areas where AOL and the Huffington Post's

content overlap. [...] While we believe there are $20 million of cost savings, there shouldn't be change in your models to your 2011 [...] estimates.

149.   Not to be left out, on that same conference call, Huffington explicitly addressed the value provided by Plaintiffs and the Classes who, presumably, were expected to continue to provide top quality content at no cost to Defendants:

> In terms of content strategy, one of the things that was done well at TheHuffingtonPost.com is to produce high-quality content in cost-effective ways.

150.   The value Plaintiffs and the Classes provided to Defendants is further demonstrated by a document leaked from AOL, entitled "The AOL Way – Content, Product, Media Engineering, and Revenue Management," which was created one week before AOL acquired TheHuffingtonPost.com. In "The AOL Way", AOL acknowledges that:

a.   AOL employs technology to track the cost of each piece of content and the revenue generated by each piece of content to determine profitability for each post (page 11).   Upon information and belief, TheHuffingtonPost.com employs similar technology;

b.   Profitability decreases as the cost of production of content increases. For example, "vetted freelancers" (such as Plaintiffs and the Classes) come at a high cost (as AOL previously paid its freelancers), but the use of vetted freelancers such as Plaintiffs and the Classes not only creates top quality content but also disseminates the content created over social network media and other media, yielding "Search Engine Optimization" ("SEO"), which leads to higher search rank, more comments, more page views (PVs), internet traffic and therefore profitability (page 14);

c.    Content creators such as Plaintiffs and the Classes, through self-promotion and their own social following, among other things, bring external internet traffic to AOL websites and increase page views (page 36);

d.    Freelancers, since they are expensive (such as Plaintiffs and the Classes if they were compensated), should only be used sparingly because of the associated cost (page 19);

e.    AOL's "Scaled Content Creation Process" requires it to identify profitable content creation opportunities, such as where it can generate top quality content for the lowest cost possible.

151.    The Credit Suisse Media Daily summed up the "AOL way" on February 8, 2011 as follows: "A terrifying leaked document entitled 'The AOL Way' pinged round the US media business last week containing the company's "secret sauce" for success in creating journalism for the internet. Quintessentially that seemed to be increasing the number of pieces writers produced, for less money. 'Scaled content production' is the rather sobering term for this."

152.    Therefore, upon information and belief, TheHuffingtonPost.com was an attractive merger target for AOL because of TheHuffingtonPost.com's ability to obtain high quality content from Plaintiffs and the Classes at no cost.  AOL's CEO, Tim Armstrong, has been quoted as being in interested in attracting TheHuffingtonPost.com's 'hordes of free bloggers' since doing so would cover the cost of content creation.

153.    In an article in CNNMoney.com, published on February 2, 2011,  the author sampled the content sought by AOL and the prices offered for creators of such content:

> The quality of content is a partly subjective assessment, of course. But here's a sampling of the Stories Seed is currently offering to freelancers: "Parents at Justin Bieber Concerts (photos)," "Confessions of a Greeting Card Writer," and "Why I love to Dress My Body." That last one, which would be published in AOL's

StyleList site, pays $50. Meanwhile, "Backpacking the Axis of Evil," due in five days, pays $10 for 1,000 words. Most assignments range between $10 and $25.

[. . .] AOL is not only switching from one business to another, but it is spending big on content creation and a nationwide local strategy, as well as actual newsgathering operations.

154.    Upon information and belief, AOL only offers to pay amounts for content which are less than the revenue potentially earned from that content.  In other words, at AOL, content creators are paid an amount only because AOL is able to realize revenue *in excess* of the amount paid for the content.  Therefore, upon information and belief, after merging with TheHuffingtonPost.com, Defendants' profits will increase because of their ability to obtain higher quality content at no cost due to TheHuffingtonPost.com's refusal to compensate content creators such as Plaintiffs and the Class. Indeed, upon information and belief, AOL has already terminated, or stopped soliciting content from, paid content creators in favor of unpaid content creators, such as Plaintiffs and the Class.

155.    On April 7, 2011, an editor at AOL wrote to a recently terminated paid content providers encouraging them to provide content for free in the future, an example of the implementation of AOL's strategy.

156.    Later in the Spring of 2011, AOL began to terminate its paid content providers in favor of unpaid content providers such as Plaintiffs and the Classes, who, in many cases, are also professional or quasi-professional writers.

157.    When terminating many of its paid content providers, Defendants made the arbitrary distinction between paid content providers who, according to Defendants, provide content in exchange for payment and unpaid content providers who Defendants believe do not need to be paid because they provide content in exchange for "exposure."  This distinction, between paid content providers and unpaid content providers, is arbitrarily made by Defendants

in an effort to avoid compensating Plaintiff and the Classes for the valuable content provided. Indeed, Plaintiffs and the Classes, as well as the content providers paid by Defendants, are generally quasi-professional or professional writers.

158.   Finally, by making Plaintiffs and the Classes responsible for "the consequences of posting or publishing" content, TheHuffingtonPost.com's Browse-wrap Terms (addressed below) place all downside risk with Plaintiffs and the Classes, but all the benefits from the content, i.e. the revenue derived, with Defendants.

159.   In sum, by eliminating all costs associated with content production and placing those costs with Plaintiffs and the Classes, Defendants are being unjustly enriched.

**TheHuffingtonPost.com's Refusal to Compensate Content Providers is Atypical and a Departure from Normal Practices at Other Digital Media Sites.**

160.   Defendants' practice of refusing to compensate Plaintiffs and the Classes for valuable content provided is atypical of digital media sites, most of whom compensate content providers by either paying for the content provided outright or through revenue sharing agreements which provide content creators a percentage of the revenue from advertising associated with the content provided.

161.   For example, the following popular sites compensate content providers:

a.   "About.com" provides content creators a base payment of $675 per month for the first two years and measures page view growth (month-over-month in content providers' first year, and year-over-year every year after) with payment incentives for pageview growth.

b.   "Demandstudios.com" offers either an upfront payment for content or a revenue share. Content providers may choose their topics.

c.   "DigitalJournal.com" compensates content providers based on the revenue generated from the content provided and the amount of attention generated by the content provided. Extra bonuses are provided for on-the-ground reporting and interviews.

d.   "Helium.com" pays content providers based on the popularity of the content, total amount of views, and the value of the advertising attracted to the content. For certain articles, content providers are also paid per piece of content provided.

e.   "Hubpages.com" allows content providers to receive a portion of the revenue generated by advertising on the content provided.

f.   "Newsvine.com" (acquired by MSNBC) shares 90% of the revenue generated with content providers if advertising is placed on the page with the content. According to the founder of Newsvine.com, the payment system was developed because of a belief that content providers deserve to be paid for the value created.

g.   "Oondi.com" compensates content providers by giving 100% of the revenue generated by advertisements visible to viewers of the content provided.

h.   "Squidoo.com" allows content providers to select the topic of the content provided and then provides to the content provider 50% of the revenue realized by advertisements visible to viewers of the content.

i.   "Suite101.com" allows content providers to select the topic of the content provided and then provides a share of revenue realized by advertisements visible to viewers of the content.

j.   "Triond.com" shares 50% of the revenue realized by advertisements visible to viewers of the content.

k.    "WhiteHouseVoice.com" shares revenue with content providers.

l.    YouTube.com allows content providers to obtain a portion of the revenue generated by the content provided.

