# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jonathan Tasini, Molly Secours, Tara Dublin, Richard Laermer and Billy Altman, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>   v.<br><br>AOL Inc., TheHuffintonPost.Com, Inc., Arianna Huffington and Kenneth Lerer,<br><br>           Defendants. | **ECF CASE**<br><br>CIVIL ACTION: 11 CV 2472 (JGK) |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Jeffrey Mead Kurzon (JK-3388)
Jesse Strauss (JS-0212)
Kurzon Strauss LLP
305 Broadway, 9th Floor
New York, NY 10007
Telephone: 212-822-1496
Fax: 212-822-1407
*Attorneys for Plaintiffs*

New York, New York
July 14, 2011

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................1

FACTS AS ALLEGED IN THE COMPLAINT ................................................2

ARGUMENT ................................................................................................7

I.    LEGAL STANDARD ON RULE 12(B)(6) MOTION TO DISMISS ..........7

II.   EQUITY AND GOOD CONSCIENCE REQUIRE
      RESTITUTION OF THE REVENUES DERIVED BY
      DEFENDANTS FROM PLAINTIFFS' LABOR ...............................8

III.  DEFENDANTS HAVE VIOLATED NEW YORK GENERAL
      BUSINESS LAW SECTION 349 ...........................................19

CONCLUSION ........................................................................25

i

## <u>TABLE OF ATHORITIES</u>

### FEDERAL CASES

*Arnold v. Baisch (In Re Great Lakes Boat Repair),* 2006 Bankr. Lexis 2537

(Bankr. W.D.N.Y 2006)…………………………………………………….....................14

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)………..…………………………………….7

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 10-1372-cv

(2d Cir. Jun. 20, 2011)………………………………………………………...12

*Bildstein v. Mastercard Int'l Inc.*, 2005 U.S. Dist. LEXIS 10763

(S.D.N.Y., June 6 2005)……………………………………………………........20

*Brody v. Brody*, 2009 U.S. Dist. LEXIS 17078 (S.D.N.Y. Feb. 13, 2009)………………..8

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F. Supp. 2d 298

(S.D.N.Y. 1999)………………………………………………………...10, 11

*Golden Pac. Bancorp v. FDIC*, 273 F.3d 509 (2d Cir. 2001)………..………………15

*Goldstein v. Pataki*, 516 F.3d 50 (2d Cir. 2008)…….………………………………7

*Hallissey v. America Online, Inc.* 2006 U.S. Dist. Lexis 12964

(S.D.N.Y. Mar. 10, 2006)………………………………………….…….13

*Int'l Design Concepts, LLC v. Saks, Inc.*, 486 F. Supp. 2d 229

(S.D.N.Y. 2007)……………………...…………………………….………………24

*International News Service v. The Associated Press*, 248 U.S. 215 (1918)………....12, 13

*Kuklachev v. Gelfman,* 600 F. Supp. 2d 437 (E.D.N.Y. 2009)…………………………...9

*Kurschner v. Mass. Cas. Ins. Co.*, 2009 U.S. Dist. LEXIS 16623

(E.D.N.Y. Mar. 3, 2009) …………………………………………………...…19

*Leibowitz v. Cornell Univ.,* 584 F. 3d 487 (2d Cir. 2009)…………………………...10, 14

*M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538 (E.D.N.Y. 2010)…….…………........ 25

*Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir. 2000)…………….………………………...24

*New World Comm'ns, Inc. v. Thompsen*, 878 A.2d 1218 (D.C. 2005)…………………..11

*New York v. Feldman,* 210 F. Supp. 2d 294 (S.D.N.Y. 2002)…………………….......23

*P. Kaufmann, Inc. v. Americraft Fabrics, Inc.*, 232 F. Supp. 2d 220

(S.D.N.Y. 2002)……………………………………………………………………………24

*Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008)….……………………………7

*Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256 (2d Cir. 1995)…….………..23

*Serendip LLC v. Franchise Pictures LLC*, 2000 U.S. Dist. LEXIS 12946

(S.D.N.Y. Sept. 6, 2000)……………………………………………………………..8

*Tony and Susan Alamo Foundation et. al. v. Secretary of* Labor,

471 U.S. 290 (1985)......................................................................10, 11

*Ulloa v. Universal Music & Video Distrib. Corp*., 303 F. Supp. 2d 409

(S.D.N.Y. 2004)………………………………………………………………...10, 11

*Watts v. Jackson Hewitt Tax Service*, 579 F. Supp. 2d 334 (E.D.N.Y 2008)……………19

## STATE CASES

*Access Staffing, LLC v. Duff & Phelps, LLC*, 2011 N.Y. Slip Op 31515U

(N.Y. Sup. Ct. May 31, 2011)……………………………………………………………18

*Bescette v. Niles*, 803 N.Y.S.2d 837 (App. Div. 2005)………………………………14

*Bradkin v. Leverton*, 26 N.Y. 2d 192 (1970)……………………………………….......18

*Clark-Fitzpatrick v. Long Island R.R. Co.,* 521 N.Y.S.2d 653 (1987)……………...17, 18

*Corsello v. Verizon N.Y., Inc.,* 908 N.Y.S.2d 57 (App. Div. 2010)……………………...14

*DeAngelis v. Timberpeg E., Inc.,* 858 N.Y.S.2d 410 (App. Div. 2008)………………….23

*Donerial Corp. N.V. v. 405 Park LLC,* 2011 N.Y. Slip Op 50147(U)

(Sup. Ct. N.Y. Cnty. 2011)...…………………………………………………………18

*Elacqua v. Physicians' Reciprocal Insurers*, 860 N.Y.S.2d 229 (App. Div. 1999)……..24

*Estate of Goth v. Tremble*, 873 N.Y.S.2d 364 (App. Div. 2009)……………...........10, 14

*Judge Rotenberg Educ. Ctr. v. Maul*, 658 N.Y.S.2d 493 (App. Div. 1997)…………10, 14

*Gaidon v. Guardian Life Ins. Cnty. of Am.*, 94 N.Y.2d 330 (1999)……………………...24

*Grombach Prods. v. Waring,* 293 N.Y. 609 (1944)……………………………………...17

*Karlin v. IVF Am.*, Inc., 690 N.Y.S.2d 495 (N.Y. 1999)……………...……......……...23

*Lake Erie Distribs.  v. Martlet Importing Co.*, 634 N.Y.S.2d 599 (App. Div. 1995)…….9

*Lake Minnewaska Mountain Houses Inc. v. Rekis*, 686 N.Y.S.2d 186

(App. Div. 1999)……………………………………………………………….....8

*Maas v. Cornell Univ.*, 94 N.Y.2d 87 (1999) …………………………………........15

*Matter of Linker v. Martin*, 803 N.Y.S.2d 534 (App. Div. 2005)…………………………14

*Manufacturers Hanover Trust Co. v. Chemical Bank*, 559 N.Y.S.2d 704

(App. Div. 1990)……………………………………………………………….....11

*Med. Soc'y v. Oxford Health Plans, Inc.*, 790 N.Y.S.2d 79 (App. Div. 2005)……..…….24

