UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

JONATHAN TASINI, MOLLY SECOURS, TARA
DUBLIN, RICHARD LAERMER and BILLY
ALTMAN, individually and on behalf           11 Civ. 2472 (JGK)
of all others similarly situated,

       Plaintiffs,                          OPINION AND ORDER

       - against -

AOL, INC., THEHUFFINGTONPOST.COM,
INC., ARIANNA HUFFINGTON AND KENNETH
LERER

       Defendants.
_____

JOHN G. KOELTL, District Judge:

    The plaintiffs, Jonathan Tasini ("Tasini"), Molly Secours

("Secours"), Tara Dublin ("Dublin"), Richard Laermer

("Laermer"), and Billy Altman ("Altman"), individually and on

behalf of all others similarly situated (collectively "the

plaintiffs"), bring this proposed class action under the common

law doctrine of unjust enrichment and New York General Business

Law ("NYGBL") § 349.  The plaintiffs have sued AOL, Inc.

("AOL"), TheHuffingtonPost.com, Inc., Arianna Huffington

("Huffington"), and Kenneth Lerer ("Lerer") (collectively "the

defendants"), alleging that the defendants unjustly and

deceptively denied the plaintiffs compensation for submitting

content to and promoting content on The Huffington Post

(www.thehuffingtonpost.com),[1] a website owned and operated by the defendants.  The defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the First Amended Class Action Complaint ("FAC" or "Complaint") with prejudice.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the Complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The Court should not dismiss the Complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949

---

[1] This Opinion will refer to TheHuffingtonPost.com, Inc. and The Huffington Post website interchangeably as "The Huffington Post," except as the context otherwise requires.

(2009).  While the Court should construe the factual allegations
in the light most favorable to the plaintiffs, "the tenet that a
court must accept as true all of the allegations contained in
the complaint is inapplicable to legal conclusions."  <u>Id.</u>

When presented with a motion to dismiss pursuant to Rule
12(b)(6), the Court may consider documents that are referenced
in the Complaint, documents that the plaintiffs relied on in
bringing suit and that are either in the plaintiffs' possession
or that the plaintiffs knew of when bringing suit, or matters of
which judicial notice may be taken.  <u>See</u> <u>Chambers v. Time</u>
<u>Warner, Inc.</u>, 282 F.3d 147, 153 & n.3 (2d Cir. 2000).


                              **II.**

The following facts alleged in the Complaint are accepted
as true for the purposes of this motion to dismiss, unless
otherwise indicated.

The Huffington Post launched its www.huffingtonpost.com
website as a for-profit enterprise on May 9, 2005.  (FAC ¶ 119.)
The Huffington Post was ostensibly created by defendants
Huffington and Lerer, although the proper attribution of The
Huffington Post's creation is subject to ongoing litigation.
(FAC ¶ 120.)  The website has become quite popular, receiving
more than 26 million unique visitors per month as of January
2011.  (FAC ¶ 124.)  The website provides a mix of content that

is written by paid staff members, collected from other websites, or submitted by unpaid bloggers[2] who have been selected or recruited to blog for the website.  (FAC ¶¶ 132, 135, 182.)

The named plaintiffs and prospective class members are members of the last group:  the website's unpaid content providers.  (FAC ¶ 104.)  The majority of these content providers are "professional or quasi-professional writers." (FAC ¶ 142.)  The named plaintiffs are all repeat-providers, having submitted significant volumes of content over varying periods of time.  For example, plaintiff Tasini, described in the Complaint as a professional author, politician, union leader, and successful United States Supreme Court litigant, submitted content 216 times over the course of more than 5 years and publicized that content through social networking media such as Facebook and Twitter.  (FAC ¶¶ 14-17, 23, 25-26.)