162.    By actively soliciting Plaintiffs and the Classes to provide content to TheHuffingtonPost.com without compensation, Defendants made Plaintiffs and the Classes less able to obtain compensation for the content provided either on their own websites or through any of the digital media sites listed above because a viewer of the content on TheHuffingtonPost.com would not be providing any revenue to Plaintiffs and the Classes but rather would be generating revenue purely for Defendants.

163.    Despite refusing to provide compensation to Plaintiff and the Classes, TheHuffingtonPost.com is aware that it is required to pay for certain content and pays for content from Yahoo.com and Foursquare.com, among others.

**Plaintiffs and the Classes Provide the Valuable Service of Driving Traffic to The HuffingtonPost.com**

164.    In addition to providing high quality content for TheHuffingtonPost.com, Plaintiffs and the Classes were also asked to, and did, drive internet traffic to TheHuffingtonPost.com by alerting their electronic mail contacts of the content provided and using various social networking media.  Such efforts were solicited by TheHuffingtonPost.com and created enormous product recognition and goodwill for the Defendants.

165.    For example, as of March 31, 2010, and, upon information and belief, earlier, TheHuffingtonPost.com posted on their website and sent to Plaintiffs and the Classes by electronic mail a document entitled "Huffpost Blogging Guidelines, Tips, FAQ."  The document contained the following guidelines for Plaintiffs and the Classes (all emphasis in original):

We encourage contributors to promote their pieces and send them around – many readers arrive at pieces on TheHuffingtonPost.com via links passed on from friends and other sites. Here are a couple of ideas:

- **Email Lists:** Send a short note with a link to your post to any lists you're on – whether social organizations, extracurricular groups, or even just your typical family/friends list. Encourage them to comment! Our experience shows that often the more comments a post attracts, the better it does in generating clicks and more comments. Create a community around your post, and help it grow by starting with your own personal community. Encourage your friends to share it as well.

- **Facebook/MySpace:** Share your post via Facebook or Myspace! Facebook makes it especially easy to share links through what they call "Posted Items." Click here: http://www.facebook.com/posted.php and paste your permalink into the box titled Post a Link. If it all goes well, your profile will say that you've "shared a blog post" and should even include your HuffPost headshot.

- **Blogs that cover the topic you're writing about:** Most blogs will have a 'contact' electronic mail for their proprietor. If you've written something you think a specific blog might be interested in, send it their way with a brief, polite note explaining why you thought they might find it interesting (don't send them everything you write, and don't send to multiple blogs simultaneously, i.e., 'spam' them). It also doesn't hurt to reference individual posts that they've written in your posts, by linking to them.

- **Respond to Comments:** Responding to comments on your own post helps the community grow around it. Your comments will have a special badge next to them to note your affiliation with the site as a "HuffPost blogger" – simply make sure you are logged in to the backstage area where you first submitted your post, then proceed to huffingpost.com to write your comment.

- **Friends = Fans:** Encourage your friends to become your "fan" on Huffington Post, by proceeding to any post of yours on the site and clicking the link that reads, "Become a Fan." After doing so, they will automatically get an electronic mail letting them know when you've published something.

166.    Upon information and belief, Defendants give preference to content providers who have large networks of followers so as to optimize the revenue generated by those content providers.

167.    Plaintiffs Tasini, Secours, Dublin, Laermer and Altman each publicized the content provided to TheHuffingtonPost.com through social networking media and their e-mail

contacts and thereby provided additional value to TheHuffingtonPost.com without any compensation.

168.    Because of the system set up by TheHuffingtonPost.com, Plaintiffs and the Classes gave the Defendants more exposure than vice-versa, namely, Plaintiffs and the Classes typically shared the link to the content provided with their social networks, sharing via electronic mail, Facebook, Twitter and the like (as so encouraged and directed by TheHuffingtonPost.com), thereby driving internet traffic to the HuffingtonPost.com and creating value for the Defendants. However, with a few exceptions, Plaintiffs and the Classes received only nominal exposure from TheHuffingtonPost.com.

169.    Plaintiffs also maintain their own websites which contain much of the content provided to TheHuffingtonPost.com.  In contrast to Huffington's contention that "maintaining a blog is an enormous amount of work," new tools have made maintaining personal websites a simple and often lucrative task.

**Acknowledging That Plaintiffs and the Classes Deserve Compensation for the Value Created by Their Content, TheHuffingtonPost.com Offers Only "Exposure" And, if Any Exposure is Provided, it is Provided in Unknown Quantities**

170.    On several occasions TheHuffingtonPost.com publicly stated that value was being provided by Plaintiffs and the Classes.

171.    For example, on February 7, 2011 Huffington sent Plaintiffs and the Classes electronic mail stating "Our bloggers have always been a very big part of who we are. . . [and] . . .Thank you for being such a vital part of the HuffPost family."

172.    In a 2007 solicitation to content providers, Huffington stated that the creation of original content was "the hardest work of a blogger" and that TheHuffingtonPost.com was merely providing the "megaphone."

173.   Also in 2007, Huffington noted that it was the number of content providers (Plaintiffs and the Classes) that allowed TheHuffingtonPost.com to have original, interesting content which drew viewers to the content provided, although not necessarily exposure for Plaintiffs and the Classes.

174.   Despite the value provided to TheHuffingtonPost.com, Plaintiffs and the Classes were only enticed with the promise of "exposure," which, if provided, as set forth below, was provided in indeterminate quantities.

175.   To the extent that the valuable content provided to TheHuffingtonPost.com created exposure, it was TheHuffingtonPost.com, and not Plaintiffs and the Classes, which received the majority of the exposure.

176.   As TheHuffingtonPost.com grew, and additional members of the Classes' provided content, the amount of exposure provided, if any, to any one Class member decreased, substantially, while the revenue generated by TheHuffingtonPost.com continued to grow. Nevertheless, Plaintiffs and the Classes were never notified of the decreasing amount of exposure and continued to provide content to TheHuffingtonPost.com.

177.   If it were not for the labor of Plaintiffs and the Classes for TheHuffingtonPost.com, each of whom helped make TheHuffingtonPost.com a household name, TheHuffingtonPost.com would not have been an attractive merger target and would have sold for at least $105 million less than the merger price of $315 million.