*Merrill Lynch v. Chipetine,* 634 N.Y.S.2d 469 (App. Div. 1995)…………………………..8

*Miller* v. *Schloss,* 218 N.Y. 400 (1916)……………………………………………………17

*Paramount Film Distrib. Corp. v.  State of New York*, 30 N.Y. 2d 415 (1972)……..……13

*Reit v. Yelp!, Inc.*, 907 N.Y.S.2d 411 (Sup. Ct. N.Y. Cnty. 2010)………………………24

*Rocky Point Props., Inc. v. Sear-Brown Group, Inc.*, 744 N.Y.S.2d 269

(App. Div. 2002)…………………………………………………………….....18

*Samiento v. World Yacht Inc.,* 10 N.Y.3d 70 (2008)………..…………………………...24

*Sharp v. Kosmalski*, 40 N.Y.2d 119 (1976)……………………………………….......13

*Whalen v. Pfizer, Inc.* 862 N.Y.S.2d 812 (Sup. Ct. 2005)…………..………………...14

*Williamson v. Stallone*, 2010 N.Y. Slip Op 20234 (N.Y. Sup. Ct. 2010)……………..14

*Wilner v. Allstate Ins. Co.*, 983 N.Y.S.2d 208 (App. Div. 2010)……………………...24

## STATUTES AND RULES

New York General Business Law § 349……………………………………….passim

Federal Rule of Civil Procedure 12(b)(6)…………….……………………….…passim

## TREATISES

Restatement (Second) of Contracts § 19………………………………………………17

## LITERATURE

William Knoedelseder, <u>I'm Dying Up Here</u> (2009)………………………………....7

Mark Twain, <u>Tom Sawyer</u> (1876)……………………………………………...7

## PRELIMINARY STATEMENT

This case presents an issue of first impression: Does the equitable principle of unjust enrichment require restitution when solicited content and promotional efforts provided by unpaid writers create a valuable internet property?  If writing is to continue as a viable vocation for talented, motivated individuals as valuable content production and dissemination adapts to the digital age, this honorable Court should answer that question in the affirmative and allow this action to proceed.

Defendants AOL Inc., TheHuffingtonPost.com, Inc. ("HuffingtonPost.com"), Arianna Huffington and Kenneth Lerer (collectively referred to as "Defendants" unless denoted otherwise) profited unjustly from valuable original digital content and publicity efforts obtained from Plaintiffs Jonathan Tasini, Molly Secours, Tara Dublin, Richard Laermer and Bill Altman (collectively referred to as "Plaintiffs").  Due to the millions of viewers attracted, a portion of which were attracted by Plaintiffs' content and publicity efforts, Defendants realized substantial advertising revenue and built a digital media brand that recently sold for $315 million dollars.  Yet, not one cent of the $315 million sale was shared with Plaintiffs, despite their efforts in building HuffingtonPost.com into one of the most valuable properties on the internet.

Defendants' motion to dismiss the First Amended Complaint ("FAC") raises a series of arguments regarding Plaintiffs' expectation of compensation that are legally irrelevant.  Defendants assert that Plaintiffs' claims are barred by a post-hoc "implied-in-fact" contract whereby Plaintiffs, allegedly cognizant of the vast fortunes Defendants were realizing from the content provided were, nevertheless, providing the content in exchange for the amorphous and unquantified "exposure" that Defendants were

1

providing.  No such contract existed and its existence, dependent on the intent of the alleged contracting parties, cannot be established on this record.  Rather, the FAC alleges the existence of a quasi-contact "implied-in-law" that requires Plaintiffs be compensated, lest Defendants be unjustly enriched.  Defendants also contend that the misleading statements and actions that enticed Plaintiffs and the approximate 9,000 other unpaid content providers to contribute digital content and services do not violate New York's deceptive business practices prohibition.  As this case presents a matter of public interest, Defendants' attempt to avoid New York's deceptive business prohibition is factually and legally without support.

The Roman law principle in the Latin maxim *Nemo Debet Locupletari Ex Aliena Jactura* ("no one should be enriched by another's loss") is as true today as throughout the development of the Western legal cannon. This Court should honor that tradition and permit Plaintiffs to demonstrate that Defendants' monetary gains have come at their expense and that equity and good conscience require restitution.

## FACTS AS ALLEGED IN THE COMPLAINT

Since its inception in May 2005, HuffingtonPost.com has been in the business of selling advertising targeted to site viewers.  FAC ¶¶ 119, 123.  Advertising revenues increase in proportion to the amount of page views a website receives.  FAC ¶¶ 133-34, 168.  The amount of page views is a reflection of the quality of the content on a website and of the website's ability to attract viewers either through its own marketing or harnessing the existing social networks of others. FAC ¶¶ 5, 7, 186-87.  Viewers are attracted to HuffingtonPost.com due to the high quality content provided by its contributors such as Plaintiffs, the majority of whom are either professional or quasi-

professional journalists and authors, and Defendants' use of content providers' networks to publicize the site.  FAC ¶¶ 5, 7, 142, 164-65.  The original content created by contributors like the Plaintiffs is the most valuable content because most search engines, including Google's leading search engine, give such original content priority, thereby "optimizing" HuffingtonPost.com's ranking and making it more likely to attract views. FAC ¶ 183-84.  The HuffingtonPost.com does not pay content providers either for their original content or for their publicity efforts.  FAC ¶ 126.

Obtaining valuable content, for free, and harnessing the networks of content providers to publicize HuffingtonPost.com, is extremely valuable because the use of unpaid content providers and its ensuing publicity, allowed HuffingtonPost.com to keep the cost of content production low.  FAC ¶¶ 5, 146-47, 154, 187-88.  Tim Armstrong, the CEO of Defendant AOL Inc., the company that recently acquired HuffingtonPost.com for $315 million, was recently quoted as being motivated to acquire HuffingtonPost.com because of its "hordes of free bloggers."  FAC ¶ 152.  Ms. Huffington has stated that HuffingtonPost.com's ability to "produce high-quality content in cost effective ways" – namely through the acquisition of top quality content, for free – was something HuffingtonPost.com did "well."  FAC ¶¶ 149, 173.  Ms. Huffington's comment is an understatement: HuffingtonPost.com's ability to obtain top quality content for free is a failed innovation, especially because other websites pay content creators and therefore have higher costs.[1] FAC ¶¶ 161, 150 (explaining AOL's aversion to using paid content

---

[1] As a matter of public interest, HuffingtonPost.com's innovation allows it to obtain top quality content for free from professional writers and therefore threatens to undermine the journalism profession by making it increasingly difficult for journalists to earn a living. In response, the Newspaper Guild, a nationally recognized union with 26,000 members, has asked its members to boycott HuffingtonPost.com.  *See*

creators because of the cost inasmuch as its goal is to create top quality content for the lowest cost possible); 155-157 (describing AOL's transition from paying content providers to relying on top quality content provided for free); 188 (noting that one analyst saw AOL Inc.'s acquisition of HuffingtonPost.com as a "long term positive, if [AOL] can . . . avoid disruption of HuffPost's 'citizen reporter' model and culture").