Rather than monetary compensation, the unpaid content providers are offered exposure — namely, visibility, promotion, and distribution, for themselves and their work.  (FAC ¶¶ 123, 126, 174.)  Although the defendants have, at times, considered compensating the unpaid content providers by, for example, allowing content providers to choose charities with which advertising revenue generated by their content would be shared,

---

[2] A "blogger" is an individual who writes for a "blog" (a combination of the words "web" and "log"), a colloquialism that initially meant a personal online journal but now more generally refers to any online publication.

the defendants otherwise made clear to the plaintiffs from the beginning that they never intended to pay content providers such as the plaintiffs for submissions.  (FAC ¶¶ 125-26, 157, 174, 215.)  The unpaid submissions are arguably the website's most valuable content, both because of their effect of "optimizing" the website's ranking in search engines such as Google (thus attracting more viewers to the website) and because they allow The Huffington Post to keep production costs low.  (FAC ¶¶ 126, 145-47, 183-84, 187-88.)  Additionally, The Huffington Post encourages the bloggers to promote their own submissions via their social networks such as by sending emails, sharing their posts on Facebook or MySpace, responding to reader comments, and contacting other blogs.  (FAC ¶ 165.)  As a result, the Complaint alleges that The Huffington Post gains more both in terms of exposure and monetary value from the unpaid submissions than do the authors.  (FAC ¶ 168.)

From its inception, The Huffington Post has generated revenue by, among other things, selling advertising targeted towards visitors to the website.  (FAC ¶ 123.)  Advertising revenues increase in proportion to the amount of page views a website receives, which in turn is a function of the quality of the content provided, as well as the website's ability to attract visitors either through its own marketing or via the social networks of others.  (FAC ¶¶ 5, 7, 133-34, 168, 179, 186-

87.)  The Huffington Post allegedly keeps track of the number of page views of, and thus the revenue generated by, each piece of content (including unpaid submissions) on the website.  (FAC ¶¶ 180, 185, 204-05.)  This information was never provided to the plaintiffs or other content providers.  (FAC ¶ 180.)

The Complaint alleges that, while the "guidelines" distributed by The Huffington Post to the plaintiffs and other content providers suggest that this page-view information is unavailable, the data is in fact generated and retained by The Huffington Post and is readily accessible.  (FAC ¶¶ 180, 204-05.)  Keeping this data hidden prevents the plaintiffs and others from knowing the exact monetary value The Huffington Post generates from their submissions.  (FAC ¶ 206.)  Stated in other terms, this prevents the plaintiffs from knowing how much exposure their submissions generate for The Huffington Post as compared to the level of exposure the plaintiffs acquire from being published by The Huffington Post.  (FAC ¶ 206.)  Nowhere does the Complaint allege that the plaintiffs were promised any monetary compensation.  See FAC ¶ 126, 174, 215.

In early 2011, AOL purchased The Huffington Post for around $315 million.  (FAC ¶¶ 207-10.)  The Complaint asserts that The Huffington Post "was an attractive merger target for AOL because of [The Huffington Post's] ability to obtain high quality content from [the plaintiffs] at no cost."  (FAC ¶ 152.)  The

Complaint alleges that at least $105 million of the purchase price is properly traceable to the plaintiffs, including "the value created by the content provided by [the plaintiffs]," the plaintiffs' "efforts to publicize the content provided," and "the value created by [the plaintiffs] in lowering the cost of content production for AOL . . . ." (FAC ¶ 211.) Following the purchase, AOL has ostensibly hopped on the unpaid-content bandwagon, reducing its volume of paid submissions in favor of unpaid submissions. (FAC ¶¶ 154-57.)

After the merger, the plaintiffs brought this suit claiming that The Huffington Post's practice of soliciting and accepting unpaid submissions amounts to a violation of New York General Business Law § 349 and that The Huffington Post was unjustly enriched as a result of this practice. (FAC ¶¶ 212-29.) Pursuant to their claim of deceptive business practices, the plaintiffs seek the greater of actual or statutory damages for the opportunities the plaintiffs were deceived by the defendants into forgoing. Under the doctrine of unjust enrichment, the plaintiffs seek damages in the form of compensation for the alleged monetary value of their submissions, specifically at least $105 million (the plaintiffs' alleged contribution to The Huffington Post's purchase price), as well as any additional appropriate damages. (FAC at 67-68.)

### III.

The plaintiffs claim that they are entitled to a portion (namely, $105 million) of the $315 million that AOL tendered in acquiring The Huffington Post.  The plaintiffs assert a claim of unjust enrichment arising from the alleged failure of the defendants to compensate the plaintiffs adequately for adding value to, and thus boosting the purchase price of, The Huffington Post.  The plaintiffs allege that they added value by submitting content to the website and promoting that content. The defendants argue that the plaintiffs' claim should be dismissed for failure to demonstrate that equity and good conscience require restitution and, in the alternative, that the plaintiffs' unjust enrichment claim is barred by the existence of an implied contract between the plaintiffs and the defendants.