178.   Moreover, Plaintiffs Tasini, Secours, Dublin and Laermer each maintain their own websites and, in some case, realize revenue from the website. The exposure, if any, provided by TheHuffingtonPost.com was at the expenses of exposure through Plaintiffs' own websites and other opportunities on the internet.

REVENUES DERIVED BY DEFENDANTS FROM PLAINTIFFS AND THE CLASSES

179.   There are numerous revenue streams recognized from digital media sites such as TheHuffingtonPost.com, the principal one being online advertising revenue.  Online advertising revenues increase in proportion to the amount of internet traffic and the quality of the content appearing on a digital media site.

180.   Upon information and belief, TheHuffingtonPost.com tracked content costs and revenues and profits from each piece of content provided by Plaintiffs and the Classes. However, such information was never shared with Plaintiffs and the Classes and Plaintiffs and the Classes were affirmatively misled regarding the availability of such information.

181.   According to Quantcast, a service that provides website internet traffic data, TheHuffingtonPost.com has recently received 15.6 million page views per weekday.

182.   TheHuffingtonPost.com publishes approximately 600 to 700 pieces of content a day. Although some of this content is produced by paid content providers and some are links to other digital media sources, many of the pieces are original content provided by Plaintiffs and the Classes.

183.   Furthermore, based on search engine algorithms, the original content provided by the Plaintiffs and the Classes is especially valuable because original content allows for "search engine optimization."

184.   TheHuffingtonPost.com is aware and has been aware of the search engine optimization potential of original content and seeks to maximize revenues from such content.

185.   TheHuffingtonPost.com uses a sophisticated system created by DoubleClick (a subsidiary of Google) to track the revenue yields from each piece of content provided by Plaintiffs and the Classes.

186.   Based on public reports, almost fifty percent (50%) of visitors to TheHuffingtonPost.com only view one page, which, upon information and belief, is likely to be the page they were directed to by Plaintiffs or the Classes through social networking media or electronic mail.   Published reports also indicate that the most popular section of TheHuffingtonPost.com is the "blog" section.  However, TheHuffingtonPost.com also realizes substantial revenue from advertising viewed from its links to content created by other media companies' paid contributors.

187.   Upon information and belief, the "blog section" attracts the most initial site visits due, in part, to the efforts of Plaintiffs and the Classes to advise their contacts through social networking media or electronic mail of the valuable content Plaintiffs and the Classes provided to TheHuffingtonPost.com.  For example, Wedbush Equity Research, a respected analyst of the value of internet properties, stated that TheHuffingtonPost.com's success and high value is directly related to the high quality content provided by Plaintiffs and the Classes and Plaintiffs' and the Classes' efforts to disseminate the content provided. Commenting on the value that TheHuffingtonPost.com brought to AOL, on February 11, 2011 Wedbush stated:

> Execs have noted that part of the acquisition premium in the $315 deal likely relates to the "R&D" which HuffPo can bring to AOL's social marketing operations. HuffPo has been a leader in using social media strategies – including game-ification of the content consumption process, badge awards for audience contributions, and cultivation of fans – to build the engagement of site users. One measure of HuffPo's resulting success is that over the past year, it has more than doubled its comments per month to over 3m.

188.   Further, a Merriman Capital Equity Research report dated February 8, 2011 also indicated that the high quality content provided by Plaintiffs and the Classes created value for TheHuffingtonPost.com, especially because, unlike its purchaser, AOL,

TheHuffingtonPost.com's cost of content creation is minimal due to the fact that Plaintiffs and the Classes are uncompensated for the high quality content provided:

> HuffPost reached profitability in 2010 and is expected to generate over $50M in ad sales in 2011 with around $10M in OIBDA. That implies a rich valuation multiple of 6x sales and 31x OBIDA [sic]. However, the acquisition should generate around $20M in cost synergies within the AOL operations with overlapping content areas. That would make the valuation multiples far more reasonable at 10X OIBDA. [. . .] Longer term, AOL expects HuffPost to reach a $100M revenue run rate within the next 12 months and 30% operating margins. Considering the growth of HuffPost (22% audience growth in December 2010 to 25M unique visitors), the quality of the content and the brand, we view this acquisition as a long term positive, if the company can execute on integration with existing AOL content operations, and avoid disruption of HuffPost's "citizen reporter" model and culture.

### THE DEFENDANTS' BROWSE-WRAP TERMS

189.   From   the   formation   of   TheHuffingtonPost.com   until   2008, TheHuffingtonPost.com's website contained a "Service User Agreement."  A true and accurate copy of the Service User Agreement is attached to this First Amended Complaint as <u>Exhibit 1</u>. The Service User Agreement was available by opening a small link available only by scrolling to the bottom of TheHuffingtonPost.com website.

190.   From 2008 until the present, TheHuffingtonPost.com's website contained a "Terms and Conditions."  A true and accurate copy of such Terms and Conditions is attached to this First Amended Complaint as <u>Exhibit 2</u>.   The Terms and Conditions was and continues to be available  by  opening  a  small  link  available  only  by  scrolling  to  the  bottom  of TheHuffingtonPost.com website.  The Service User Agreement and the Terms and Conditions are collectively referred to as the "Browse-wrap Terms."

191.   Plaintiffs and the Classes never manifested their assent to the Browse-wrap Terms.  Plaintiffs were not aware and did not view the Browse-wrap Terms before submitting

content to TheHuffingtonPost.com because the Browse-wrap Terms were not readily visible to Plaintiff and the Classes.

192.    The Browse-wrap Terms were not provided to Plaintiffs and the Classes in any other format other than through inconspicuous placement on TheHuffingtonPost.com. Moreover, Defendants never explicitly brought the Browse-wrap Terms to the attention of Plaintiffs and the Classes by asking them to "click" to accept them or otherwise affirmatively give their assent to such Browse-wrap Terms.

193.    Plaintiffs and the Classes submitted content through a "backstage" site located at blogger.huffingtonpost.com. The Browse-wrap Terms are not viewable by link or otherwise from blogger.huffingtonpost.com, the site where Plaintiffs and the Classes submitted their content.

194.    The Browse-wrap Terms were created by the Defendants.

195.    Aside from not being generally visible to Plaintiffs and the Classes and not being accessible from the backstage site where Plaintiffs and the Classes provided content to TheHuffingtonPost.com, most provisions of the Browse-wrap Terms do not apply to Plaintiffs and the Classes.

196.    Sections in the Service User Agreement cannot apply to Plaintiffs and the Classes, such as:

    a.    Section 4(a) which limits TheHuffingtonPost.com users from using the content provided by Plaintiffs and the Classes, is not applicable to the creators of the content, Plaintiffs and the Classes;

    b.    Section 6 refers to Plaintiffs and the Classes as "third parties" to the Service User Agreement;

197.    There is no provision in the Service User Agreement regarding consideration or other payment by Defendants to Plaintiffs and the Classes in exchange for the content provided or any provision that states that no compensation will be provided or otherwise limits the compensation to be provided Plaintiffs and the Classes.