HuffingtonPost.com closely tracks the amount of page views received by each piece of content as page views are the backbone of its revenue model.  FAC ¶¶ 168, 180, 185.  Known only to them, Defendants refuse to disclose the amount of page views their content receives and even affirmatively misled Plaintiffs regarding the availability of such data.  FAC ¶ 204.

HuffingtonPost.com's strategy of generating page views through the use of unpaid content providers has been successful for the Defendants.  As of January 2011, HuffingtonPost.com received more than 26 million page unique visitors each month and, in the aggregate (non-unique), 15.6 million page views each weekday.  FAC ¶¶ 124, 181.  In 2011 HuffingtonPost.com is expected to generate over $50 million in advertising revenue.  FAC ¶ 188.

Having discovered that substantial revenues could be derived through content obtained for free, Defendants set about to actively solicit unpaid content providers who could optimize page views and search engine placement either because of the quality of

---

http://www.newsguild.org/index.php?ID=10712 (last visited June 30, 2011).   The National Writers Union (local 1981 of the United Auto Workers) has also called for a boycott of HuffingtonPost.com.  *See* http://www.nwu.org/boycott-huffington-post-0 (last visited June 30, 2011 (stating that AFL-CIO President Rich Trumka, and the Presidents of the United Auto Workers, the Communication Workers of America and United Steel Workers are honoring the boycott).

their posts, their large social networks, or both.  FAC ¶¶ 7, 133, 135.  Defendants did so in a number of different ways.

Plaintiff Jonathan Tasini, an author, politician, union leader and activist was recruited personally by Ms. Huffington in 2005 to contribute content to HuffingtonPost.com.  FAC ¶ 20.  Over the following six years, Mr. Tasini contributed 216 pieces of content and disseminated links to the content provided to his social network, consisting of 4,000 Facebook friends, 10,000 e-mail addresses and, later, hundreds of Twitter followers.  FAC ¶¶ 21, 23, 26.

Plaintiff Molly Secours, a writer, film maker, social activist and speaker in Nashville, Tennessee, was invited to write for HuffingtonPost.com after a review of her work by one of HuffingtonPost.com's editors in late 2009.  FAC ¶¶ 30-31, 34.  Over the following 13 months, Ms. Secours contributed 23 pieces of content and disseminated links to the content she provided to her social network of over 1,000 e-mails addresses, a considerable amount of Facebook friends and Twitter followers. FAC ¶ 38. Ms. Secours also publicized HuffingtonPost.com on her weekly radio show and referenced the content she provided at speaking engagements around the nation.  FAC ¶ 41.

Plaintiff Tara Dublin, a writer and voiceover artist well known in the Portland, Oregon area, was invited to write for HuffingtonPost.com in July 2010 after entering a contest open to the public.  FAC ¶¶ 45, 47-48.  Over the following twelve months, Ms. Dublin provided 16 pieces of content and disseminated links to the content provided to her personal e-mail list.  FAC ¶¶ 52, 55.

Plaintiff Richard Laermer is the CEO of a public relations firm, a former journalist, author of five bestselling books, a regular contributor to newspapers and

periodicals, a regular commentator on television and radio and a paid media trainer.  FAC ¶¶ 60-61.  Mr. Laermer was contacted by an editor for HuffingtonPost.com in November 2008 and asked to provide content.  FAC ¶ 64.  Over the next 30 months, Mr. Laermer contributed 115 pieces of content and disseminated links to the content provided to his over 13,000 Twitter followers and his widely read e-mail list.  FAC ¶¶ 70, 74.

Plaintiff Billy Altman is a journalist, author, writer, commentator and teacher who writes on sports and music. FAC ¶¶ 78-80.  In the Fall 2009, HuffingtonPost.com asked Mr. Altman to contribute content to its new sports section. FAC ¶ 83.  During the following 18 months, Mr. Altman contributed 22 pieces of content to HuffingtonPost.com and was encouraged to disseminate links to his content to e-mail contacts.  FAC ¶¶ 87, 90.  None of the Plaintiffs received any compensation for either the content provided or for their efforts to publicize HuffingtonPost.com.  FAC ¶¶ 25, 40, 54, 73, 89.

In addition to the direct solicitations of Plaintiffs, Defendants, attempting to obtain the highest quality content possible, embarked on a series of public solicitations. FAC ¶¶ 135-138.  Defendants systemically sought additional content providers it believed were "interesting" (FAC ¶ 137); dissuaded potential content creators from setting up their own competing blogs by attesting to the amount of maintenance involved (FAC ¶ 139); published a book about blogging to recruit new bloggers (FAC ¶ 140); and, perhaps most insidiously, Ms. Huffington gave lectures at journalism schools where she induced students and members of the general public to provide content, for free, by touting the number of book deals allegedly offered to content providers.  FAC ¶ 141.

Defendants' claims that providing valuable content, for free, to HuffingtonPost.com, creates "exposure" for content providers such as Plaintiffs has never been verified.[2] FAC ¶¶ 204, 206.  In fact, the FAC alleges that any exposure created accrues to the benefit of HuffingtonPost.com, not Plaintiffs, because the publicity efforts by the 9,000 unpaid content providers created more exposure for HuffingtonPost.com than that received by the Plaintiffs.  FAC ¶ 168, 206.

## ARGUMENT

## I.  LEGAL STANDARD ON A RULE 12(B)(6) MOTION TO DISMISS

In deciding a motion to dismiss a Complaint under Rule 12(b)(6), a court must "accept . . . all factual allegations in the complaint and draw . . . all reasonable inferences in the plaintiff's favor." *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotation marks omitted).  Because the court assumes the veracity of the allegations, the Plaintiffs are required only to "provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw

---

[2] Defendants analogize their profiteering from Plaintiffs' valuable content to agreements that exist between commentators and the cable news channels or public affairs programs on which they appear. Defendants' Memorandum of Law ("Def. Memo") p. 9.  However, many, if not most, cable news commentators are, in fact, paid for their appearances. *See* http://www.ehow.Cnty.uk/info_8421092_salary-cable-political-commentators.html (last visited June 29, 2011) (describing the average salaries for political commentators). More appropriate analogies may be found in William Knoedelseder, I'm Dying Up Here (2009) (describing the collective action movement of unpaid comedians) or Mark Twain, Tom Sawyer ch. 2 (1876) ("Like it? Well, I don't see why I oughn't to like it. Does a boy get a chance to whitewash a fence every day?").