### A.

The defendants argue that the plaintiffs' unjust enrichment claim should be dismissed because the plaintiffs have failed to demonstrate that equity and good conscience require restitution.

The equitable doctrine of unjust enrichment rests on the principle that a party should not be allowed to enrich itself at the expense of another.  Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 263 (2d Cir. 1984).  In order to establish a claim for

unjust enrichment under New York law, a plaintiff must
establish: "(1) that the defendant benefitted; (2) at the
plaintiff's expense; and (3) that equity and good conscience
require restitution." In re Mid-Island Hosp., Inc., 276 F.3d
123, 129-30 (2d Cir. 2002) (citation omitted); see also Jofen v.
Epoch Biosciences, Inc., No. 01 Civ. 4129, 2002 WL 1461351, at
*9 (S.D.N.Y. July 8, 2002), aff'd, 62 F. App'x 410 (2d Cir.
2003) (summary order). "The essential inquiry in any action for
unjust enrichment . . . is whether it is against equity and good
conscience to permit the defendant to retain what is sought to
be recovered." Dragon Inv. Co. II LLC v. Shanahan, 854 N.Y.S.2d
115, 118 (App. Div. 2008). If the plaintiffs fail to
demonstrate that equity and good conscience require restitution,
their claim should be dismissed. See In re Jetblue Airways
Corp. Privacy Litig., 379 F. Supp. 2d 299, 330 (E.D.N.Y. 2005)
(granting dismissal of unjust enrichment claim because "even
assuming arguendo that [the defendant] was enriched at
plaintiffs' expense, plaintiffs have failed to demonstrate that
equity and good conscience require restitution by [the
defendant]").

Here, the plaintiffs claim that the defendants have been
unjustly enriched by generating profit from the submissions of
the plaintiffs to The Huffington Post and not paying the
plaintiffs for those submissions, while enticing the plaintiffs

with misleading promises of exposure.  However, the plaintiffs
entered into their transactions with the defendants with full
knowledge of the facts and no expectation of compensation other
than exposure.  In such circumstances, equity and good
conscience counsel against retroactively altering the parties'
clear agreements.

There is no question that the plaintiffs submitted their
materials to The Huffington Post with no expectation of monetary
compensation and that they got what they paid for — exposure in
The Huffington Post.  (FAC ¶¶ 174, 215.)  Courts applying New
York law require a plaintiff to allege some expectation of
compensation that was denied in order to demonstrate that equity
requires restitution.  See Leibowitz v. Cornell Univ., 584 F.3d
487, 509-10 (2d Cir. 2009) (affirming summary judgment
dismissing unjust enrichment claim because "in the absence of
any proof that plaintiff had a reasonable basis for believing
she would receive compensation, . . . it cannot be said that
principles of equity require any restitution"); Estate of Goth
v. Tremble, 873 N.Y.S.2d 364, 367-68 (App. Div. 2009)
(concluding that defendant's unjust enrichment counterclaim was
defeated by the "defendant's candid admissions that he
voluntarily provided services . . . without expectation of any
compensation"); Soldiers', Sailors', Marines' & Airmen's Club,
Inc. v. Carlton Regency Corp., 911 N.Y.S.2d 774, 783 (Sup. Ct.

2010) (treating "an expectation of compensation" as a required element of unjust enrichment); <u>Wing Kwong Ho v. Target Constr. of NY, Corp.</u>, No. 08 Civ. 4750, 2011 WL 1131510, at *17 (E.D.N.Y. Mar. 28, 2011) (equating <u>quantum meruit</u> and unjust enrichment claims and treating "an expectation of compensation" as required element of both); <u>Nanjing Textiles IMP/EXP Corp., Ltd. v. NCC Sportswear Corp.</u>, No. 06 Civ. 52, 2006 WL 2337186, at *12 (S.D.N.Y. Aug. 11, 2006) (same). But see <u>Gidatex, S.r.L. v. Campaniello Imps., Ltd.</u>, 49 F. Supp. 2d 298, 302-03 (S.D.N.Y. 1999) (distinguishing <u>quantum meruit</u> doctrine from unjust enrichment doctrine and concluding that expectation of compensation is not a required element for an unjust enrichment claim).[3]