198.    Sections in the Terms and Conditions cannot apply to Plaintiffs and the Classes, such as:

      a.    Section 4(a) which limits TheHuffingtonPost.com users from using the content provided by Plaintiffs and the Classes, is not applicable to the creators of the content, Plaintiffs and the Classes;

      b.    Section 5 explicitly refers to Plaintiff and the Classes as "third parties" to the Terms and Conditions;

      c.    Section 7 refers to Plaintiff and the Classes as "third parties" to the Terms and Conditions.

199.    There is no provision in the Terms and Conditions regarding consideration or other payment by Defendants to Plaintiffs and the Classes in exchange for the content provided or any provision that states that no compensation will be provided or otherwise limits the compensation to be provided Plaintiffs and the Classes.

200.    The Terms and Conditions explicitly state that it is not the entire agreement between TheHuffingtonPost.com and Plaintiffs and the Classes.  Section 2 makes the Terms and Conditions "subject to the rights of our licensors and licensees under applicable agreements, understandings and arrangements."

201.    The Browse-wrap Terms each choose New York law as the governing law.

<u>THEHUFFINGTONPOST.COM VALUES THE CONTENT PROVIDED BY PLAINTIFFS
AND THE CLASSES INCORRECTLY AND INAPPROPRIATELY</u>

202.    TheHuffingtonPost.com admits that the content provided by Plaintiffs and the

Classes has value, but incorrectly calculates that value based on what is gained by Plaintiffs and

the Classes, not by Defendants.  For example, Arianna Huffington, at a meeting in Beverly Hills,

California, February 8, 2011 stated:

> People have not fully adjusted to the fact that self-expression is, for many people,
> a new source of fulfillment and entertainment... We have 9,000 bloggers with a
> password and literally get hundreds of submissions that our editors have to
> process. People are dying to blog for us...Do you think anybody really writes an
> op-ed for the NYT [sic] to get $100? They write because they want the exposure
> for their views.

203.    Plaintiffs and the Classes often write for compensation in the range of $100 per

piece of content provided.

204.    Nevertheless, despite touting the high level of "exposure" provided to Plaintiffs

and the Classes, TheHuffingtonPost.com jealously guards any hard data regarding the number of

page views Plaintiffs' and the Classes' content receive, although such data is readily available.

TheHuffingtonPost.com actually affirmatively misrepresented its ability to garner this

information in the "guidelines" distributed to Plaintiffs and the Classes by electronic mail:

> **How do I know how many readers my blog got?**
>
> Unfortunately we don't keep stats on all of our pages. However, the number of
> comments a post receives is one possible indication of the traction of one's post,
> but is not necessarily a direct indication of views.

205.    Due to the plethora of metrics maintained by Defendants to calculate revenue

yields for each piece of content provided by Plaintiff and the Classes, including the sophisticated

system used by TheHuffingtonPost.com created by DoubleClick, Defendants' statement that

statistics are not kept on all of its pages is affirmatively misleading.

206.   In addition to affirmatively misleading Plaintiffs and the Classes regarding its ability to track page views, the amount of exposure that TheHuffingtonPost.com provides Plaintiffs and the Classes is grossly overstated, over-emphasized and misrepresentative of the fact that Plaintiffs and the Classes provide immense value for TheHuffingtonPost.com by allowing TheHuffingtonPost.com to obtain top quality content at no cost and by disseminating that content via social networking media and electronic mail, giving TheHuffingtonPost.com exposure, which allows for search engine optimization, web internet traffic and hence revenue and/or profit, none of which is or has been shared with Plaintiffs and the Classes.

<u>THE MERGER</u>

207.   On February 7, 2011, AOL entered into an Agreement and Plan of Merger dated as of February 6, 2011 with Headline Acquisition Corporation, a Delaware corporation ('MergerSub") and wholly-owned subsidiary of AOL for the acquisition by AOL of TheHuffingtonPost.com.

208.   On March 4, 2011, AOL completed the acquisition of TheHuffingtonPost.com by means of a merger of MergerSub with and into TheHuffingtonPost.com, with TheHuffingtonPost.com becoming a wholly-owned subsidiary of AOL (the "Merger").

209.   On May 4, 2011, AOL filed the Merger agreement as an exhibit to its Form 10-Q for the quarterly period ended March 31, 2011.

210.   The transaction value of the Merger is estimated to be around $315 million (the "Merger Consideration").

211.   Upon information and belief, at least $105 million of the Merger Consideration recognized by TheHuffingtonPost.com, Huffington, Lerer and others is due to the value created by the content provided by Plaintiffs and the Classes, Plaintiffs' and the Classes' efforts to

publicize the content provided, and the value created by Plaintiffs and the Classes in lowering the cost of content production for AOL as set forth above.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**DECEPTIVE BUSINESS PRACTICE**
**(N.Y. Gen. Business Law §349)**
**PLAINTIFFS AND THE CLASSES v. DEFENDANTS**

212.   Plaintiffs and the Classes incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

213.   Defendants deceptively marketed themselves as a forum for news and ideas to get Plaintiffs and the Classes to provide valuable content for free. Defendants actively solicited content from Plaintiffs and the Classes from which Defendants intended to realize substantial revenues at the expense of the Plaintiffs and the Classes.

214.   Defendants deceived, and continue to deceive, Plaintiffs and the Classes in five ways: (1) by hiding the amount of page visits and page views attributed to the content created by Plaintiffs and the Classes, thereby hiding the amount of revenue that Plaintiffs and the Classes are providing; (2) by stating that information regarding the amount of internet traffic generated by each piece of content provided is unavailable when, in fact, it is available; (3) by not notifying Plaintiffs and the Classes that the exposure received was decreasing over time as additional content was added; (4) by presenting TheHuffingtonPost.com as a free forum or platform for ideas while actually building a product with substantial value for Defendants' sole benefit; (5) by actively dissuading Plaintiffs and the Classes from creating their own websites upon which Plaintiffs and the Classes could obtain exposure and revenue.

215.   It is deceptive to promise exposure (visibility, promotion and distribution) in lieu of monies to Plaintiffs and the Classes, but then not provide a real and accurate measure of

exposure and it is deceptive to solicit content on the promise of providing a free forum for ideas when, in fact, a product with tremendous value is being created by the solicited and uncompensated services provided. It is further deceptive to dissuade Plaintiffs and the Classes from creating their own websites when doing so is simple and lucrative.