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Numerous factual issues regarding the benefits obtained by a party from services rendered, the detriment to the party providing the services as well as the equity of allowing one party to retain the benefits of the other's labor without restitution, regularly require courts to deny 12(b)(6) motions in unjust enrichment causes of action.  *See e.g. Brody v. Brody*, 2009 U.S. Dist. LEXIS 17078, at *15 (S.D.N.Y. Feb. 13, 2009) (denying a motion to dismiss an unjust enrichment claim under New York law);  *Serendip LLC v. Franchise Pictures LLC*, 2000 U.S. Dist. LEXIS 12946, at *19-20  (S.D.N.Y. Sept. 6, 2000) (holding that where a complaint alleged the plaintiff rendered valuable advice and services without payment and "defendants should not retain the benefit thereof without payment for same" the claim should survive a Rule 12(b)(6) motion).

## II.   EQUITY AND GOOD CONSCIENCE REQUIRE RESTITUTION OF THE REVENUES DERIVED BY DEFENDANTS FROM PLAINTIFFS' LABOR

### A.   Plaintiffs' Have Satisfied All the Elements of Unjust Enrichment Under New York Law.

To state a claim for unjust enrichment under New York law, only three elements must be satisfied: "(1) defendant was enriched (2) at plaintiff's expense, and (3) that it is against equity and good conscience to permit. . . defendant to retain what is sought to be recovered." *Lake Minnewaska  Mountain Houses Inc. v. Rekis*,  686  N.Y.S.2d  186,  187 (App. Div. 1999); *Merrill Lynch v. Chipetine,* 634 N.Y.S.2d 469, 471 (App. Div. 1995) (noting that in assessing the sufficiency of an unjust enrichment claims courts "will also look to see if defendant's conduct was tortious or fraudulent").

Each of the elements of a prima-facie case of unjust enrichment is stated in the FAC. The FAC alleges that (1) Defendants were enriched through advertising revenue obtained as a result of the Plaintiffs' provision of content and publicity efforts (2) that the enrichment was at Plaintiffs' expense because of the hours dedicated to the creation of content and by placing the content on HuffingtonPost.com, Plaintiffs were deprived of the revenues they could have obtained by placing the content on sites that paid for content and because exposure from the content provided, if any, was shared with Defendants and (3) that equity and good conscience require restitution because to allow otherwise would be unjust, even more especially given Defendants' misleading conduct and our custom to compensate people for their labor and writers for their writings.  FAC ¶¶ 3, 164, 168, 219-28.  *See Lake Erie Distribs. v. Martlet Importing Co.*, 634 N.Y.S.2d 599, 601-602 (App. Div. 1995) (holding that a claim for unjust enrichment was satisfied where the "plaintiff conferred a benefit upon defendants in the form of enhanced product recognition and good will. . . and that defendants have unjustly retained that benefit"); *Kuklachev v. Gelfman,* 600 F. Supp. 2d 437, 477 (E.D.N.Y. 2009) (finding a prima-facie case for unjust enrichment where the defendants misappropriated plaintiffs' "persona, goodwill and reputation"). [3]

---

[3] In *Kulachev* the Defendant created a show substantially similar to Plaintiffs' unique show without compensating Plaintiffs.  In considering whether Plaintiffs stated a claim for unjust enrichment, the Court found that because Plaintiffs intended to produce the show in the future, and Defendants' actions made Plaintiffs' property less marketable by decreasing the audience for the show, it was against equity and good conscious to allow Defendants to retain profits from the elicit show.  *See Kulachev,* 600 F. Supp.2d at 477.  Here, the Plaintiffs allege that because the content was provided free to Defendants, the content provided became less valuable because viewers could access it on HuffingtonPost.com, and by so doing allowed Defendants' to solely profit from the content provided. FAC ¶¶ 162, 169.

Defendants' motion to dismiss appears to concede that the FAC states two of the three elements of an unjust enrichment claim in New York, but alleges that the third element has not been satisfied. Essentially, Defendants make two primary arguments: (1) the third element requires an expectation of payment and (2) Plaintiffs' repeated contributions of valuable content without demanding compensation somehow makes restitution less equitable. Def. Memo p. 11.

First, Defendants suggest that equity and good conscience do not require payment to be made to a provider of services who does not expect to be paid. *See* Def. Memo p. 9. However, Defendants misconstrue the law of unjust enrichment by inserting an extra element – the expectation of payment – into New York's law, as they conflate it with *quantum meruit*, a separate and unique form of implied-in-law contract from unjust enrichment.[4]  *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F. Supp. 2d 298, 301-303 (S.D.N.Y. 1999) (finding that a cross-claim plaintiff could state a cause of action for unjust enrichment even where it never expected payment and stating "A claim for quantum meruit requires plaintiff to show that it expected compensation; a claim for

---

[4]  The cases cited by Defendants for the proposition that a plaintiff in an unjust enrichment claim must express some expectation of compensation are all inapposite to the facts of this case.  For example, in *Leibowitz v. Cornell Univ.,* 584 F.3d 487 (2d Cir. 2009), no unjust enrichment was found when a counselor volunteered services to students after her employment contract with a university was not renewed. *Id.* at 509. Importantly, in that case, the court addressed the Plaintiffs' *quantum meruit* and unjust enrichment claims together and found that the plaintiff was never asked to perform the services but did so voluntarily – a circumstance different from the Plaintiffs in this matter who were solicited to contribute valuable content and who had no contract that spoke to compensation that had since expired.  *Id.*; FAC ¶¶ 20, 34, 48, 64, 83.  *Judge Rotenberg Educ. Ctr. v. Maul*, 658 N.Y.S.2d 493 (App. Div. 1997) also addressed *quantum meruit* and unjust enrichment claims in a cursory fashion, together, and addressed the City's policy of cutting off funding for people with disabilities after their twenty-first birthday. *Id.* at 495.  *Estate of Goth v. Tremble*, 873 N.Y.S.2d 364 (App. Div. 2009) is a case dealing with an unjust enrichment claim for services provided by one party to another "out of friendship," a situation not present here.

unjust enrichment does not.") (Scheindlin, J.). Indeed, in many unjust enrichment fact scenarios, the plaintiff is found to satisfy all the elements of an unjust enrichment claim even though the plaintiff did not anticipate compensation because, at the time the benefit is provided, it is unclear that the defendant is being enriched.[5]   *See, e.g. Ulloa v. Universal Music & Video Distrib. Corp*., 303 F. Supp. 2d 409, 419 (S.D.N.Y. 2004), *motion for reconsideration denied 2004 U.S. Dist. LEXIS 6755,* at *7-8* (holding that a recording artist could assert a claim for unjust enrichment when a vocal phrase which she spontaneously began singing when invited to observe a recording session was included on another artist's recording); *New World Comm'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1225-26 (D.C. 2005) (citing New York law and holding that it would be reasonable for a provider of solicited material to expect compensation if revenue is derived at some point in the future, even though there was no expectation of compensation at the time the material was provided); *see also Manufacturers Hanover Trust Co. v. Chemical Bank*, 559 N.Y.S.2d 704, 707 (App. Div. 1990) (holding that where a party confers a benefit unintentionally, allowing the counterparty to retain that benefit is against equity and good conscience, a rule that "has its underpinnings in unjust enrichment").  Therefore, whether Plaintiffs expected Defendants to share revenue with them (or provide any compensation)