The plaintiffs argue that an expectation of compensation is not always required for an unjust enrichment claim. The plaintiffs point to cases where it was not initially clear to the plaintiff that the plaintiff actually enriched the defendant, such as where it was uncertain whether the defendant

---

[3] The opinion in <u>Gidatex</u> is contrary to the great majority of well-reasoned cases. It is also contrary to the subsequent clear statement by the Court of Appeals for the Second Circuit that "in the absence of any proof that plaintiff had a reasonable basis for believing she would receive compensation . . . it cannot be said that principles of equity require any restitution." <u>Leibowitz</u>, 584 F.3d at 509-10. Moreover, in a subsequent opinion, the <u>Gidatex</u> court cast doubt on its prior opinion by concluding that unjust enrichment and <u>quantum meruit</u> are not distinct grounds for recovery. <u>Learning Annex Holdings, LLC v. Rich Global, LLC</u>, No. 09 Civ. 4432, 2012 WL 92281, at *9-10 (S.D.N.Y. Jan. 11, 2012).

would ultimately use what the plaintiff had provided.  <u>See,</u>
<u>e.g.</u>, <u>News World Commc'ns, Inc. v. Thompsen</u>, 878 A.2d 1218,
1224-25 (D.C. 2005).  At best, these cases stand for the
proposition that plaintiffs who are unsure of whether they will
be compensated if their services are not used may still sue if
the services they render do ultimately benefit a defendant who
then denies compensation.  <u>See Thompsen</u>, 878 A.2d at 1224-26
(noting that defendant "obviously would not be unjustly enriched
if it refused to pay for the unsolicited material" that it never
used).  Stated in other terms, the plaintiffs in these cases
expected compensation but the exact terms of the compensation
were unclear.  These cases therefore fail to support the
plaintiffs' argument that unjust enrichment does not require an
expectation of compensation.  Indeed, in this case, the
plaintiffs expected only exposure rather than monetary
compensation if their submissions were used, and those terms
were clear from the outset.  (FAC ¶¶ 174, 215.)  Therefore,
under New York law, a plaintiff must plead some expectation of
compensation that was denied in order to recover under a theory
of unjust enrichment.  The Complaint fails to do so and the
claim for unjust enrichment must therefore be dismissed.

Moreover, equity and good conscience plainly do not support
the plaintiffs in this matter.  No one forced the plaintiffs to
give their work to The Huffington Post for publication and the

12

plaintiffs candidly admit that they did not expect compensation. The principles of equity and good conscience do not justify giving the plaintiffs a piece of the purchase price when they never expected to be paid, repeatedly agreed to the same bargain, and went into the arrangement with eyes wide open.  See Shanahan, 854 N.Y.S.2d at 118 ("A claim for unjust enrichment does not lie to relieve a party 'of the consequences of [the party's] own failure to . . . exercise caution with respect to a business transaction.'" (quoting Charles Hyman, Inc. v. Olsen Indus., 642 N.Y.S.2d 311 (App. Div. 1996)); cf. Miller v. Schloss, 113 N.E. 337, 339 (N.Y. 1916) (implied contract not found where "[e]ach and every act of the plaintiffs was voluntary and with full and exact knowledge on their part"). Quite simply, the plaintiffs offered a service and the defendants offered exposure in return, and the transaction occurred exactly as advertised.  The defendants followed through on their end of the agreed-upon bargain.  That the defendants ultimately profited more than the plaintiffs might have expected does not give the plaintiffs a right to change retroactively their clear, up-front agreement.  That is an effort to change the rules of the game after the game has been played, and equity and good conscience require no such result.

The Complaint fails to demonstrate that the principles of equity and good conscience require restitution and thus fails to

allege a proper claim for unjust enrichment.  For the reasons
explained above, the plaintiffs' claim for unjust enrichment
must be dismissed.[4]

**IV.**

The plaintiffs claim that the defendants engaged in
deceptive business practices in violation of NYGBL § 349.

NYGBL § 349 prohibits "[d]eceptive acts or practices in the
conduct of any business, trade or commerce or in the furnishing
of any service . . . ."  N.Y. Gen. Bus. Law § 349(a).  To plead
a prima facie claim under § 349, the plaintiffs must allege
that:  "(1) the defendant's deceptive acts were directed at
consumers, (2) the acts are misleading in a material way, and
(3) the plaintiff has been injured as a result."  <u>Maurizio v.
Goldsmith</u>, 230 F.3d 518, 521 (2d Cir. 2000).