216.   This behavior was directed at the public generally, as any member of the public could apply to be a TheHuffingtonPost.com content provider; TheHuffingtonPost.com, Lerer and Huffington solicited content providers generally through various media including TheHuffingtonPost.com, which had contests open to the public and programs such as "Off the Bus" aimed directly at getting more unpaid content providers from among the general public, the book *The Huffington Post Complete Guide to Blogging*, which was available to the general public and events such as Huffington's speeches at the Columbia University School of Journalism where Huffington spoke to the general public about the benefits of providing content to TheHuffingtonPost.com.

217.   Plaintiffs and the Classes were injured by the deceptive act(s) of the Defendants, statutorily, as well as by way of lost opportunity, time and effort, which would have been more appropriately spent elsewhere had Defendants not acted deceptively.

## SECOND CAUSE OF ACTION
## UNJUST ENRICHMENT
## PLAINTIFFS AND THE CLASSES v. DEFENDANTS

218.   Plaintiffs and the Classes incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

219.   Defendants acted deceptively, misrepresenting the purpose of TheHuffingtonPost.com, hiding the amount of page views generated by each piece of content

provided by Plaintiffs and the Classes, failing to inform Plaintiffs and the Classes of the amount of revenue generated and dissuading Plaintiff and the Classes from creating their own websites.

220.    Plaintiffs and the Classes provided valuable services to Defendants, services that were encouraged, solicited and sought after and accepted by Defendants.

221.    Defendants' failure to compensate Plaintiffs and the Classes is atypical and non-customary among digital media sites, most of which have developed systems to compensate content providers.  Defendants' failure to compensate Plaintiffs and the Classes is especially striking in light of the high quality of the content provided by Plaintiffs and the Classes to Defendants.

222.    The value of the services and writings provided by Plaintiffs and the Classes but not paid for can be quantified by, among other methods, (1) the amount of revenue realized by Defendants from each piece of content provided by Plaintiffs or the Classes' members; (2) the content production costs saved by Defendants when obtaining content from Plaintiffs and the Classes as opposed to using compensated content creators; (3) the efforts of Plaintiffs and the Classes to direct traffic to TheHuffingtonPost.com; and (4) the increase in value of TheHuffingtonPost.com due to the labor and services provided by Plaintiffs and the Classes to the Defendants, as evidenced by the Merger Consideration.

223.    Defendants were enriched by the content provided and the publicizing efforts of Plaintiffs and the Classes, and the revenues recognized by the same.

224.    Plaintiffs and the Classes were selected by Defendants to provide services due to their skills and networks.

225.    Plaintiffs and the Classes spent a substantial amount of time, effort and resources creating the content provided to TheHuffingtonPost.com.

226.    Defendants' enrichment came at the expense of Plaintiffs and the Classes.

227.    Plaintiff and the Damages Class are entitled to damages as a result of Defendants' unjust enrichment.

228.    It is against equity and good conscience to permit Defendants to retain any more than two-thirds of the Merger Consideration when the value of the Merger Consideration arose by the collective efforts of the Plaintiffs and the Classes.  It is against equity and good conscience to permit Defendants to retain such monies after acting deceptively and contrary to well accepted traditions of compensating content creators.

229.    The foregoing acts and omissions merit an unjust enrichment award for the Plaintiffs and the Classes.  Plaintiff and the Declaratory and Injunctive Relief Class seeks declaratory and injunctive relief prohibiting Defendants from continuing to be enriched by the value provided by Plaintiff and the Declaratory and Injunctive Relief Class, but not paid for, as well as restitution.

## JURY DEMAND

230.    Plaintiffs and the Classes hereby demands trial by jury, pursuant to Federal Rules of Civil Procedure 38(b), on all issues so triable.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs and the Classes pray that this Honorable Court grant the following relief:

a.      That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b.      On Plaintiffs' and the Classes' first cause of action for Deceptive Business Practices based on New York law, actual or statutory damages, whichever is

greater and treble damages thereon to the statutory limit as the Court deems appropriate in an amount to be determined at trial;

c.     On Plaintiffs' and the Classes' second cause of action for Unjust Enrichment, injunctive and declaratory relief and damages equal to restitution for the benefit bestowed on the Defendants by the labor, promotional efforts, creativity and work of the Plaintiffs and the Classes and the cost that Defendants would have otherwise paid to obtain the content provided by Plaintiffs and the Classes in an amount to be determined at trial but not less than $105 million;

d.     Attorney's fees;

e.     Costs for this action;

f.     That the Court use its inherent powers to grant such other and further relief as it deems just and proper at law and in equity to vindicate the claims brought forth in this action by Plaintiffs on behalf of the Classes.

Dated: New York, New York
        June 9, 2011

Respectfully submitted,

By: /s/ Jeff Kurzon
Jeffrey Mead Kurzon, Esq.
Bar No. JM3388
Jeff@KurzonStrauss.com

By: /s/ Jesse Strauss
Jesse Strauss, Esq.
Bar No. JS0212
Jesse@KurzonStrauss.com

**KURZON STRAUSS LLP**
305 Broadway, 9 FL
New York, NY 10007
Phone: 212-822-14
www.KurzonStrauss.com
Attorneys for Plaintiffs and the Classes

# EXHIBIT 1



DELIVERING NEWS AND OPINION SINCE MAY 9, 2005

Please read this User Agreement before using this Service. By continuing to use
TheHuffingtonPost.com, you agree to abide by the conditions of this User Agreement.

## THEHUFFINGTONPOST.COM SERVICE USER AGREEMENT

1. Welcome to TheHuffingtonPost.com ("THP," "Service" or "we"). By using this Service, you agree to
be bound by all of the terms of this Agreement (the "User Agreement"). We reserve the right to change
the terms of this User Agreement or to modify any features of this Service at any time without notice
to you, and you agree to be bound by such changes. Any changes to this User Agreement shall become
a part of this User Agreement and shall apply as soon as they are posted. The most current version of
the User Agreement can be viewed at any time at: TheHuffingtonPost.com. Your use of this Service
constitutes your agreement to all such terms, conditions and policies. Unless explicitly stated
otherwise, any new features or functionality that augment or enhance the Service, shall be subject to
this User Agreement.

2. THP reserves the right at any time and from time to time to modify or discontinue, temporarily or
permanently, the Service (or any part thereof) with or without notice. You agree that THP shall not be
liable to you or any third party for any modification, suspension or discontinuance of the Service.

3. This Service (including, without limitation, text, photographs, graphics, video and audio content) is
protected by copyright as a collective work or compilation under the copyright laws of the United States
and other countries. All individual articles, content and other elements comprising this Service are also
copyrighted works. You must abide by all additional copyright notices or restrictions contained in this
Service. By posting content on the Service, a user is giving THP the right to display such content on the
Service and its affiliated publications and to distribute such content and use such content for
promotional and marketing purposes.