---

[5] In other contexts as well, expectation or desirability of payment is irrelevant to the determination of whether a laborer should be compensated.  For example, in *Tony and Susan Alamo Foundation et. al. v. Secretary of* Labor, 471 U.S. 290 (1985) the Supreme Court found that even where workers wanted to voluntarily contribute their services, United States Department of Labor ("DOL") regulations required payment for the work. *Id.*  The Court stated "[t]hat the associates themselves vehemently protest coverage under the Act makes this case unusual, but the purposes of the Act require that it applied even to those who decline its protection.  If an exception to the Act were carved out for employees willing to testify that they performed work "voluntarily," employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act."  *Id.* at 302.  The applicability of DOL regulations to Defendants' business model is beyond the scope of this brief.

is irrelevant to this claim. *See Gidatex,* 49 F. Supp.2d at 303 ("Because Campaniello need not prove that it expected compensation from Gidatex, any fact dispute on this question is a red herring. The sole issue . . . is whether Gidatex was unjustly enriched").

The FAC alleges facts sufficient for the Court to find that equity and good conscience require restitution of the revenues and profit derived by Defendants from Plaintiffs' labors. Plaintiffs allege that Defendants carefully chose what content to post on their website and that the selection of Plaintiffs over other contributors was based on two factors: the ability for the content to garner page views and the ability of the content provider to attract viewers. FAC ¶¶ 133-34. Plaintiffs were expected to develop quality original content (which Ms. Huffington once described as "the hardest work of a blogger" and HuffingtonPost.com's "greatest asset" FAC ¶¶ 126, 172), provide that content to HuffingtonPost.com for free, and to distribute it to their networks of contacts, friends and followers. FAC ¶¶ 3-5, 165.

The inequity of this arrangement is vivid: Under Defendants' business model, the substantial revenues realized from the free content and publicity provided by Plaintiffs remained with Defendants, alone. FAC ¶¶ 127, 158, 179-88. 83 years ago the Supreme Court held that International News Service's business model of using wire services to report news originated through the efforts of others was wrongful because:

> [t]he process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those have not; with a special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

*International News Service v. The Associated Press*, 248 U.S. 215, 240 (1918).[6]   The Supreme Court's holding in *INS* is in keeping with the broad mandate provided to courts of equity, like this one, to do justice. *See Paramount Film Distrib. Corp. v. State of New York*, 30 N.Y.2d 415, 421 (1972) (holding that unjust enrichment claims are undoubtedly equitable and depend "upon broad considerations of equity and justice").   It is axiomatic that the doctrine of unjust enrichment should be construed flexibly to address novel situations such as the one presented by Defendants' digital-age business model. *See Sharp v. Kosmalski*, 40 N.Y.2d 119, 123 (1976) (stating that equitable principals such as unjust enrichment should be invoked where transactions have the "opportunity for abuse and unfairness. It was for just this type of case that there evolved equitable principles and remedies to prevent injustices").   Indeed, the FAC does not allege that any of the Plaintiffs expected to be paid for their content provided at the time they provided it to TheHuffintonPost.com.[7]

---

[6] *INS* addressed a Federal common law claim of misappropriation, a body of Federal law no longer recognized.   Plaintiffs in this case do not assert a common law misappropriation claim under New York State law, however, *INS* is cited for the proposition that when a court of equity is confronted with a business arrangement that deprives one party of the benefits of their labor, courts "ought not hesitate long" in finding an equitable remedy. *Id*. at 240.   *See also Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 10-1372-cv (2d Cir. Jun. 20, 2011) (noting that although *INS* is no longer good law, it "maintains a ghostly presence as a description of tort theory" and that it has been absorbed into New York State misappropriation law).

[7] While the Plaintiffs do not allege an expectation of compensation, the FAC alleges that Defendants' practice of not compensating content providers is atypical and that many digital media sites (and most analogue news outlets) compensate content providers. FAC ¶¶ 3, 160-61, 221.   That fact, coupled with Ms. Huffington's own ruminations about ways HuffingtonPost.com could compensate content providers through donating a portion of the advertising revenue derived from the content provided to  charities of the provider's choice (FAC ¶ 125) could have lead Plaintiffs to believe that they would be compensated for their valuable content in the future.   *See Hallissey v. America Online, Inc.* 2006 U.S. Dist. Lexis 12964, at *16 (S.D.N.Y. Mar. 10, 2006). (stating that where the plaintiffs in a Federal Fair Labor Standards Act claim conceded that they did not "have an express

But, of course, the Plaintiffs did not expect TheHuffingtinPost.com to be sold to AOL, Inc. for $315 million, either.

With respect to Defendants' second argument, to the extent that Defendants appear to be claiming that an unjust enrichment claim fails when a plaintiff continues to provide services to the defendant and not be paid, Defendants are incorrect.[8]  In fact, the retroactive demand for compensation, despite the ongoing nature of the enrichment, is the hallmark of many unjust enrichment claims.[9]  *See e.g. Arnold v. Baisch (In Re Great Lakes Boat Repair),* 2006 Bankr. Lexis 2537 at *18-20 (Bankr. W.D.N.Y. 2006) (unjust enrichment stated where the transferee of the debtor's property realized $2,000,000 over three years); *Bescette v. Niles*, 803 N.Y.S.2d 837 (App. Div. 2005).  For example, in cases where unjust enrichment is used as an alternative remedy for trespass of real property, a plaintiff can still satisfy the third element even where the trespass has been

agreement for compensation" that was not determinative because "For FLSA purposes . . . an expectation of compensation may be implied").

[8] Defendants' argument that Plaintiffs repeatedly contributed content without demanding compensation is something akin to a laches defense.  However, Defendants attempt to assert laches without alleging any prejudice from the delay or the repeated provision of content by Plaintiffs.  *See Matter of Linker v. Martin*, 803 N.Y.S.2d 534, 189 (App. Div. 2005). Defendants have not yet answered the FAC and therefore have not asserted a laches defense and the availability of one is questionable.  *See Williamson v. Stallone*, 2010 N.Y. Slip Op 20234, 11 (N.Y. Sup. Ct. 2010) (holding that an unjust enrichment claim for the return of money mistakenly distributed could not be subject to a laches defense).