Without contesting whether the plaintiffs properly allege
injury, the defendants contend that the plaintiffs' claim under
§ 349 must be dismissed because the defendants' alleged conduct
as stated in the Complaint was neither directed at consumers nor
materially misleading.

---

[4] The defendants argue in the alternative that the plaintiffs and
defendants had an agreement amounting to an implied contract,
such that the unjust enrichment claim must fail because a quasi-
contract claim cannot exist when there is an actual contract.
It is unnecessary to reach this argument because the plaintiffs
have failed to state a claim for unjust enrichment.

14

**A.**

The defendants contend that the plaintiffs fail to state a claim under § 349 because the facts stated in the Complaint do not show that the defendants' alleged misleading conduct was consumer-oriented.

Although the text of NYGBL § 349 does not explicitly limit the provision to conduct aimed at consumers, courts have consistently held that "the statute is, at its core, a consumer protection device." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995).  Consumers are "those who purchase goods and services for personal, family or household use." Med. Soc'y of State of New York v. Oxford Health Plans, Inc., 790 N.Y.S.2d 79, 80 (App. Div. 2005) (citation omitted); Cruz v. NYNEX Info. Res., 703 N.Y.S.2d 103, 106 (App. Div. 2000) ("In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for 'personal, family or household purposes.'" (citation omitted)).

Non-consumers, such as business competitors, may have standing to sue under § 349, but "the gravamen of the complaint must be consumer injury or harm to the public interest." Securitron, 65 F.3d at 264 (citation omitted).  The plaintiffs must show that "the acts or practices have a broader impact on consumers at large in that they are directed to consumers or

15

that they potentially affect similarly situated consumers."
Spirit Locker, Inc. v. EVO Direct, LLC, 696 F. Supp. 2d 296, 302
(E.D.N.Y. 2010) (internal quotation marks and citation omitted);
see also City of New York v. Smokes-Spirits.Com, Inc., 911
N.E.2d 834, 839 (N.Y. 2009) ("We . . . have emphasized that
section 349 is directed at wrongs against the consuming public
and that plaintiffs must demonstrate that the complained-of acts
or practices have a broader impact on consumers at large."
(internal quotation marks and citations omitted)).  Conduct that
does not harm consumers at large is not actionable under § 349.
See Maurizio, 230 F.3d at 522.  Further, "courts have stated
consistently that unique private transactions between
sophisticated business parties do not give rise to liability
under [§ 349]."  Spirit Locker, 696 F. Supp. 2d at 301
(collecting cases); see also Oswego Laborers' Local 214 Pension
Fund v. Marine Midland Bank, 647 N.E.2d 741, 744 (N.Y. 1995)
("Private contract disputes, unique to the parties, for example,
would not fall within the ambit of the statute.").

       The plaintiffs argue that they are "consumers" under § 349.
The plaintiffs attempt to draw support from "liberal"
interpretations of the term "consumer-oriented" in New York
state and federal courts.  See, e.g., Securitron, 65 F.3d at
264; New York v. Feldman, 210 F. Supp. 2d 294, 301 (S.D.N.Y.
2002); Karlin v. IVF Am., Inc., 712 N.E.2d 662, 665-66 (N.Y.

16

1999).  However, these courts discuss broad interpretations of § 349 in justifying an expansive view of the type of plaintiff who may have standing (for example, a business competitor) and the types of goods or services the statute might cover (for example, medical services), not in defining who actually is a consumer.  All courts addressing this issue still require that consumers be harmed by the defendants' alleged conduct.  See Spirit Locker, 696 F. Supp. 2d at 302; see also, e.g., Feldman, 210 F. Supp. 2d at 300-02 (upholding claims where tainted stamp auctions harmed unwary "marketplace participants"); Karlin, 93 712 N.E.2d at 665-66 (upholding claims of consumers of medical services).

In this case, the facts alleged in the Complaint do not show harm to any consumer.  The plaintiffs are individual bloggers who were "carefully-vetted contributors" to The Huffington Post.  (FAC ¶ 3.)  The harm alleged in the Complaint, namely being deceived into submitting content to The Huffington Post, is restricted to the plaintiffs and other similarly-situated content providers.  Indeed, at oral argument, the plaintiffs made clear that they are alleging that they themselves are the consumers harmed by the defendants' conduct, not the general public.  (Tr. 28.)