4. (a) Unless expressly permitted, you may not copy, reproduce, distribute, publish, enter into a
database, display, perform, modify, create derivative works, transmit, or in any way exploit any part of
this Service, except as permitted under the last sentence of this Section 4(a) and except that you may
make one print copy that is limited to occasional articles of personal interest only. Without limiting the
generality of the foregoing (but subject to the last sentence of this Section 4(a)), you may not
distribute any part of this Service over any network, including, without limitation, a local area network,
nor sell or offer it for sale. In addition, these files may not be used to construct any kind of database.
Just as THP from time to time excerpts materials from other sources in order to support the various
commentaries and writings contained herein, we respect the right of others to make "fair use" of the
materials contained on THP; accordingly, you may from time to time excerpt and use materials set
forth on this site, provided, that you must give the original author credit and such use must be for a
non-commercial purpose only and not, for example, for re-sale.

(b) We are concerned about the integrity of our Service when it is viewed in a setting created by a
third party that includes advertising or other materials that we have not authorized to be displayed
with our Service. Neither you nor any third party shall make use of the contents of the Service in any
manner that constitutes an infringement of our rights, including copyright or that has not been
authorized by us.

5. You agree to indemnify and hold harmless THP and its affiliates, and their respective members,
directors, officers, managers, employees, shareholders, agents, and licensors, from and against all
losses, expenses, damages and costs, including reasonable attorneys' fees, resulting from any violation
by you of this Agreement. We reserve the right to take over the exclusive defense of any claim for
which we are entitled to indemnification under this Section. In such event, you shall provide us with
such cooperation as is reasonably requested by us.

6. THIS SERVICE IS AVAILABLE "AS IS." WE DO NOT WARRANT THAT THIS SERVICE WILL BE
UNINTERRUPTED OR ERROR-FREE. THERE MAY BE DELAYS, OMISSIONS, INTERRUPTIONS AND
INACCURACIES IN THE NEWS, INFORMATION OR OTHER MATERIALS AVAILABLE THROUGH THIS
SERVICE. WE DO NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT

The Huffington Post | RSS/XML                                                    Page 2 of 2

LIMITATION, THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THIS SERVICE OR ANY INFORMATION OR GOODS THAT ARE AVAILABLE OR ADVERTISED OR SOLD THROUGH THIS SERVICE. WE DO NOT MAKE ANY REPRESENTATIONS, NOR DO WE ENDORSE THE ACCURACY, COMPLETENESS, TIMELINESS OR RELIABILITY OF ANY ADVICE, OPINION, STATEMENT OR OTHER MATERIAL OR DATABASE DISPLAYED, UPLOADED OR DISTRIBUTED IN THIS SERVICE OR AVAILABLE THOUGH LINKS IN THIS SERVICE. WE RESERVE THE RIGHT TO CORRECT ANY ERRORS OR OMISSIONS IN THIS SERVICE. ALTHOUGH WE INTEND TO TAKE REASONABLE STEPS TO PREVENT THE INTRODUCTION OF VIRUSES, WORMS, "TROJAN HORSES" OR OTHER DESTRUCTIVE MATERIALS TO THIS SERVICE, WE DO NOT GUARANTEE OR WARRANT THAT THIS SERVICE OR MATERIALS THAT MAY BE DOWNLOADED FROM THIS SERVICE DO NOT CONTAIN SUCH DESTRUCTIVE FEATURES. WE ARE NOT LIABLE FOR ANY DAMAGES OR HARM ATTRIBUTABLE TO SUCH FEATURES. IF YOU RELY ON THIS SERVICE AND ANY MATERIALS AVAILABLE THROUGH THIS SERVICE, YOU DO SO SOLELY AT YOUR OWN RISK.

THIS SERVICE MAY CONTAIN VARIOUS COMBINATIONS OF TEXT, IMAGES, AUDIOVISUAL PRODUCTIONS, OPINIONS, STATEMENTS, FACTS, ARTICLES, MARKET DATA, STOCK QUOTES OR OTHER INFORMATION CREATED BY THP OR BY THIRD-PARTIES. DUE TO THE NUMBER OF SOURCES FROM WHICH CONTENT IN THIS SERVICE IS OBTAINED, AND THE INHERENT HAZARDS OF ELECTRONIC DISTRIBUTION, THERE MAY BE DELAYS, OMISSIONS OR INACCURACIES IN SUCH CONTENT. ACCORDINGLY, SUCH CONTENT, INCLUDING THE MARKET DATA, IS FOR YOUR REFERENCE ONLY AND SHOULD NOT BE RELIED UPON BY YOU FOR ANY PURPOSE. SUCH CONTENT IS NOT INTENDED FOR THE PURPOSE OF TAX OR INVESTMENT ADVICE AND IT DOES NOT ADVOCATE THE PURCHASE OR SALE OF ANY SECURITY OR INVESTMENT. INFORMATION CREATED BY THIRD PARTIES THAT YOU MAY ACCESS ON THE SERVICE OR THROUGH LINKS IS NOT ADOPTED OR ENDORSED BY THP AND REMAINS THE RESPONSIBILITY OF SUCH THIRD PARTIES.

7. We are not responsible for the availability or content of other services that may be linked to this Service. Because we have no control over such services, you acknowledge and agree that we are not responsible for the availability of such external services, and that we do not endorse and are not responsible or liable for any content, accuracy, quality, advertising, products or other materials on or available from such services. You further acknowledge and agree that THP shall not be responsible or liable, directly or indirectly, for any damage or loss caused or alleged to be caused by or in connection with the use of or reliance on any content, goods or services available on or through such services.

8. THP and its affiliates, and their respective members, directors, officers, managers, employees, shareholders, agents and licensors are not liable for incidental, indirect, consequential, special, punitive, or exemplary damages of any kind, including, without limitation, lost revenues or profits, loss of business or loss of data, in any way related to this Service or for any claim, loss or injury based on errors, omissions, interruptions or other inaccuracies in this Service (including, without limitation, as a result of breach of any warranty or other term of this Agreement). Any claim against us shall be limited to the amount you paid, if any, for use of this Service.

9. This Agreement may be terminated by either party for any reason at any time. Sections 3 through 8 of this Agreement shall survive such termination.

10. This Agreement shall be governed by the laws of the United States and the State of New York, applicable to agreements made and to be performed therein without regard to conflict of laws principles . BY CONTINUING TO USE THE SERVICE, YOU AGREE TO ABIDE BY THE TERMS OF THIS AGREEMENT.