[9] None of the cases cited by Defendants stand for the proposition that the repeated provision of services without a demand for compensation jeopardize a claim for unjust enrichment under New York law. In *Whalen v. Pfizer, Inc.* 862 N.Y.S.2d 812 (Sup. Ct. 2005), the plaintiff's unjust enrichment claim was barred not because of the plaintiff's continued use of the product (which certainly did not enhance the claim) but because the plaintiff did not quantify her unjust enrichment damages, did not explain how the defendant benefited and failed to identify "any inequitable financial gain."  Neither *Leibowitz*, *Judge Rotenberg Edu. Ctr.* nor *Estate of Goth*, addresses the effect of the repeated provision of services on an unjust enrichment claim under New York law.

ongoing for a long period of time before the suit is brought.  *See Corsello v. Verizon N.Y., Inc.,* 908 N.Y.S.2d 57, 78–79 (App. Div. 2010) (unjust enrichment stated where telephone equipment was affixed to a property in the 1970s or 1980s but the first complaint was not made until later in the 1980s and the complaint was not filed until 2007).  The elapse of time, and Plaintiffs' continuous enrichment of the defendant within that period, has no bearing on the equity of permitting Defendants to retain the value provided by Plaintiffs. Moreover, the limitations period for these claims is six years, thereby making the revenues derived from Plaintiffs' content legally recoverable.[10] *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519-20 (2d Cir. 2001) (noting that under New York law a cause of action for unjust enrichment begins to run at the time of the wrongful act). Plaintiffs' repeated contributions without monetary compensation, if at all relevant to this claim, are only relevant to the extent they increase Plaintiffs' potential damages.

### B.  No Contract Implied-in-Fact Existed

Defendants next assert that the alleged existence of a contract implied-in-fact, whereby Plaintiffs agreed to provide content in exchange for "access" to Defendants' "platform" and an ill-defined and unquantified amount of exposure.[11] Def. Memo pp. 11-

---

[10]  Plaintiffs Tasini, the first of the Plaintiffs to provide content to Defendants, began providing content on December 5, 2005. FAC ¶ 23.  Under New York's six year statute of limitations period for unjust enrichment claims, December 5, 2005, is the earliest date that Defendants were unjustly enriched and the period runs from that date.

[11]  HuffingtonPost.com is very different from platforms such as Facebook.com, Twitter.com, photo sharing websites and open forums such as TheDailyKos.com which allow any user to post content.  FAC ¶ 132. HuffingtonPost.com carefully collates its content, and rejects content from a great number of officious content providers and even, on some occasions, rejects content from its vetted providers such as Plaintiffs.  FAC ¶¶ 49 (rejecting two pieces about gay rights by Plaintiff Tara Dublin), 66 (rejecting a piece by Plaintiff Richard Laermer critical of the actor Ashton Kutcher),144.

13.   However, this defense is specious: contracts implied-in-fact still require all the elements of a contract, namely "consideration, mutual assent, legal capacity and legal subject matter." *Maas v. Cornell Univ*., 94 N.Y.2d 87, 93-94 (1999) (holding that a university's code of conduct was not an implied-in-fact contract between it and a professor because "[t]he University nowhere reflected an intent that the provisions of its Code would become terms of a discrete, implied-in-fact agreement").

Defendants' motion to dismiss fails to explain how the Plaintiffs manifested assent to this phantom agreement except by stating that "plaintiffs repeated submission of blog posts" demonstrated an understanding that "no monetary compensation" would be forthcoming. Def. Memo p. 12.  Despite alleging a contract implied-in-fact, Defendants do not explain how the purported implied contract terms were communicated with Plaintiffs or allege that Plaintiffs were provided notice that their "consideration" for the valuable content provided was the "exposure" and use of the platform.  Defendants' communications with Plaintiffs actually indicates the opposite: that although Plaintiffs were permitted to use HuffingtonPost.com's platform, it is up to the content provider to create their own exposure and that is *not* a service offered by Defendants.  FAC ¶¶ 165, 185, 204-206 (Defendants told Plaintiffs, "[w]e encourage contributors to promote their pieces and send them around . . . our experience shows that often the more comments a post attracts, the better it does in generating clicks . . .Encourage your friends to become your fan on Huffington Post").   Because the Plaintiffs were not told it was the Defendants' duty in the contract implied-in-fact to provide exposure, Plaintiffs' dutifully publicized their content to their social networks, among other exposure generating

activities. [12] FAC ¶¶ 26, 41, 55, 74, 90.  Moreover, the record indicates that Plaintiffs could have continued to contribute content to HuffingtonPost.com for any number of reasons unrelated to potential "exposure," including that they were asked to do so and wanted to satisfy their commitment to contribute content (FAC ¶¶ 20, 64, 83) or their enthusiasm for Ms. Huffington's version of progressive politics (FAC ¶¶ 127-30).  In sum, Plaintiffs could have been contributing content for any number of reasons, and with any number of understandings of what their purported "bargain" was with Defendants.

As a matter of law, such inconclusive conduct by the parties does not exhibit the existence of a contract implied-in-fact. *See* Restatement (Second) of Contracts § 19 ("The conduct of a party may manifest assent *if the party intends to engage in such conduct and knows that such conduct gives rise to an inference of assent*") (emphasis added).  New York's long held law on implied-in-fact contracts is unequivocal on this point: "A contract cannot be implied-in-fact where the facts are inconsistent with its existence; or against the declaration of the party to be charged;  . . . or against the intention or understanding of the parties . . . The assent of the person to be charged is

---

[12] Defendants' assertion that Plaintiffs agreed that their compensation would be limited to exposure is further belied because Plaintiffs had numerous other means of obtaining exposure other than by posting on HuffingtonPost.com, including posting their content on their own websites (FAC ¶¶ 18, 32, 47, 60, 169), other websites (FAC ¶ 162), create videos (FAC ¶ 31) and create analogue content such as books and newspapers articles (FAC ¶¶ 16, 17, 33, 47, 61).  Based on Plaintiffs' efforts to publicize the content posted to HuffingtonPost.com – publication efforts which were specifically requested by HuffingtonPost.com – it is highly probable that HuffingtonPost.com received more exposure from the Plaintiffs than Plaintiffs obtained from HuffingtonPost.com.  This is supported by the comments of Ms. Huffington and the senior editors of HuffingtonPost.com that HuffingtonPost.com is "very active in pursuing people we think are interesting" (FAC ¶ 137), Ms. Huffington's comment that that number of content providers allowed HuffingtonPost.com to have original interesting content which attracted readers (FAC ¶ 173), and Ms. Huffington's comment that HuffingtonPost.com's "greatest asset" is its unpaid content providers (FAC ¶ 126), among others.

necessary and unless he has conducted himself in such a manner that his assent may fairly be inferred he has not contracted." *Miller* v. *Schloss,* 218 N.Y. 400, 406-7 (1916); *see also Grombach Prods. v. Waring,* 293 N.Y. 609, 615 (1944) (no contract implied-in-fact where the plaintiff failed to prove the defendant assented to "the unsolicited disclosure of the plaintiffs 'idea' and that the defendant did not conduct himself in a manner which imports his assent"); *See also Clark-Fitzpatrick v. Long Island R.R. Co.,* 521 N.Y.S. 2d 653, 656 (1987) (noting that the existence of a contract must be "undisputed" before a quasi-contract remedy is precluded).