The plaintiffs are not "consumers" in any reasonable interpretation of the word; rather, they participate in

17

producing the content that is consumed by visitors to The Huffington Post.  Those who produce content for others to consume cannot be said to be "purchas[ers of] goods and services."  <u>Med. Soc'y of State of New York</u>, 790 N.Y.S.2d at 80.

Thus, the Complaint fails to state facts indicating that the defendants' alleged misleading conduct was consumer-oriented, as required under NYGBL § 349.  The plaintiffs' claim under NYGBL § 349 must therefore be dismissed.


**B.**

In addition, the defendants argue that the plaintiffs' § 349 claim must be dismissed because the plaintiffs have failed to allege that the defendants' conduct was materially misleading.  The defendants contend that any conduct alleged in the Complaint was either not misleading or not materially so. The plaintiffs, in contrast, point to five ways in which the defendants allegedly materially misled the plaintiffs:

(1)  [B]y hiding the amount of page visits and page views attributed to the content created by Plaintiffs and the Classes, thereby hiding the amount of revenue that Plaintiffs and the Classes are providing;

(2)  [B]y stating that information regarding the amount of internet traffic generated by each piece of content provided is unavailable when, in fact, it is available;

(3)  [B]y not notifying Plaintiffs and Classes that the exposure received was decreasing over time as additional content was added;

(4)  [B]y presenting TheHuffingtonPost.com as a free forum or platform for ideas while actually building a

             product with substantial value for Defendants' sole
             benefit;

    (5)  [B]y actively dissuading Plaintiffs and the Classes
             from creating their own websites upon which Plaintiffs
             and the Classes could obtain exposure and revenue.

(FAC ¶ 214.)

     To state a claim under § 349, the plaintiffs must allege
conduct that is "misleading in a material way." Cohen v. JP
Morgan Chase & Co., 498 F.3d 111, 126 (2d Cir. 2007). An act or
omission is materially misleading if it is "likely to mislead a
reasonable consumer acting reasonably under the circumstances."
Oswego, 647 N.E.2d at 745. "A deceptive practice, however, need
not reach the level of common-law fraud to be actionable under
section 349." Stutman v. Chem. Bank, 731 N.E.2d 608, 612 (N.Y.
2000). Additionally, the plaintiffs need not show actual
reliance for a claim brought under § 349. Id.

     With respect to the fourth and fifth allegedly misleading
actions by the defendants enumerated above, the plaintiffs
plainly fail to allege any misleading conduct. Concerning the
fourth such action, the Complaint acknowledges that The
Huffington Post has openly been a "for-profit" enterprise from
its inception. (FAC ¶¶ 119, 123.) While the defendants
undoubtedly benefited from their transactions with the
plaintiffs, there is no indication that the plaintiffs should
not have or did not expect or intend as much. The Complaint
nowhere alleges that the plaintiffs thought The Huffington Post

was a non-profit venture; the plaintiffs at most complain that
they were unaware of just how much revenue the defendants could
or would generate.  Additionally, the plaintiffs knew that they
were not going to be compensated, and there was no materially
misleading statement as to that essential fact.  Rather, the
plaintiffs were explicitly made aware that they would receive
"exposure . . . in lieu of monies." (FAC ¶ 215.)  Finally, it
is unclear how The Huffington Post's presenting itself as a
"free forum or platform for ideas" is inconsistent with the fact
that The Huffington Post generated profit. (FAC ¶ 214.)  The
plaintiffs have thus failed to allege that the defendants
misrepresented the for-profit status of The Huffington Post in
any way.

    Likewise, the plaintiffs have alleged nothing misleading
concerning the defendants' alleged efforts to dissuade the
plaintiffs from creating and maintaining their own websites.  At
the outset, the Complaint states that the plaintiffs have
maintained and continue to maintain their own websites despite
any statements made by the defendants. (FAC ¶ 178.)  Indeed,
the Complaint notes that the plaintiffs posted the same content
on their own websites as they submitted to The Huffington Post.
(FAC ¶ 169.)  Statements that have virtually no effect cannot be
said to be material.  See Bildstein v. MasterCard Int'l, Inc.,
329 F. Supp. 2d 410, 413-14 (S.D.N.Y. 2004) (dismissing claim

because complaint failed to allege that disclosure would have
had any effect on the plaintiff).