© 2005 TheHuffingtonPost.com, LLC | User Agreement

# EXHIBIT 2

Case 1:11-cv-02472-JGK   Document 21   Filed 06/10/11   Page 73 of 77
Terms and Conditions                                              Page 3 of 7
Case 1:11-cv-02472-JGK   Document 20-2   Filed 05/26/11   Page 2 of 6



Obama Addresses British Parliament

John Edwards Could Be Indicted Within Days

White House Unveils New Energy-Efficient Standards For Vehicles

'The Oprah Winfrey Show' Ends

Democrat Scores Upset In New York Special Election

# Terms and Conditions

**Welcome to The Huffington Post. Please read these Terms and Conditions before using, or submitting content in any form or medium for publication on, The Huffington Post. By continuing to use us, or by submitting content for publication on The Huffington Post, you agree to abide, and that you are bound, by these Terms and Conditions. We reserve the right to change these Terms and Conditions at any time, and you agree (including by virtue of your continued use of our site) to be bound by any such changes. Unless explicitly stated otherwise, any new features or functionality (including, without limitation, video and related projects) that augment or enhance our site shall be subject to these Terms and Conditions. The most current version of these Terms and Conditions can be viewed at any time at: huffingtonpost.com.**

**1. We May Discontinue or Suspend Our Site or Terminate Your Use:** We reserve the right at any time and from time to time to modify or discontinue, temporarily or permanently, our site (or any part thereof) with or without notice. You agree that The Huffington Post shall not be liable to you or any third party for any such modification, suspension or discontinuance of our site. In addition, we reserve the right to terminate your access to our site for any reason, and to take any other actions that The Huffington Post, in its sole discretion, believes to be in the interest of our company and of our users as a whole.

**2. We Have All Rights In Our Site and Content; You Grant Us Certain Rights When You Submit Content to Us:**

(a) Our site (including all text, photographs, graphics, video and audio content contained on our site) is protected by copyright as a collective work or compilation under the copyright laws of the United States and other countries, and we (subject to the rights of our licensors and licensees under applicable agreements, understandings and arrangements) have all rights therein. All individual articles, blogs, videos, content and other elements comprising our site are also copyrighted works, and we (subject to the rights of our licensors and licensees under applicable agreements, understandings and arrangements) have all rights therein. You must abide by all additional copyright notices or restrictions contained on our site.

(b) By posting or submitting content on or to our site (regardless of the form or medium with respect to such content, whether text, videos, photographs, audio or otherwise), you are giving us, and our affiliates, agents and third party contractors the right to display or publish such content on our site and its affiliated publications (either in the form submitted or in the form of a derivative or adapted work), to store such content, and to distribute such content and use such content for promotional and marketing purposes. Without limiting the generality of the foregoing, with respect to any video submissions to us made by you from time to time, you understand and agree that (unless you and we agree otherwise) we may, or may permit users to, based solely on functionality provided and enabled by our website, compile, re-edit, adapt or modify your video submission, or create derivative works therefrom, either on a stand-alone basis or in combination with other video submissions, and (unless you and we agree otherwise) you shall have no rights with respect thereto and we or our licensees shall be free to display and publish the same (as so compiled, re-edited, adapted, modified or derived) for any period.

(c) You shall be solely responsible for your own submissions and the consequences of posting or publishing them. In connection with each of your submissions, you affirm, represent, and/or warrant that: *(I)* you own or have the necessary licenses, rights, consents, and permissions to use and authorize us to use all patent, trademark, trade secret, copyright or other proprietary rights in and to any and all such submissions to enable inclusion and use of such submissions in the manner contemplated by us and these Terms and Conditions; and *(II)* you have the written consent, release, and/or permission of each and every identifiable individual person in such submissions to use the name or likeness of each and every such identifiable individual person to enable inclusion and use of such submissions in the manner contemplated by us and these Terms and Conditions. In furtherance of the foregoing, you agree that you will not: *(I)* submit material that is copyrighted, protected by trade secret or otherwise subject to third party proprietary rights, including privacy and publicity rights, unless you are the owner of such rights or have permission from their rightful owner to post the material and to grant us all of the rights granted herein; *(II)* publish falsehoods or misrepresentations that could damage us or any third party; *(III)* submit material that is unlawful, obscene, defamatory, libelous, threatening, pornographic, harassing, hateful, racially or ethnically offensive, or encourages conduct that would be considered a criminal offense, give rise to civil liability, violate any law, or is otherwise inappropriate; or *(IV)* post advertisements or solicitations of business. We reserve the right to remove or not publish submissions without prior notice. You understand that when you submit content in any form to The Huffington Post we may authorize such content to be distributed or syndicated to or published on other Huffington Post-branded environments.

Please be advised that our site uses services and products protected by one or more of U.S. Patent Nos. 5,880,722; 5,886,692; 6,157,771; 6,201,925; 6,262,777; 6,285,361; 6,400,886; 6,661,430; and patents pending.

**3. You Have Rights if You Believe Your Copyright is Being Infringed:** If you are a copyright owner or agent thereof and believe that any of our content infringes upon your copyright, please click here.

**4. Your Use of Our Content is Restricted:**

(a) Unless expressly permitted, you may not copy, reproduce, distribute, publish, enter into a database, display, perform, modify, create derivative works from, transmit or in any way exploit any part of our site or any content thereon, except as permitted under the last sentence of this Section 4(a) and except that you may make one print copy that is limited to occasional articles of personal interest only. Without limiting the generality of the foregoing (but subject to the last sentence of this Section 4(a)), you may not distribute any part of this site or any content thereon over any network, including, without limitation, a local area network, or sell or offer it for sale. In addition, these files may not be used to construct any kind of database. Just as we from time to time excerpt materials from other sources in order to support the various commentaries and writings contained herein,

we respect the right of others to make "fair use" of the materials contained on our site; accordingly, you may from time to time excerpt and use materials set forth on this site consistent with the principles of "fair use."

   **(b)** We are concerned about the integrity of our site when it is viewed in a setting created by a third party that includes advertising or other materials that we have not authorized to be displayed with the content of our site. Neither you nor any third party shall make use of the contents of our site in any manner that constitutes an infringement of our rights, including copyright or that has not been authorized by us.

**5. We are an Internet Service Provider, e.g., We are Not Responsible For and Do Not Necessarily Hold the Opinions Expressed by Our Content Contributors:** Opinions and other statements expressed by users and third parties (e.g., bloggers) are theirs alone, not opinions of The Huffington Post. Content created by third parties is the sole responsibility of the third parties and its accuracy and completeness are not endorsed or guaranteed. You acknowledge that by providing you with the ability to view and distribute content through our site, The Huffington Post is not undertaking any obligation or liability relating to the content. The Huffington Post and its affiliates, successors, assigns, employees, agents, directors, officers and shareholders do not undertake or assume any duty to monitor our site for inappropriate or unlawful content. The Huffington Post and its affiliates, successors, assigns, employees, agents, directors, officers and shareholders assume no responsibility or liability which may arise from the content thereof, including, but not limited to, claims for defamation, libel, slander, infringement, invasion of privacy and publicity rights, obscenity, pornography, profanity, fraud, or misrepresentation. Notwithstanding the foregoing, The Huffington Post reserves the right to block or remove communications, postings or materials at any time in our sole discretion.