Even if Defendants had come forward with some indication that Plaintiffs were aware of the "contract," and assented to it (evidence which is impermissible on a motion to dismiss), whether or not the parties intended to be bound by an implied-in-fact contract is an issue of fact that cannot be determined on the current record. *See Rocky Point Props., Inc. v. Sear-Brown Group, Inc.*, 744 N.Y.S.2d 269, 912 (App. Div. 2002) (holding that whether an implied-in-fact contract "was formed and, if so, the extent of its terms, involves factual issues regarding the intent of the parties and the surrounding circumstances"); *Donerial Corp. N.V. v. 405 Park LLC,* 2011 N.Y. Slip Op 50147(U) (Sup. Ct. N.Y. Cnty. 2011). (intent to be bound by an agreement is an issue of fact to be determined at trial).

In the absence of an express contract which either does not exist or the existence of which cannot be determined at this time, a contract "implied-in-law" requires restitution to avoid the inequitable result of Defendants solely benefiting from the services provided by Plaintiffs. *See Bradkin v. Leverton*, 26 N.Y.2d 192, 197 (1970) (finding a contract implied-in-law where "the defendant received a benefit from the

plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them"). Courts regularly create contracts implied-in-law in these circumstances (*See, e.g. Access Staffing, LLC v. Duff & Phelps, LLC*, 2011 N.Y. Slip Op 31515U, 6 (N.Y. Sup. Ct. May 31, 2011)) and this Court should be no less reticent, especially where the injustice of failing to do so would be so great.

### III.   DEFENDANTS HAVE VIOLATED NEW YORK GENERAL BUSINESS LAW SECTION 349

Defendants move to dismiss Count One of the FAC alleging violations of New York's anti-deceptive practices act, New York General Business Law § 349 ("NYGBL § 349"). Defendants allege four reasons why they have not run afoul of NYGBL § 349. Def. Memo. pp. 14-22. As set forth below, under close examination, none of those reasons are persuasive and the Plaintiffs should be permitted to submit their valid NYGBL § 349 claims to a finder of fact. *Kurschner v. Mass. Cas. Ins. Co.*, 2009 U.S. Dist. LEXIS 16623, at *11 (E.D.N.Y. Mar. 3, 2009) (denying a Rule 12(b)(6) motion where the complaint alleged "some harm to the public at large."); *See, e.g. Watts v. Jackson Hewitt Tax Service*, 579 F. Supp. 2d 334, 346-349 (E.D.N.Y. 2008) (denying a Rule 12(b)(6) motion and stating "[i]n addition to considering the specific act or practice alleged to be deceptive, courts also look to see if defendants' general business practices reinforce the alleged misleading effect").

#### A.   **The Deception Was Material**

Defendants allege that because the deceptive statements did not pertain to whether HuffingtonPost.com would compensate its content providers, the deception cannot be material. Def. Memo p. 15. This misreads Plaintiffs' NYGBL § 349 claim. In fact, as the Defendants admit in other places in their brief, there is no allegation that Plaintiffs

were misled regarding HuffingtonPost.com's compensation policy.  *See* Def. Memo pp. 3–4, 14.

Rather, the FAC alleges that Defendants' deceptive statements were made in an effort to entice Plaintiffs to contribute valuable content for free – or, more precisely, for "exposure" which, as it turns out, was ill-defined and purposefully hidden.  FAC ¶ 214. Defendants deceptive statements and conduct, in as much as they were part and parcel of a scheme to entice members of the public to contribute valuable content to HuffingtonPost.com for free, affects the public interest in New York (and beyond).  The materiality of each misleading statement will be addressed in turn.

1. *Defendants' Refusal to Provide the Number of Page Views Attributed to Each Piece of Content Provided by Plaintiffs.*

Defendants' refusal to provide the number of page views attributed to each piece of content provided, despite knowing the amount of page views, was material to Plaintiffs' decision to continue to provide content to Defendants.  *Bildstein v. Mastercard Int'l Inc.*, 2005 U.S. Dist. LEXIS 10763, at *10-11 (S.D.N.Y. June 6, 2005) (holding "Omission-based claims under Section 349 are appropriate where the business alone possesses material information that is relevant to the consumer and fails to provide this information") (quotations omitted).  The misstatement was material to Plaintiffs' decision to provide content because if the amount of page views were too low Plaintiffs might have decided to stop posting content.  Moreover, if the amount of page views was fewer than the amount of people to whom Plaintiffs disseminated links to the content, Plaintiffs would have known that they were providing more exposure to HuffingtonPost.com than HuffingtonPost.com was providing to them or, stated another way, the content provider would have been better off simply circulating the content rather than providing a link to

HuffingtonPost.com.  *Id.* at 11 (holding that a material misstatement was alleged where the defendant went to great lengths to hide a 1% foreign currency fee from its customers and the fee would have impacted consumers' decision to use the credit card).

2.   *Defendants' Misleading Statement Regarding the Availability of Page View Statistics.*

The Complaint alleges that Defendants' assertion that they do not maintain statistics regarding page views for all web pages containing Plaintiffs' content is an outright misstatement.  In fact, such statistics were maintained.[13]  FAC ¶¶ 185, 205-06.

In defense of this seemingly blatant misstatement, Defendants contend that the misstatement is immaterial because Plaintiffs continued to provide content despite not knowing the number of pages views.   Def. Memo p. 16.  In fact, Plaintiffs' continued provision of content despite being unaware of the amount of page views demonstrates the materiality of the misstatements: Plaintiffs were left blissfully unaware of the low number of page views obtained or, conversely, naive to the popularity of their content.  In either case, Plaintiffs could have made an informed decision about their continued relationship with HuffingtonPost.com had Defendants been honest about the page view data.

3.   *Failure to Advise Plaintiffs' That Their Content Would Receive Less Exposure as More Content Was Added.*

Defendants' failure to inform Plaintiffs that as additional content was added to HuffingtonPost.com the amount of exposure received by any single content provider decreased was material to Plaintiffs' decision to continue to provide content. FAC ¶ 176. For example, Plaintiff Tasini contributed content beginning in December 2005, prior to Defendants' solicitation of additional content providers. FAC ¶ 21. However, because Defendants were attempting to obtain as much free content as possible (and benefit from

---

[13] The misstatement alleged is "we don't keep stats on all our pages." FAC ¶ 204.

the search engine optimization and publicity efforts of its added content providers), Plaintiff Tasini received less exposure from his content as time went on, to the extent he ever received any.   Had Defendants advised Plaintiffs of the decreasing amount of exposure offered, then Plaintiffs would have made a more informed decision about whether to continue to contribute to HuffingtonPost.com.