The first three allegedly misleading actions more closely
approximate deception:  namely, that The Huffington Post keeps
data on how many views each page receives, and is thus aware of
the amount of "exposure" each piece generates and likewise the
revenue derived from each of the plaintiffs' submissions, but
told the plaintiffs that it did not have such information.  If
the defendants keep such data and told the plaintiffs otherwise,
such behavior was clearly misleading.

However, the question remains whether any allegedly
misleading conduct was material.  In this case, there is no
plausible claim that the practice of withholding page-view data
was materially misleading.  The Huffington Post made it clear
that it would not provide this information to the plaintiffs.
(FAC ¶ 204.)  Therefore, it did not matter whether the
defendants kept this information or not.

The agreement, such as it was, provided the plaintiffs an
unspecified amount of exposure, both in terms of the additional
attention a particular article would get on The Huffington Post
as compared to the plaintiffs' own websites, as well as the
plaintiffs' ability to claim that their posts were accepted and
published by a popular and selective organization.  See FAC ¶¶
124, 132, 135, 174, 215 (noting The Huffington Post's popularity

and selectivity in publishing articles).  The defendants never offered and the plaintiffs never expected any particular level of exposure.  Cf. Andre Strishak & Assocs., P.C. v. Hewlett Packard Co., 752 N.Y.S.2d 400, 403 (App. Div. 2002) (affirming dismissal of § 349 claim where printer packaging advertised that ink cartridges were included but did not specify the size of the included cartridges and therefore was not materially misleading in that respect).

Moreover, omissions are not deceptive if "a consumer could . . . reasonably obtain such information" from sources other than the defendants.  Pelman, 237 F. Supp. 2d at 529.  While the exact page-view data was unavailable to the plaintiffs, they likely could have inferred an approximate level of exposure both from The Huffington Post's growing popularity generally and from other article-specific indicators, such as the number of times an article was referenced or "liked" on social networking sites such as Twitter and Facebook, or the number of comments left by readers on each article on The Huffington Post website.  Such information was clearly available to all plaintiffs.  See FAC ¶¶ 23, 38, 52, 70, 87 (describing number of "tweets" and Facebook "likes" each of the plaintiffs' submissions received).  Plaintiff Secours, for example, was able to estimate that each article she submitted "generated between 500 and 700 page

views," presumably without the page-view data solely in the possession of The Huffington Post.  (FAC ¶¶ 35.)

Moreover, there is no question that all of the plaintiffs continued to contribute content despite the fact that they were told from the beginning that they would never be given page-view information.  (FAC ¶¶ 23, 38, 52, 70, 87, 204.)  At any time, the plaintiffs could have submitted their posts to other websites that provided such page-view data.  While the defendants arguably made a misstatement by suggesting that they lacked this information, there is no plausible allegation that the plaintiffs would have acted differently had the defendants instead stated that they had the information but did not intend to give it to the plaintiffs.  Because the issue of page-view data was plainly irrelevant to the plaintiffs' decision to continue posting, any alleged misrepresentations about such data cannot be said to be material.  See Bildstein, 329 F. Supp. 2d at 413.

The facts stated in the Complaint thus fail to demonstrate that the defendants engaged in any materially misleading conduct as required for claims brought under NYGBL § 349.  For the reasons explained above, the plaintiffs' claim for a violation of § 349 must be dismissed.

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the reasons explained above, the defendants' motion to dismiss is **granted** on both claims. The First Amended Class Action Complaint is therefore **dismissed with prejudice.**[5] The Clerk is directed to enter judgment, to close this case, and to close all pending motions.

SO ORDERED.

Dated:     New York, New York
           March 30, 2012

                                    John G. Koeltl
                           United States District Judge

---

[5] The plaintiffs filed an amended complaint after the first motion to dismiss was filed. Because the plaintiffs have failed to state a claim after two opportunities to do so, the Complaint is dismissed with prejudice. See Abu Dhabi Commercial Bank v. Morgan Stanley & Co., No. 08 Civ. 7508, 2009 WL 3346674, at *2 (S.D.N.Y. Oct. 15, 2009) ("[A] dismissal with prejudice is generally appropriate where a court puts a plaintiff on notice of a complaint's deficiencies and the plaintiff fails to correct those deficiencies after amendment.").