**6. You Will Be Responsible for Any Harm We Suffer as a Result of Your Violation of These Terms and Conditions or Any Breach by You of Your Representations and Warranties:** You agree to indemnify and hold harmless The Huffington Post and its affiliates, and their respective members, directors, officers, managers, employees, shareholders, agents, and licensors, from and against all losses, expenses, damages and costs, including reasonable attorneys' fees, resulting from any violation by you of these Terms and Conditions or any breach by you of your representations and warranties hereunder. We reserve the right to take over the exclusive defense of any claim for which we are entitled to indemnification under this Section 6. In such event, you shall provide us with such cooperation as is reasonably requested by us.

**7. Your Use of Our Site is Subject to Certain Disclaimers:** OUR SITE IS AVAILABLE "AS IS." WE DO NOT WARRANT THAT OUR SITE WILL BE UNINTERRUPTED OR ERROR-FREE. THERE MAY BE DELAYS, OMISSIONS, INTERRUPTIONS AND INACCURACIES IN THE NEWS, INFORMATION OR OTHER MATERIALS AVAILABLE THROUGH OUR SITE. WE DO NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO OUR SITE OR ANY INFORMATION OR GOODS THAT ARE AVAILABLE OR ADVERTISED OR SOLD THROUGH OUR SITE. WE DO NOT MAKE ANY REPRESENTATIONS, NOR DO WE ENDORSE THE ACCURACY, COMPLETENESS, TIMELINESS OR RELIABILITY OF ANY ADVICE, OPINION, STATEMENT OR OTHER MATERIAL OR DATABASE DISPLAYED, UPLOADED OR DISTRIBUTED ON THIS SITE OR AVAILABLE THROUGH LINKS ON OUR SITE. WE RESERVE THE RIGHT TO CORRECT ANY ERRORS OR OMISSIONS ON OUR SITE. ALTHOUGH WE INTEND TO TAKE REASONABLE STEPS TO PREVENT THE INTRODUCTION OF VIRUSES, WORMS, "TROJAN HORSES" OR OTHER DESTRUCTIVE MATERIALS TO OUR SITE, WE DO NOT GUARANTEE OR WARRANT THAT OUR SITE OR MATERIALS THAT MAY BE DOWNLOADED FROM OUR SITE DO NOT CONTAIN SUCH DESTRUCTIVE FEATURES. WE ARE NOT LIABLE FOR ANY DAMAGES OR HARM ATTRIBUTABLE TO SUCH FEATURES. IF YOU RELY ON OUR SITE AND ANY MATERIALS AVAILABLE THROUGH OUR SITE, YOU DO SO SOLELY AT YOUR OWN RISK.

OUR SITE MAY CONTAIN VARIOUS COMBINATIONS OF TEXT, IMAGES, AUDIOVISUAL PRODUCTIONS, OPINIONS, STATEMENTS, FACTS, ARTICLES, MARKET DATA, STOCK QUOTES OR OTHER INFORMATION CREATED BY US OR BY THIRD-PARTIES. DUE TO THE NUMBER OF SOURCES FROM WHICH CONTENT ON OUR SITE IS OBTAINED, AND THE INHERENT HAZARDS OF ELECTRONIC DISTRIBUTION, THERE MAY BE DELAYS, OMISSIONS OR INACCURACIES IN SUCH CONTENT. ACCORDINGLY, SUCH CONTENT, INCLUDING MARKET DATA, IS FOR YOUR REFERENCE ONLY AND SHOULD NOT BE RELIED UPON BY YOU FOR ANY PURPOSE. SUCH

Terms and Conditions

CONTENT IS NOT INTENDED FOR THE PURPOSE OF TAX OR INVESTMENT ADVICE AND IT DOES NOT ADVOCATE THE PURCHASE OR SALE OF ANY SECURITY OR INVESTMENT. INFORMATION CREATED BY THIRD PARTIES THAT YOU MAY ACCESS ON OUR SITE OR THROUGH LINKS IS NOT ADOPTED OR ENDORSED BY US AND REMAINS THE RESPONSIBILITY OF SUCH THIRD PARTIES

**8. We are Not Responsible for Linked Sites:** We are not responsible for the availability or content of other services that may be linked to our site. Because we have no control over such services, you acknowledge and agree that we are not responsible for the availability of such external services, and that we do not endorse and are not responsible or liable for any content, accuracy, quality, advertising, products or other materials on or available from such services. You further acknowledge and agree that we shall not be responsible or liable, directly or indirectly, for any damage or loss caused or alleged to be caused by or in connection with the use of or reliance on any content, goods or services available on or through such services.

**9. We May be Legally Compelled to Disclose Certain Information:** You agree that in the event we receive a subpoena issued by a court or from a law enforcement or government agency, we shall comply with such subpoenas without your consent or prior notice to you and may disclose your IP address, username, name, IP location or other information in response thereto.

**10. Our Liability to You is Limited:** The Huffington Post and its affiliates, and their respective members, directors, officers, managers, employees, shareholders, agents and licensors are not liable for incidental, indirect, consequential, special, punitive, or exemplary damages of any kind, including, without limitation, lost revenues or profits, loss of business or loss of data, in any way related to this site or for any claim, loss or injury based on errors, omissions, interruptions or other inaccuracies in our site (including, without limitation, as a result of breach of any warranty or other term of these Terms and Conditions). Any claim against us shall be limited to the amount you paid, if any, for use of our site.

**11. Any Dispute Between Us Will be Governed by New York Law:** These Terms and Conditions shall be governed by the laws of the United States and the State of New York, applicable to agreements made and to be performed therein without regard to conflict of laws principles. BY CONTINUING TO USE OUR SITE, YOU AGREE TO ABIDE BY THESE TERMS AND CONDITIONS. The caption to each Section of these Terms and Conditions are for convenience of reference only and shall be ignored in the construction or interpretation hereof.

| Submit Query |
| --- |

- FRONT PAGE
- POLITICS
- BUSINESS
- ENTERTAINMENT
- MEDIA
- TECH
- COMEDY
- STYLE
- WORLD
- FOOD
- HEALTHY LIVING
- IMPACT
- MORE
- LOCAL

HOW YOU CAN HELP VICTIMS OF THE MISSOURI TORNADO

- FEATURED
- GREEN
- SPORTS

Terms and Conditions

- AOL TRAVEL
- WEIRD NEWS
- ARTS
- RELIGION
- DIVORCE
- BOOKS

- Advertise |
- Log In |
- Make HuffPost your Home Page |
- RSS |
- Careers |
- FAQ

- User Agreement |
- Privacy |
- Comment Policy |
- About Us |
- Contact Us

- Copyright © 2011 TheHuffingtonPost.com, Inc. |
- "The Huffington Post" is a registered trademark of TheHuffingtonPost.com, Inc. All rights reserved.

- Part of **HuffPost News** • **HPMG News**