4.   *Statements Regarding the Profit Making Purpose of HuffingtonPost.com.*

Defendants failure to advise Plaintiffs of the HuffingtonPost.com's purpose of earning substantial revenues and, instead, presenting itself as a forum for ideas, was material to Plaintiffs' decision to contribute content.  Plaintiff Tasini is a union activist who would certainly not have provided content had he been aware he was creating a valuable media property where all revenue derived from labor went to management and ownership, not the content providers.   Indeed, Ms. Huffington's public comments indicated her seemingly sympathetic support of progressive causes, leading Plaintiffs to believe that HuffingtonPost.com was a very different website than the profiteering juggernaut it was revealed to be after its $315 million sale to Defendant AOL, Inc.. FAC ¶¶ 128-31.

5.   *Comments Discouraging Plaintiffs From Creating Their Own Blogs.*

Ms. Huffington's comments regarding the feasibility of Plaintiffs' own blogs were material to Plaintiffs' decision to begin, and continue, to provide content to HuffingtonPost.com.  Indeed, as Plaintiffs' maintenance of their own blogs demonstrates, creating and maintaining a blog is not difficult. FAC ¶ 169.  Ms. Huffington's comments were meant to obtain as much content for HuffingtonPost.com as possible by limiting the competition.  The fact that the deceptive statement seemingly had no effect (at least with

respect to four of the five Plaintiffs, who maintained their own websites) is irrelevant to whether it was materially misleading.

### B.   The Conduct was Consumer Oriented

Finally, Defendants assert that because the FAC "identifies only conduct that was directed at bloggers like plaintiffs who were recruited or selected as providers of services in individual one-on-one solicitations" the misleading content is somehow beyond the scope of NYGBL § 349.  Def. Memo. p. 20.  Defendants' contention is both factually and legally incorrect.  *Karlin v. IVF Am.*, Inc., 690 N.Y.S.2d 495, 498 (N.Y. 1999) (holding that NYGBL § 349 should be interpreted in a flexible manner  so that the statute can "cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in our State"); *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir. 1995) (holding that a defendant engages in "consumer-oriented" activity if his actions cause any "consumer injury or harm to the public interest"); *New York v. Feldman,* 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (noting that the requirement that the fraud be "consumer oriented" has been construed liberally).

The FAC alleges that Defendants' solicitation was not made on a "one-on-one" basis but was made to the public at large.  For example, the FAC alleges that Ms. Huffington and Mr. Lerer wrote a book whose purpose was to solicit free content for HuffingtonPost.com (FAC ¶ 140) and that Ms. Huffington gave lectures at leading journalism schools where she explained to members of the public that one of the benefits of contributing free content to HuffingtonPost.com was the potential to obtain a book deal (FAC ¶ 141).  Moreover, Plaintiffs Tara Dublin was asked to contribute content after entering a HuffintonPost.com contest aimed at the general public.   FAC ¶ 48,

*DeAngelis v. Timberpeg East, Inc.,* 858 N.Y.S.2d 410, 414 (App. Div. 2008) (finding consumer oriented activity where false statements were made in an "advertisement disseminated to the public in a regional magazine, flyers and open houses").

Defendants contention that a Defendant can immunize itself from NYGBL § 349 by recruiting and selecting members of the general public rather than directing their activity indiscriminately is incorrect. Def. Memo p. 21.   Indeed, simply because a deceptive practice is aimed at parties with whom a party has an existing relationship, rather than the public at large, does not mean that the practice is beyond the remedial reach of NYGBL § 349.[14]   *See, e.g. Wilner v. Allstate Ins. Co.*, 983 N.Y.S.2d 208, 216 (App. Div. 2010) (practice of refusing to timely reach a decision on insurance coverage, even though it only affected policy holders, held to be consumer oriented); *Elacqua v. Physicians' Reciprocal Insurers*, 860 N.Y.S.2d 229, 231 (App. Div. 1999) (consumer oriented behavior found where the "failure to inform plaintiffs of their right to select

---

[14] The cases cited by Defendants are inapposite as they involve individual contract disputes between customers and service providers where the consumer oriented activity is tangential, at best, to the actual deception complained of.   *See Samiento v. World Yacht Inc.,* 10 N.Y.3d 70 (2008) (dispute between wait staff and a restaurant regarding gratuities); *Med. Soc'y v. Oxford Health Plans, Inc.*, 790 N.Y.S.2d 79 (App. Div. 2005) (dispute between doctors enrolled in health care plan and the plan); *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (private dispute between two authors over royalties); *Reit v. Yelp!, Inc.*, 907 N.Y.S.2d 411 (Sup. Ct. N.Y. Cnty. 2010) (dispute between internet company which reviewed business and a business reviewed); *Int'l Design Concepts, LLC v. Saks, Inc.*, 486 F. Supp. 2d 229 (S.D.N.Y. 2007) (dispute between retailer and licensee); *P. Kaufmann, Inc. v. Americraft Fabrics, Inc.*, 232 F. Supp. 2d 220 (S.D.N.Y. 2002) (dispute between a fabric manufacturer and a designer where "[t]here are no allegations as to how these behaviors affected a wide range of consumers").   In contrast to those cases, the consumer oriented behavior by Defendants is clear: Defendants sought out members of the public to contribute valuable content for free with misleading statements. The requirement that deceptive practices be "consumer oriented" in order to state a claim under NYGBL § 349 has been satisfied. *See Gaidon v. Guardian Life Ins. Cnty. of Am.*, 94 N.Y.2d 330, 344 (1999) (holding that the plaintiff stated a cause of action under NYGBL § 349 by alleging a deception in "an extensive marketing scheme").

independent counsel was not an isolated incident, but a routine practice that affected many similarly situated insured"); *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 571 (E.D.N.Y. 2010) ("While the deceptive practices were aimed at particular individuals in these instances, nothing suggests that similarly vulnerable consumers could not — and did not — fall victim to similar practices, and there is nothing especially unique or unusual about these particular transactions").

## CONCLUSION

For the reasons set forth herein, the Defendants' motion should be denied in its entirety and the Plaintiffs should be entitled to develop a complete record so that the finder of fact can properly adjudicate Plaintiffs' claims.

Dated: New York, New York
         July 14, 2011

                                        Respectfully submitted,


                                        By: /s/ Jeff Kurzon
                                        Jeffrey Mead Kurzon (#JM3388)
                                        Jesse Strauss (#JS0212)
                                        Kurzon Strauss LLP
                                        305 Broadway, 9th Floor
                                        New York, New York 10007
                                        Jeff@kurzonstrauss.com
                                        Jesse@kurzonstrauss.com
                                        Telephone: 212-822-1496
                                        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jeffrey Mead Kurzon, hereby certify that on the 14th day of July, 2011, I caused the foregoing to be served on all counsel of record via ECF.


/s/ Jeff Kurzon
Jeffrey Mead Kurzon